Vincent Indelicato
Timothy Q. Karcher
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, New York 10036
Telephone:  (212) 969-3000
Facsimile:  (212) 969-2900

Charles A. Dale
**PROSKAUER ROSE LLP**
One International Place
Boston, MA 02110
Telephone:  (617) 519-9600
Facsimile:  (617) 519-9899

Steve Y. Ma
**PROSKAUER ROSE LLP**
2029 Century Park East, Suite 2400
Los Angeles, CA 90067-3010
Telephone:  (310) 557-2900
Facsimile:  (310) 557-2193

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | **Chapter 11** |
| **KB US Holdings, Inc.,** *et al.*, | **Case No. 20-22962** |
| **Debtors.**[1] | **(Joint Administration Requested)** |

**DEBTORS' MOTION FOR ENTRY OF (I) ORDER (A) AUTHORIZING PERFORMANCE UNDER THE STALKING HORSE PURCHASE AGREEMENT, (B) APPROVING BIDDING PROCEDURES FOR THE SALE OF ASSETS, (C) SCHEDULING HEARINGS AND OBJECTION DEADLINES WITH RESPECT TO THE SALE, (D) SCHEDULING BID DEADLINE AND AN AUCTION, (E) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (F) APPROVING CONTRACT ASSUMPTION AND ASSIGNMENT PROCEDURES, AND (G) GRANTING RELATED RELIEF; AND (II) ORDER (A) AUTHORIZING THE SALE OF ASSETS FREE AND**

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: KB US Holdings, Inc. (1000), KB Holding, Inc. (3082), AG Kings Holdings Inc. (8681), AG Holdings II Inc. (3828), Kings Super Markets, Inc. (6769), Balducci's Holdings LLC (1913), Balducci's Connecticut LLC (1945), Balducci's Maryland LLC (1926), Balducci's Virginia LLC (1949), and Balducci's New York LLC (1934).  The location of the Debtors' corporate headquarters is 700 Lanidex Plaza Parsippany, NJ 07054.

**CLEAR, (B) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

KB US Holdings, Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**") respectfully represent as follows in support of this motion (the "**Motion**").

**Preliminary Statement**

1.      The Debtors commenced these chapter 11 cases with the goal of facilitating a sale (the "**Sale**") of substantially all of the assets of the Debtors (the "**Assets**") pursuant to section 363 of title 11 of the United States Code (the "**Bankruptcy Code**").  To effectuate the Sale as efficiently as practicable, the Debtors seek to establish Court-approved bidding procedures for the sale of all, substantially all, or any combination of the Assets.

2.      In addition to maximizing the value of the Debtors' estates for the benefit of their creditors and other stakeholders, the proposed Sale will preserve thousands of jobs and allow the Debtors to continue to provide essential goods to the communities they serve during the COVID-19 pandemic.  Following an extensive prepetition marketing process and negotiations with numerous potential bidders, the Debtors entered into the Stalking Horse Purchase Agreement (as defined herein) on July 13, 2020.  The Stalking Horse Purchase Agreement provides for the sale of, among other things, thirty (30) of the Debtors' stores, for an aggregate purchase price of approximately $75 million.  The Stalking Horse Purchase Agreement required the Stalking Horse Bidder to negotiate with the Unions prepetition, in consultation with the Debtors, to seek a consensual agreement on the terms of employment with affected unionized employees.  The Stalking Horse Bid is subject to higher or otherwise better offers in accordance with the Bidding

Procedures (defined below).  The Debtors continue to engage with other interested parties as part of the sale process.

3.    To facilitate the sale, as is set forth in the DIP Motion filed contemporaneously herewith, the Debtors have agreed to various case milestones that will allow for an efficient Sale process.  Specifically, the milestones provide that (a) by September 15, 2020, this Court enter the Bidding Procedures Order; (c) by October 8, 2020, the Debtors conduct the Auction; and (d) by October 22, 2020, this Court approve the Sale contemplated by this Motion. As is set forth herein, given the extensive prepetition marketing process that the Debtors have already undertaken, the Debtors submit that this sale timeline is reasonable and appropriate.

4.    To effectuate the Sale, the Debtors submit this Motion respectfully requesting that the Court (a) authorize the Debtors to enter into the Stalking Horse Purchase Agreement; (b) approve the Bidding Procedures (as defined herein) for the sale of the Assets; (c) set dates and deadlines in connection therewith (including a bid deadline, the date of an auction, and hearing dates and objection deadlines relating to the Sale); (d) approve the form and manner of notice of each of the foregoing; (e) approve procedures for the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale; and (f) grant the Debtors any related relief.  In addition, the Debtors request that the Court (x) authorize the Sale of the Assets free and clear of all liens, claims, interests, and encumbrances; (y) approve the assumption and assignment of the Assigned Contracts (as defined herein) in connection with the Sale; and (z) grant the Debtors any related relief.

5.    The Debtors believe that this Sale process for the Assets will serve as a cornerstone of their restructuring and maximize the ultimate value realized by their stakeholders. The Bidding Procedures were designed with the objective of generating the greatest level of

interest in and best offer for the Assets while affording the Debtors maximum flexibility to execute

a sale of the Assets as efficiently as possible. Moreover, the Debtors believe that the establishment

of the Bidding Procedures, entry into the Stalking Horse Purchase Agreement, and the related relief

requested in this Motion will facilitate the Sale of the Assets for the highest or otherwise best

value, and are in the best interests of the Debtors' estates and their stakeholders. Accordingly, the

Debtors respectfully request that the Court grant this Motion.

### **Background**

6.      On the date hereof (the "**Commencement Date**"), the Debtors each

commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code

(the "**Bankruptcy Code**"). The Debtors are authorized to continue to operate their businesses and

manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code. No trustee, examiner, or statutory committee of creditors has been appointed

in these chapter 11 cases.

7.      Contemporaneously herewith, the Debtors have filed a motion requesting

joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of

Bankruptcy Procedure (the "**Bankruptcy Rules**").

8.      Additional information regarding the Debtors' businesses, capital structure,

and the circumstances leading to the commencement of these chapter 11 cases is set forth in the

*Declaration of M. Benjamin Jones Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the*

*Southern District of New York,* sworn to on the date hereof (the "**Jones Declaration**") and the

*Declaration of Scott Moses in Support of Debtors' Motion for Entry of (I) Order (A) Authorizing*

*Performance Under the Stalking Horse Purchase Agreement, (B) Approving Bidding Procedures*

*for the Sale of Assets, (C) Scheduling Hearings and Objection Deadlines with Respect to the Sale,*

4

*(D) Scheduling Bid Deadline and an Auction, (E) Approving the Form and Manner of Notice Thereof, (F) Approving Contract Assumption and Assignment Procedures, and (G) Granting Related Relief; and (II) Order (A) Authorizing the Sale of Assets Free and Clear, (B) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* (the "**Moses Declaration**"), which have been filed with the Court contemporaneously herewith and is incorporated by reference herein.

### Jurisdiction and Venue

9.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2010 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. § 1408 and 1409.

### Relief Requested

10.     The Debtors hereby seek entry of an order (the "**Bidding Procedures Order**")[2] substantially in the form attached hereto as **Exhibit A**,

    a.  authorizing the Debtors to perform under that certain Asset Purchase Agreement attached hereto as **Exhibit C** (the "**Stalking Horse Purchase Agreement**");

    b.  approving the proposed bidding procedures attached as **Exhibit 1** to the Bidding Procedures Order (the "**Bidding Procedures**") in connection with the sale of all, substantially all, or any combination of the Assets free and clear of all claims, liens, and encumbrances;

    c.  scheduling (i) an auction in connection with the Sale (the "**Auction**"), (ii) a hearing in connection with approval of the Sale (the "**Sale Hearing**"), and (iii) objection deadlines in connection with the Sale (collectively, the "**Sale Schedule**");

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Bidding Procedures Order, the Bidding Procedures, the Moses Declaration, and/or the Jones Declaration, as applicable.

d.  approving the form and manner of notice of the Auction and Sale Hearing, attached to the Bidding Procedures Order as **Exhibit 2** (the "**Sale Notice**");

e.  approving procedures (the "**Assignment Procedures**") for the assumption and assignment of certain executory contracts and unexpired leases in connection with the sale (collectively, the "**Assigned Contracts**"), and approving the form and manner of notice thereof, attached to the Bidding Procedures Order as **Exhibit 3** (the "**Cure Notice**"); and

f.  granting the Debtors any related relief, and

an order (the "**Sale Order**")[3] substantially in the form attached hereto as **Exhibit B** authorizing and approving:

a.  the sale of the Assets free and clear of all liens, claims, interests, and encumbrances, except certain permitted encumbrances as determined by the Debtors and any purchaser of the Assets;

b.  the assumption and assignment of the Assigned Contracts in connection with the Sale; and

c.  granting related relief.

### The Stalking Horse Purchase Agreement

11.     On July 13, 2020, the Debtors entered into the Stalking Horse Purchase Agreement with TLI Bedrock LLC (the "**Stalking Horse Bidder**," and its bid the "**Stalking Horse Bid**"). The Stalking Horse Purchase Agreement represents a bid for the majority of the Debtors' stores, and substantially all assets related to such stores, for consideration of (a) cash in the amount of $75 million, subject to certain adjustments under the Stalking Horse Purchase Agreement and (b) the Stalking Horse Bidder's assumption of certain liabilities under the Stalking Horse Purchase Agreement.

---

[3] A proposed form of Sale Order is attached hereto as **Exhibit B**. The Debtors will file a revised proposed Sale Order prior to the Sale Hearing.

12.     By this Motion, the Debtors request authority to provide the Stalking Horse Bidder with standard Stalking Horse Bid Protections.  Specifically, the Stalking Horse Purchase Agreement provides for (i) the payment of a break-up fee of $2,625,000 (the "**Termination Fee**"), (ii) the reimbursement of reasonable and documented expenses up to $550,000 (the "**Expense Reimbursement**") in the event the Stalking Horse Bid is not selected as the winning bid. Furthermore, the Stalking Horse Purchase Agreement provides for the reimbursement of reasonable and documented expenses up to $750,000 (the "**Negotiated Expense Amount**" and together with the Termination Fee and Expense Reimbursement, the "**Stalking Horse Bid Protections**") if the Stalking Horse Purchase Agreement is terminated in the event the Sale Order does not include certain findings of fact and conclusions of law related to the Stalking Horse Bidder's liability for union agreements and pension plans.  The Bidding Procedures also establish that if the Stalking Horse Bidder bids at the Auction, it will be entitled to a credit in the amount of the Termination Fee and Expense Reimbursement against the increased purchase price for the Assets.

13.     In the event it is not the winning bidder at the Auction, the Stalking Horse Bidder has agreed to act as a "Back-up Bidder" and, as such, hold open its binding offer to purchase the Assets for twenty (20) days after the entry of the Sale Order in case the winning bid is not consummated.

14.     The Stalking Horse Purchase Agreement includes various customary representations, warranties, and covenants by the Debtors and the Stalking Horse Bidder, as well as certain conditions to closing the contemplated Sale and rights of termination.  The transactions contemplated by the Stalking Horse Purchase Agreement are subject to approval by the Court and entry of the Bidding Procedures Order and the Sale Order.

15.     The following chart describes certain material terms of the Stalking Horse

Purchase Agreement:[4]

| Term | Summary Description |
|------|---------------------|
| Purchase Price | $75 million |
| Bid Protections | Termination Fee: $2,625,000<br><br>Expense Reimbursement: not to exceed $550,000<br><br>In the alternative, and only in the event that the Sale Order approving a Sale to the Stalking Horse Bidder does not contain findings of fact and conclusions of law that none of the Stalking Horse Bidder, its designee, or the Acquired Assets shall have assumed or shall have liability for the Union Agreements relating to the termination of any contribution to or other obligations with respect to any Multiemployer Pension Plan, except pursuant to Modified Labor Agreements, Negotiated Expense Amount: not to exceed $750,000 |
| Acquired Assets | The Stalking Horse Bidder will acquire substantially all of the Debtors' right, title, and interest in those assets related to the Stores to be acquired by the Stalking Horse Bidder, which Stores are set forth in Schedule 2.01 to the Stalking Horse Purchase Agreement.  Such assets include, among other things, Inventory, Furnishings, Assumed Leases, Assumed Contracts, Permits and Liquor Licenses, Owned Intellectual Property, causes of action, Insured Welfare Benefit Plans, proceeds of insurance policies, and all other properties, assets, and rights owned by the Debtors which are used in the Business and are not otherwise Excluded Assets. |
| Excluded Assets | The Acquired Assets will not include, among other things, tax refunds, Permits not part of the Acquired Assets, insurance policies, rights under any Contract related to any Excluded Asset and all Contracts other than Assumed Contract, all Union Agreements (excluding the Modified Labor Agreements), bank accounts, Cash and Cash Equivalents, and those assets set forth on Schedule 2.02(m) under the heading "Excluded Assets." |
| Assumed Liabilities | The Stalking Horse Bidder will pay, as and when due, all of the following liabilities of the Debtors: all liabilities arising from ownership, possession, or sue of the Acquired Assets from and after the Closing Date; liabilities under the Assumed Contracts arising from and after the |

---

[4]  The following summary is provided for convenience purposes only.  To the extent any of the terms described below are inconsistent with the Stalking Horse Purchase Agreement, the Stalking Horse Purchase Agreement controls in all respects.

| Term | Summary Description |
|---|---|
| | Closing Date; all Cure Costs and Permitted Overage Costs up to the Cure Cost Cap; all Modified Labor Agreements; and Transfer Taxes. |
| Excluded Liabilities | The Assumed Liabilities will not include: liabilities not relating to or arising out of the Business or the Acquired Assets; Taxes, except as otherwise provided or constituting Cure Costs less than the Cure Cap; indebtedness for borrowed money; liabilities with respect to Union Agreements for any action or inaction of Seller occurring prior to the Closing Date; liabilities with respect to employees; liabilities relating to Liquor Licenses arising prior to the Closing Date; liabilities arising under any Benefit Plan not assumed by the Stalking Horse Bidder. |
| Sale of Assets Free and Clear | On the closing date, the Assets will be transferred to the Stalking Horse Bidder, free and clear of all liens, claims, and encumbrances, with all customary protections afforded to a buyer under Bankruptcy Code section 363. |
| Closing Conditions | The Stalking Horse Purchase Agreement contains closing conditions as are customary for transactions similar to the Sale and for a company similar to the Debtors, including:<br>• The Court shall have entered the Sale Order, the Assignment Order, and any related order, authorization, consent, or approval.<br>• If and only if the Sale Order is subject to a Labor Appeal, the Sale Order shall have become a Final Order.<br>• The parties' representations and warranties must be true and correct, subject to a "material adverse effect" threshold.<br>• The parties' performance in all material respects of all obligations required to be performed at or prior to closing.<br>• Delivery of all deliveries required to be made at closing. |
| Termination Events | The Stalking Horse Purchase Agreement may be terminated at any time prior to the closing only by:<br>• Mutual written consent<br>• By either the Debtors or the Stalking Horse Bidder if closing has not occurred by the Termination Date, as may be extended pursuant to the Stalking Horse Purchase Agreement.<br>• By either the Debtors or the Stalking Horse Bidder if any applicable law permanently prohibits the consummation of the Sale.<br>• By either the Debtors or the Stalking Horse Bidder upon the other party's breach or failure to perform its representations, warranties, or covenants which gives rise to the failure of that party's closing conditions that cannot be cured prior to the earlier of (i) two business days prior to the Termination Date and (ii) the date that is 30 days after the nonbreaching party receives written notice specifying the nature of such breach; provided that each |

| Term | Summary Description |
|------|---------------------|
| | party shall not terminate the Agreement if it is in breach and such breach gives rise to the failure of any of the other party's conditions to closing.<br>• By the Debtors if the Stalking Horse Bidder fails to complete the Closing.<br>• By the Stalking Horse Bidder if the Sale Order does not provide that it has not assumed any liability for the Union Agreements or any liability relating to any Multiemployer Pension Plan, except pursuant to the Modified Labor Agreements.<br>• By either the Debtors or the Stalking Horse Bidder if (i) the Debtors enter into a definitive agreement with respect to a Competing Bid and the Court enters an order approving that bid; or (ii) the Court enters an order that precludes consummation of the Sale, subject to the Stalking Horse Bidder's Termination Fee. |

16.      The Stalking Horse Purchase Agreement is designed to incentivize potential bidders and thereby maximize the potential value of the Assets for the benefit of the Debtors' estates and their various stakeholders.  The Debtors request approval and authorization of the Stalking Horse Purchase Agreement, subject only to higher or otherwise better offers made in accordance with the Bidding Procedures.

## The Bidding Procedures

### I.      Overview

17.      The proposed Bidding Procedures are designed to permit a fair, efficient, competitive, and value-maximizing sale process for the Assets, consistent with the timeline of these chapter 11 cases, to confirm that the Stalking Horse Bid is the best offer, or promptly identify an alternative bid that is higher or otherwise better.  The Bidding Procedures describe, among other things, procedures for parties to access due diligence, the manner in which bidders and bids become "qualified," the conduct of the Auction (if any), the selection and approval of the ultimately successful bid, and deadlines with respect to the sale process.  If approved, the Bidding

Procedures will allow the Debtors to solicit and identify bids from potential buyers on a schedule

consistent with the Milestones, the deadlines under the Stalking Horse Purchase Agreement, and

the Debtors' overall chapter 11 strategy.

18.    The Bidding Procedures will provide potential bidders with sufficient notice

and time to conduct due diligence to submit binding bids in advance of the Bid Deadline.  Indeed,

the Debtors and their advisors have already engaged in a comprehensive marketing process for the

Assets, which involved providing several parties with the diligence necessary to make an offer.  In

creating the Bidding Procedures, the Debtors seek to balance their interests in consummating the

Sale on a timeline that ensures the Stalking Horse Bidder's willingness to provide a baseline offer

while at the same time preserving the opportunity to attract a higher or otherwise better offer.  The

Bidding Procedures are designed to encourage all prospective bidders to put their best bid forward.

19.    Because the Bidding Procedures are attached as **Exhibit 1** to the proposed

Bidding Procedures Order, they are not restated fully herein.  Generally speaking, however, the

Bidding Procedures establish, among other things:[5]

- the Debtors will serve the Bidding Procedures Order (setting forth the Sale Schedule), Bidding Procedures, and Sale Notice on all relevant notice parties as soon as practicable after entry of the Bidding Procedures Order;

- the availability of, access to, and conduct during due diligence by "Potential Bidders;"

- the deadlines and requirements for submitting competing bids and the method and criteria by which such competing bids are deemed to be "Qualified Bids" sufficient to trigger the Auction and participate in the Auction;

- the manner in which Qualified Bids will be evaluated by the Debtors to determine the starting bid for the Auction;

- the conditions for having the Auction and procedures for conducting the Auction, if

---

[5]  The following summary is provided for convenience purposes only.  To the extent any of the terms described below are inconsistent with the Bidding Procedures, the Bidding Procedures control in all respects.

any; and

- various other matters relating to the Sale process generally, including the designation of the Back-Up Bid (as defined in the Bidding Procedures), return of any good faith deposits, and certain reservations of rights.

Importantly, the Bidding Procedures recognize and comply with the Debtors' fiduciary obligations to maximize sale value, and, as such, do not impair the Debtors' ability to consider all Qualified Bids made at or prior to the Auction, and, as noted, preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for the Debtors' estates.

## II.    Proposed Sale Schedule

20.    Subject to the Court's availability and approval, the key dates and deadlines the Debtors seek to establish pursuant to the Bidding Procedures Order are as follows, provided that the Debtors may amend the Sale Schedule, in consultation with the Consultation Parties,[6] from time to time, as necessary:

a. **Bid Deadline:  October 2, 2020, at 4:00 p.m. (prevailing Eastern Time)** is the deadline by which all Qualified Bids must be **actually received** by the parties specified in the Bidding Procedures (the "**Bid Deadline**").

b. **Auction:**  The Auction, if necessary, will be held on **October 8, 2020, at 10:00 a.m. (prevailing Eastern Time)** at the offices of counsel to the Debtors, Proskauer Rose LLP, Eleven Times Square, New York, New York, 10036, or at such other venue (or by such other medium) as may be agreed to by the Debtors, the Consultation Parties, and the United States Trustee.  If there is no Auction, the Sale Hearing to approve the Sale to the Stalking Horse Bidder will be held on **October 8, 2020, at 10:00 a.m. (prevailing Eastern Time)**.

---

[6] "**Consultation Parties**" means the following parties: (a) the DIP Lenders (as defined in the DIP Motion filed contemporaneously herewith and their counsel and financial advisors; (b) the Lenders under, and as defined in, the [Prepetition Credit Agreement] (the "**Prepetition Secured Lenders**") and their counsel and financial advisors; (c) counsel and financial advisors to any official committee of unsecured creditors appointed in the Debtors' chapter 11 cases (the "**Committee**"); and (d) the Unions and their counsel and financial advisors. Notwithstanding the foregoing, a party shall not be a Consultation Party if such party is a bidder at the Auction; *provided, however,* if any such Consultation Party notifies the Debtors in writing that it irrevocably forfeits its rights to be a bidder, the foregoing restriction shall no longer apply with respect to such Consultation Party upon the Debtors' receipt of such notice.

c. **Notice of Auction Results:** The Debtors shall file with the Court and serve on the appropriate notice parties the Notice of Auction Results within **two (2) days of the conclusion of the Auction**.

d. **Objection Deadlines:**

- The deadline by which all objections to the Sale must be filed with the Court and served so as to be **actually received** by the appropriate notice parties (the "**Sale Objection Deadline**") is **October 2, 2020, at 4:00 p.m. (prevailing Eastern Time)**.

- The deadline by which responses to objections to the Sale must be filed is **October 6, 2020, at 4:00 p.m. (prevailing Eastern Time)**. Following the Auction, the Court will entertain objections to the Successful Bid, *provided* that such objections are specific to the Successful Bid and could not have been raised in connection with the Stalking Horse Bid. Any timely objections to the Successful Bid must be filed with the Court and served so as to be **actually received** by the appropriate notice parties by **seven (7) days after service of the Notice of Auction Results or Supplemental Cure Notice, as applicable**.

e. **Sale Hearing:** The hearing approving the Sale to the Successful Bidder, if the Auction is held, shall take place before the Court on **October 18, 2020 at 10:00 a.m. (prevailing Eastern Time)**.

Upon entry of the Order, the Debtors will notify parties of these dates.

21.    The proposed Sale Schedule set forth in the Bidding Procedures is reasonable. Under the proposed timeline, there will be 40 days between the filing of this Motion and the Sale Objection Deadline and the deadline for the submission of bids. This period will provide parties with sufficient time to formulate bids to purchase the Assets. The Debtors' business has already been extensively marketed, and information regarding the Assets has been made available in an electronic data room during the process. As such, many parties that may have an interest in bidding at the Auction likely have already evaluated the Assets. In addition, potential bidders who have not previously conducted diligence on the Debtors' business will have immediate access to, subject to the execution of an appropriate nondisclosure agreement, a substantial body of information regarding the Assets.

### III.    Notice of Auction

22.    On or within two (2) business days after entry of the Bidding Procedures Order, the Debtors will cause the Sale Notice, substantially in the form attached as **Exhibit 2** to the Bidding Procedures Order, to be served on the following parties or their respective counsel, if known, the entities on the Master Service List, the Sale Notice Parties,[7] and any party that has requested notice pursuant to Bankruptcy Rule 2002

23.    In addition, within seven (7) business days of entry of the Order, the Debtors will publish the Sale Notice, with any modifications necessary for ease of publication, once in *USA Today (National Edition)* and once in *The New York Times*, to provide notice to any other potentially interested parties.

24.    If no Qualified Bid other than the Stalking Horse Bid is received by the Bid Deadline, the Debtors will not conduct the Auction, and will file with the Court, and serve on the appropriate notice parties, a notice (i) indicating the Auction has been cancelled, (ii) designating the Stalking Horse Bid as the Successful Bid, and (iii) setting forth the date and time of the Sale

---

[7] **"Sale Notice Parties"** means the following parties: (a) counsel to the Stalking Horse Bidder; (b) the Consultation Parties; (c) the Prepetition Collateral Agent; (d) all persons and entities, known by the Debtors and their advisors, to have expressed an interest in a transaction with respect to any of the Debtors' Assets during the past twelve (12) months; (e) all persons and entities known by the Debtors to have any lien, claim, encumbrance, or other interest in any Asset (for whom identifying information and addresses are available to the Debtors) or who have filed requests for service with the Bankruptcy Court; (f) all Counterparties to Proposed Assigned Contracts; (g) any governmental authority known to have a claim in these chapter 11 cases; (h) the United States Attorney for the Southern District of New York; (i) the Office of the Attorney General in each state which the Debtors operate; (j) the Office of the Secretary of State in each state in which the Debtors operate or are organized; (k) any and all multiemployer plans (including each multiemployer pension plan) to which any of the Debtors is, or within the past five (5) years has been, a contributing employer, and any single employer defined benefit plans to which any Debtor is or has been a contributing sponsor; (l) every labor organization with which any of the Debtors has, or within the past five (5) years has had, a collective bargaining agreement or similar agreement or arrangement; (m) the Federal Trade Commission; (n) the United States Attorney General/Antitrust Division of Department of Justice; (o) all of the Debtors' known creditors (for whom identifying information and addresses are available to the Debtors); (p) all applicable local environmental enforcement agencies; (q) the United States Environmental Protection Agency (r) the Pension Benefit Guaranty Corporation; and (s) all other persons directed by the Court (for whom identifying information and addresses are available to the Debtors).

Hearing. If the Auction is held, the Debtors will file with the Court and serve on the appropriate notice parties the Notice of Auction Results, which shall (i) identify the Successful Bid and Back-Up Bid, (ii) list all proposed Assumed Contracts in the Successful Bid and Back-Up Bid, (iii) identify any known proposed assignees of Proposed Assigned Contracts (if different from the Successful Bidder), and (iv) set forth the deadline and procedures for the filing of objections to the Successful Bid.

25.     The Debtors submit that these noticing procedures are reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including the date, time, and place of the Auction (if one is held) and the Bidding Procedures and Sale Schedule. In addition, these noticing procedures will provide interested parties with timely and proper notice of the Sale Hearing. Accordingly, the Debtors request that the form and manner of the Sale Notice be approved and that the Court determine that no other or further notice of the Sale Schedule is required.

## The Assignment Procedures

26.     The Assignment Procedures set forth in the Bidding Procedures Order contemplate that certain executory contracts may be assumed and assigned to the ultimate purchaser of the Assets (the "**Buyer**"), and that the Buyer will be responsible for all related cure costs.[8] The Debtors propose the Assignment Procedures set forth below for notifying the counterparties to all executory contracts and unexpired leases (the "**Contract Counterparties**") of proposed cure amounts in the event such contracts or leases are assumed and assigned in connection with the Sale. Specifically, the Assignment Procedures are as follows:

---

[8] Pursuant to the Stalking Horse Purchase Agreement, the payment of the cure costs by the Stalking Horse Bidder is subject to the Cure Cost Cap.

a. **Cure Notice.**  On or before September 18, 2020,  the Debtors shall file with the Court and serve via first class mail, electronic mail, or overnight delivery, the Cure Notice attached as **Exhibit 3** to the Bidding Procedures Order on all Contract Counterparties, and post the Cure Notice to the Case Website (https://cases.primeclerk.com/kb).

b. **Content of Cure Notice.**  The Cure Notice shall notify the applicable Contract Counterparties that the Proposed Assigned Contracts may be subject to assumption and assignment in connection with a proposed sale transaction, and contain the following information: (i) a list of the contracts or leases that could potentially be assumed and assigned, and identify the Assumed Contracts (as such term is defined in the Stalking Horse Purchase Agreement) designated by the Stalking Horse Bidder for assumption and assignment to the Stalking Horse Bidder (an "**Assigned Contracts Schedule**"); (ii) the applicable Contract Counterparties; (iii) the Debtors' good faith estimates of the cure amount due and/or that could have been sought under the Section 365 of the Bankruptcy Code under such Proposed Assigned Contracts (the "**Cure Costs**"); and (iv) the deadline by which any Contract Counterparty may file an objection to the proposed assumption, assignment, cure, and/or adequate assurance and the procedures relating thereto; *provided* that service of a Cure Notice does not constitute an admission that such Proposed Assigned Contract is an executory contract or unexpired lease or that such Proposed Assigned Contract will be assumed at any point by the Debtors or assumed and assigned pursuant to any Successful Bid.  The Cure Notice shall also provide that Cure Costs in the Cure Notice shall be binding on any party to a Proposed Assigned Contract for any amounts due or that could have been sought as Cure Costs.

c. **Service of Cure Notice.**  The Debtors shall serve the Cure Notice on all Contract Counterparties, via first class mail or electronic mail, which will include: (a) information necessary and appropriate to provide notice of the relevant proposed assumption and assignment of Assigned Contracts and rights thereunder and (b) Cure Costs, if any.  The Debtors shall serve the Cure Notice on the notice parties, via first class mail or electronic mail.  Service as set forth herein shall be deemed proper, due, timely, good, and sufficient notice and no other or further notice is necessary.

d. **Objections.**  Objections, if any, to a Cure Notice must (an "**Assigned Contract Objection**"): (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Costs, state the cure amount alleged to be owed to

the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Court and served so as to be **actually received** by the Objection Notice Parties prior to **October 2, 2020, at 4:00 p.m. (prevailing Eastern Time)** (the "**Cure Objection Deadline**"); *provided* that the Debtors, subject to consultation with the Consultation Parties, may modify the Cure Objection Deadline by filing a notice of such modification on the Court's docket.

e. **Effects of Filing an Objection to a Cure Notice.** A properly filed and served objection to a Cure Notice will reserve such objecting party's rights against the Debtors only with respect to the assumption and assignment of the Proposed Assigned Contract at issue, and/or objection to the accompanying Cure Costs, as set forth in the objection, but will not constitute an objection to the remaining relief requested in the Sale to the Successful Bidder. To the extent a party to a Proposed Assigned Contract does not timely object to the Cure Notice, such party shall be bound by the amount of Cure Costs in the Cure Notice and such party shall be barred from seeking any amounts due or that could have been sought as Cure Costs.

f. **Dispute Resolution.** Any objection to the proposed assumption and assignment of Proposed Assigned Contract, or Cure Costs, that remains unresolved as of the Sale Hearing, shall be heard at the Sale Hearing (or at such later date as may be fixed by the Court). Upon entry of an order by the Court resolving such Assigned Contract Objection, the assignment, if approved by the Court, shall be deemed effective as of the later of either (i) the date such Contract Counterparty receives the Cure Notice, or (ii) the effective date of the Sale. To the extent that any Assigned Contract Objection cannot be resolved by the parties, such Proposed Assigned Contract shall be assumed and assigned only upon satisfactory resolution of the Assigned Contract Objection, to be determined in the Successful Bidder's reasonable discretion. To the extent an Assigned Contract Objection remains unresolved, the Proposed Assigned Contract may be conditionally assumed and assigned, subject to the consent of the Successful Bidder, pending a resolution of the Assigned Contract Objection after notice and a hearing. If an Assigned Contract Objection is not satisfactorily resolved, the Successful Bidder may determine that such Proposed Assigned Contract should be rejected and not assigned, in which case the Successful Bidder will not be responsible for any Cure Costs in respect of such contract.

g. **Supplemental Cure Notice.** The Debtors reserve the right, with the consent of the Successful Bidder and subject to consultation with the Consultation Parties, at any time after the service of the Cure Notice, to: (a) supplement the Assigned Contract Schedule attached to the Cure

17

Notice with previously omitted Proposed Assigned Contract in accordance with the definitive agreement for a Sale; (b) remove any Contract or Lease from the list of executory contracts and unexpired leases ultimately selected as Proposed Assigned Contract that a Successful Bidder proposes be assumed and assigned to it in connection with a Sale or add to such list; and/or (c) modify the previously stated Cure Costs associated with any Proposed Assigned Contract (a "**Supplemental Assigned Contracts Schedule**"). In the event that the Debtors exercise any of the rights reserved above, the Debtors will promptly provide the Consultation Parties with notice and an opportunity to object to any such actions, and thereafter will serve a "**Supplemental Cure Notice**" by electronic mail, hand delivery, or overnight mail on the applicable Contract Counterparty, and its attorney, if known, to each impacted Proposed Assigned Contract at the last known address available to the Debtors. Each Supplemental Cure Notice will include the same information with respect to listed Proposed Assigned Contract as was included in the Cure Notice. Any Proposed Assigned Contract Counterparty listed on a Supplemental Cure Notice may file a "**Supplemental Assigned Contract Objection**" only if such objection is to the proposed assumption and assignment of the applicable Proposed Assigned Contract or the proposed Cure Costs, if any. All Supplemental Assigned Contract Objections must: (a) state with specificity the legal and factual basis thereof as well as what Cure Costs the objecting party believes are required, if any; (b) include appropriate documentation in support of the objection; and (c) be filed and served on the Objection Notice Parties no later than 4:00 p.m. (prevailing Eastern Time) on the date that is the later of (i) the Sale Objection Deadline and (ii) seven (7) days from the date of service of such Supplemental Cure Notice, or less to the extent necessary, but in each case no less than three (3) days before the Sale Hearing, which date will be set forth in the Supplemental Cure Notice (the "**Supplemental Assigned Contract Objection Deadline**").

h.  **<u>Supplemental Hearing.</u>**  If a Contract Counterparty files a Supplemental Assigned Contract Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute, the Debtors will seek a "**Supplemental Assigned Contract Hearing**" to determine the Cure Costs, if any, and approve the assumption of the relevant Proposed Assigned Contracts. If there is no such objection, then the Debtors will obtain entry of an order, including by filing a certification of no objection, fixing the Cure Costs and approving the assumption of any Proposed Assigned Contract listed on a Supplemental Cure Notice.

27.    For the avoidance of doubt, the inclusion of an Assigned Contract on the

Assigned Contracts Schedule or Supplemental Assigned Contracts Schedule shall not obligate the

Debtors to assume any such Assigned Contract or obligate the Successful Bidder to take

assignment of any such Assigned Contract.  The Successful Bidder shall determine whether to take

assignment of any Assigned Contracts pursuant to the terms of an asset purchase agreement, as

applicable.

### Extraordinary Provisions Under Local Guidelines

28.    Collectively, the Bidding Procedures and the Stalking Horse Purchase

Agreement contain the following provisions, which must be separately disclosed pursuant to the

Amended Guidelines for the Conduct of Asset Sales, adopted by General Order M-331:

   a.  Use of Proceeds.    Other than payment of the Stalking Horse Bid
       Protections to the Stalking Horse Bidder from the proceeds of a sale to
       a competing bidder, the Bidding Procedures and Stalking Horse
       Purchase Agreement do not allocate the proceeds of the Sale.

   b.  Record Retention.  The Stalking Horse Purchase Agreement provides
       that the Stalking Horse Bidder will acquire the Debtors' books and
       records related to the Business, other than books and records related to
       Excluded Liabilities.  The Stalking Horse Purchase Agreement grants
       the Debtors reasonable access to such records, and the Debtors will be
       able to administer their bankruptcy cases notwithstanding such sale.

   c.  Avoidance Actions.  The Stalking Horse Purchase Agreement provides
       that the Stalking Horse Bidder will acquire avoidance actions solely to
       the extent arising from the Owned Intellectual Property, Assumed
       Contracts, or otherwise related to the Acquired Assets or the Assumed
       Liabilities.  This sale of avoidance actions was negotiated at arm's
       length between the Debtors and the Stalking Horse Bidder, is a sound
       exercise of the Debtors' business judgment, and is in the best interests
       of the Debtors' estates.

   d.  Requested Findings as to Successor Liability.  The Stalking Horse
       Purchase Agreement requires that the Sale Order contain findings of fact
       and conclusions of law limiting the Stalking Horse Bidder's successor
       liability.

e.   <u>Relief from Bankruptcy Rule 6004(h)</u>.  The Debtors seek relief from the
fourteen (14) day stay imposed by Bankruptcy Rules 6004(h) and
6006(d).

**Basis for Relief**

I.   **The Bidding Procedures are Fair and Reasonable, Designed to Maximize the Value
Received for the Assets, and are Consistent with the Debtors' Reasonable Business
Judgment.**

29.   The Bidding Procedures are designed to promote the paramount goal of any

proposed sale of property of a debtor's estate: maximizing the value of sale proceeds received by

the estate.  *See In re Integrated Res., Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures

and bid protections "are important tools to encourage bidding and to maximize the value of the

debtor's assets"), *appeal dismissed* 3 F. 3d 49 (2d Cir. 1993); *see also In re Metaldyne Corp.*, 409

B.R. 661, 670 (Bankr. S.D.N.Y. 2009) ("[b]idder protections are granted when a bidder provides

a floor for bidding by expending resources to conduct due diligence and allowing its bid to be

shopped around for a higher offer").  Courts uniformly recognize that procedures established for

the purpose of enhancing competitive bidding are consistent with the fundamental goal of

maximizing value of a debtor's estate.  *See Integrated Res.*, 147 B.R. at 659 (observing that sale

procedures "encourage bidding" and "maximize the value of the debtor's assets").

30.   The Bidding Procedures provide for an orderly, uniform, and competitive

process through which interested parties may submit offers to purchase the Debtors' Assets.  The

Debtors have carefully evaluated a number of factors in designing a process that they believe will

maximize the value of their estates, produce maximum recoveries, and result in a successful

restructuring of their estates.  This process includes both entry into the Stalking Horse Purchase

Agreement and approval of the Bidding Procedures, which are designed to promote active bidding

from seriously interested parties and to elicit the highest or otherwise best offers available for the

Assets. The Debtors are confident that the Bidding Procedures will allow the Debtors to solicit additional offers and conduct the Sale in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best bid for the Assets and who can demonstrate the ability to take on the Assets, obligations, and liabilities being transferred. In particular, the Bidding Procedures contemplate an open auction process with minimum barriers to entry and provide potential bidders with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

31.    In addition, the Bidding Procedures provide the Debtors with an opportunity to consider competing bids and select the highest or otherwise best offers for the completion of the Sale. As such, creditors of the Debtors' estates can be assured that the consideration obtained will be fair and reasonable, as well as at or above market.

32.    Moreover, an orderly and expeditious sale process is critical to preserve and realize the Debtors' going concern value and maximize recoveries for the Debtors' stakeholders. In formulating the Bidding Procedures, the Debtors balanced the need to provide adequate and appropriate notice to parties in interest and potential bidders with the need to quickly and efficiently run a sale process.

33.    Courts in this and other districts have approved procedures substantially similar to the proposed Bidding Procedures. *See, e.g.*, *In re Fairway Group Holdings Corp.*, Case No. 20-10161 (JLG) (Bankr. S.D.N.Y. Feb. 21, 2020); *In re Fusion Connect, Inc.*, Case No. 19-11811 (SMB) (Bankr. S.D.N.Y. July 3, 2019) (ECF No. 164); *In re Ditech Holding Corp.,* Case No. 19-10412 (JLG) (Bankr. S.D.N.Y. Apr. 23, 2019) (ECF No. 456); *In re Waypoint Leasing Holdings Ltd.*, Case No. 18-13648 (SMB) (Bankr. S.D.N.Y. Dec. 21, 2018) (ECF No. 159); *In re Sears Holdings Corp.*, Case No. 18-23538 (RDD) (Bankr. S.D.N.Y. Nov. 19, 2018) (ECF No.

816); *In re Cent. Grocers, Inc.* Case No. 17-10993 (LSS) (Bankr. D. Del. June 2, 2017) (ECF No. 338); *In re Angelica Corp.*, Case No. 17-10870 (JLG) (Bankr. S.D.N.Y. Apr. 28, 2017) (ECF No. 137); and *In re Aéropostale, Inc.*, Case No. 16-11275 (SHL) (Bankr. S.D.N.Y. Jul. 29, 2016) (ECF No. 527); *In re The Great Atl. & Pac. Tea Co., Inc.*, Case No. 15-23007 (RDD) (Bankr. S.D.N.Y. Aug. 11, 2015) (ECF No. 495).

34.    Accordingly, for all of the foregoing reasons, the Debtors believe that the Stalking Horse Purchase Agreement and the Bidding Procedures (a) will encourage robust bidding for the Assets, (b) are consistent with other procedures previously approved by courts in this District, and (c) are appropriate under the relevant standards governing bidding, auction, and sale procedures in chapter 11 proceedings and should be approved.

## II.    The Stalking Horse Bid Protections are Reasonable and Appropriate, and are a Sound Exercise of the Debtors' Business Judgment

35.    The Debtors seek approval of customary bid protections in the event the Stalking Horse Purchase Agreement is terminated pursuant to Section 8.01(g) or (h) thereof, including the Termination Fee of $2,625,000, the Expense Reimbursement for the Stalking Horse Bidder's reasonable out-of-pocket expenses up to $550,000, and the Negotiated Expense Amount of up to $750,000.    In conjunction with the Bidding Procedures, these Stalking Horse Bid Protections were negotiated at arm's-length and were designed to encourage the Stalking Horse Bidder to set a baseline price for the Assets while at the same time preserving the opportunity to attract a higher or otherwise better offer.    The Debtors submit that the Stalking Horse Bid Protections are fair and reasonable under the circumstances.

36.    Similar bid protections are a widely accepted and, in many cases, necessary component of substantial sales conducted under section 363 of the Bankruptcy Code.    Courts analyzing the appropriateness of bid protections consider whether (i) the protection reflects the

debtor's sound business judgment; (ii) the protection hampers, rather than encourages, bidding; and (iii) the amount of the protection is reasonable in relation to the proposed purchase price. *See In re ASARCO, LLC*, 650 F.3d 593 (5th Cir. 2011); *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 465 (Bankr. S.D.N.Y. 2014); *see also Integrated Res.*, 147 B.R. at 657–58. The Stalking Horse Bid Protections should be approved under each of these factors.

37.    The Debtors believe, based on their business judgment, that the Stalking Horse Bid Protections will enable them to maximize the value of the Assets while encouraging bidding. Absent the Stalking Horse Bid Protections, the Stalking Horse Bidder would not have been willing to participate in the Sale process (and any appeal of a Sale Order in connection with the Stalking Horse Bidder's liability in connection with the Debtors' union agreements and obligations with respect to any multiemployer pension plan), to the detriment of the Debtors' estates. The Stalking Horse Bidder has expended time and resources negotiating, drafting, and performing due diligence activities in connection with entering into the Stalking Horse Purchase Agreement, despite the fact that the Stalking Horse Bid is subject not only to Court approval, but to potential higher or otherwise better bids from third parties. The Stalking Horse Bid Protections provide compensation to the Stalking Horse Bidder for both its reasonable out-of-pocket expenses and the risks that it is undertaking. *See In re APP Plus*, 223 B.R. 870, 874 (Bankr. E.D.N.Y. 1998) (break-up fees are intended to compensate for time, effort, resources, and the risk of losing other investment opportunities while the bidding process unfolds). This compensation incentivized the Stalking Horse Bidder to enter into the Stalking Horse Purchase Agreement, ensuring there will be a Sale of the Assets at a price the Debtors believe is reasonable, while preserving the ability of third parties to submit higher or otherwise better offers.

38.    Stalking Horse Bid Protections will promote the interests of the Debtors' estates to maximize value.  The Termination Fee and Expense Reimbursement will promote more competitive bidding for the Debtors' Assets by inducing the Stalking Horse Bidder to hold its offer open as a minimum bid on which other bidders and the Debtors can rely.  In doing so, the Stalking Horse Bidder will help lay the foundation for the Debtors' sale process and will serve as a catalyst for other Qualified Bids.  Executing the Stalking Horse Agreement has put the Debtors in a comfortable position to solicit competing bids that may be materially higher or of otherwise better value to the Debtors' estates than the Stalking Horse Bid.  The Stalking Horse Bid also increases the likelihood that the price at which the Assets in the Stalking Horse Package are sold will reflect their true worth.  Accordingly, the Stalking Horse Bid Protections do not hinder bidding, are reasonable, and will maximize the value of the Debtors' estates.

39.    Further, there is ample precedent for approval of a break-up fee of a similar size to the Termination Fee.[9]  *See, e.g.*, *In re Fairway Group Holdings Corp.*, Case No. 20-10161 (JLG) (Bankr. S.D.N.Y. Feb. 21, 2020) (break-up fee equal to 3%); *In re Hostess Brands, Inc.*, Case No. 12-22052 (Bankr. S.D.N.Y. 2013) (break-up fee equal to 3.5%); *In re Global Crossing Ltd.*, Case No. 02-40187 (Bankr. S.D.N.Y. 2002) (break-up fee equal to 4%); *In re LTV Steel Company, Inc.*, Case No. 00-43866 (Bankr. N.D. Ohio 2000) (break-up fee equal to 7.5%); *In re Fruit of the Loom, Inc.*, Case No. 99-4497 (Bankr. D. Del. 1999) (break-up fee equal to 3.59%); *In re Graham-Field Health Products, Inc.*, Case No. 99-4457 (Bankr. D. Del. 1999) (break-up fee equal to 4.65%).

---

[9]  The $2,625,000 Termination Fee represents 3.5% of the $75 million Purchase Price.

40.     The Debtors therefore submit that the Stalking Horse Bid Protections are an exercise of the Debtors' sound business judgment, are reasonable, and are in the best interest of the Debtors and their stakeholders.  Accordingly, the Debtors request that the Court approve the Stalking Horse Bid Protections.

### III.     The Form and Manner of the Sale Notice Should be Approved

41.     Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21-days' notice of a hearing where the Debtors will seek to use, lease, or sell property of the estate outside the ordinary course of business.  Bankruptcy Rule 2002(c) requires any such notice to include the time and place of the auction and the hearing and the deadline for filing any objections to the relief requested therein.  The Debtors seek approval of the Sale Notice as proper notice of the Auction.  The Debtors submit that notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Notice, as provided for herein, constitutes good and adequate notice of the Auction and the proceedings with respect to the Sale in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.  Accordingly, the Debtors request that this Court approve the form and manner of the Sale Notice.

### IV.     The Assignment Procedures Should be Approved

42.     To facilitate the Sale, the Debtors are seeking approval of the Assignment Procedures.  The Assignment Procedures reflect sound business judgment and are reasonable and necessary to properly notify parties of potential assumptions and/or assignments and provide the Contract Counterparties with sufficient time to determine the accuracy of the proposed Cure Costs and whether the Debtors have provided adequate assurance of future performance.

43.    Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the court's approval, may assume or reject an executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  Courts reviewing a debtor's decision to assume or reject an executory contract or unexpired lease apply a business judgment standard.  *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (noting that the business judgment standard traditionally applies to court authorization of rejection of an executory contract); *In re Orion Pictures Corp.*, 4 F.3d 1095, 1099 (2d Cir. 1993) ("[A] bankruptcy court reviewing a trustee's or debtor-in-possession's decision to assume or reject an executory contract should examine a contract and the surrounding circumstances and apply its best 'business judgment' to determine if it would be beneficial or burdensome for the estate to assume it."); *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 468 (Bankr. S.D.N.Y. 2014) ("At this point, the Court need only evaluate whether the RSA is a valid exercise of Debtors' business judgment: does it make economic sense?").

44.    Under this standard, there "is a presumption that in making a business decision, 'the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'"  *In re Abbott Labs. Derivatives Shareholders Litigation*, 325 F.3d 795, 807 (7th Cir. 2003) (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).  Accordingly, in applying the business judgment standard, courts generally give debtors significant discretion in requesting to assume or reject an executory contract or unexpired lease.  *In re Riodizio, Inc.*, 204 B.R. 417, 424 (Bankr. S.D.N.Y. 1997) ("[A] court will ordinarily defer to the business judgment of the debtor's management.").

45.    Here, the facts clearly demonstrate that the Court should approve the Debtors' decision to assume and assign the Assigned Contracts to the Successful Bidder as a sound exercise of the Debtors' business judgment.  The Assigned Contracts are necessary to the operation

of the Debtors' business.  Therefore, it is unlikely that a purchaser would want to acquire the Assets absent assumption and assignment of the Assigned Contracts, and such assumption and assignment is essential to inducing the highest or otherwise best offer for the Assets.  In addition, the Assigned Contracts will be assumed and assigned through the process approved by the Court by the Bidding Procedures Order, and thus will be reviewed by key constituents, including the contract and lease counterparties.

46.     In addition, the Debtors submit that the requirements of section 365(b) are satisfied.  Upon finding that a debtor has exercised its business judgment in determining that assuming and assigning an executory contract or unexpired lease is in the best interest of its estate, the court must then evaluate whether the assumption meets the requirements of section 365(b) that the debtor (i) cure, or provide adequate assurance of prompt cure of, prepetition defaults, (ii) compensate parties for pecuniary losses arising therefrom, and (iii) provide adequate assurance of future performance.  11 U.S.C. § 365(b)(1).

47.     The Debtors submit that these requirements are satisfied.  Specifically, the Stalking Horse Purchase Agreement will ensure that any defaults associated with the Assigned Contracts are properly cured.  Because the Bidding Procedures Order provides a clear process by which to resolve any disputes over cure amounts or other defaults, the Debtors are confident that any defaults will be cured fairly, efficiently, and properly.  In addition, the Debtors propose to file with the Court and serve on each Contract Counterparty the Cure Notice indicating the Debtors' calculation of the Cure Cost for each Assigned Contract.  The Contract Counterparties will have the opportunity to object to the Cure Costs and the assumption and assignment of the Assigned Contracts to the Successful Bidder in advance of the Sale Hearing.

48.    Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided."    11 U.S.C. § 365(f)(2)(B).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Azzari* (*In re Carlisle Homes, Inc.*), 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citation omitted). *See also In re Natco Indus., Inc*., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.,* 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

49.    Under the Stalking Horse Purchase Agreement, the Stalking Horse Bidder has agreed to provide adequate assurance of its future performance, and to demonstrate such adequate assurance to the Bankruptcy Court as needed.  Also, as required by the Bidding Procedures, the Debtors will evaluate the financial wherewithal of potential bidders before designating such party a Qualified Bidder or Successful Bidder (*e.g.*, financial credibility, willingness, and ability of the interested party to perform under the Assigned Contracts), including as it relates to such Qualified Bidder's willingness, and ability to perform under the Assigned

Contracts assigned to the Successful Bidder.  Further, the Assignment Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Successful Bidder to provide adequate assurance of future performance and object to the assumption of the Assigned Contracts or proposed cure amounts.  The Court therefore will have a sufficient basis to authorize the Debtors to reject or assume and assign the Assigned Contracts as set forth in the definitive agreement of the Successful Bidder.

50.     Accordingly, the Debtors submit that the Assignment Procedures should be approved as a sound exercise of the Debtors' business judgment and as reasonable and necessary measures to adequately notify parties in interest and conduct the proposed sale process in a fair, efficient, and proper manner.

**V.      The Sale is a Sound Exercise of the Debtors' Business Judgment**

51.     Ample authority exists for approval of the Sale contemplated by this Motion. Section 363 of the Bankruptcy Code provides, in relevant part, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts in the Second Circuit and others, in applying this section, have required that the sale of a debtor's assets be based upon the sound business judgment of the debtor. *See In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) application must find from the evidence presented a good business reason to grant such application); *Committee of Equity Security Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983) (same); *In re Gen. Motors Corp.*, 407 B.R. 463, 493-94 (Bankr. S.D.N.Y. 2009).  Where a debtor demonstrates a valid business justification for a decision, it is presumed that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the

company." *Integrated Res.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

52.     A sound business purpose for the sale of a debtor's assets outside the ordinary course of business exists where such sale is necessary to preserve the value of the estate for the benefit of creditors and interest holders. *See, e.g.*, *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d at 1063; *see also In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir. 1997) (recognizing that paramount goal of any proposed sale of property of estate is to maximize value).

53.     As is set forth above, a strong business justification exists for the Sale of the Debtors' Assets.  An orderly but expeditious sale of the Assets is critical to preserving and realizing their going concern value and, in turn, to maximizing recoveries for the Debtors, their stakeholders, and their estates, as well as to preserving jobs.  The entry into and performance under the Stalking Horse Purchase Agreement and the pursuit of a Sale of the Assets represent a reasonable exercise of the Debtors' business judgment that is in the best interests of all parties.

**VI.     The Assets may be Sold Free and Clear of Liens, Claims, Interests, and Encumbrances**

54.     In the interest of attracting the best offers, the Assets should be sold free and clear of any and all liens, claims, interests, and other encumbrances, in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims, interests, and encumbrances to attach to the proceeds of the applicable sale. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances if any one of the following conditions is satisfied:

a)     applicable non-bankruptcy law permits sale of such property free and clear of such interests;

b)      such entity consents;

c)      such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

d)      such interest is in bona fide dispute; or

e)      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. §363(f)(1)–(5).

55.     The Sale will satisfy at least one of the five requirements set forth under section 363(f) of the Bankruptcy Code, either because the affected parties consent to the Sale of the applicable Assets or some other bases exist under section 363(f) of the Bankruptcy Code to warrant the sale of the applicable Assets free and clear of such liens or interests.  Accordingly, the Debtors anticipate that one or more prongs of section 363(f) of the Bankruptcy Code will be satisfied with respect to parties that assert liens on or interests in the Assets.

**VII.    Protections as Good Faith Purchaser**

56.     Bankruptcy Code section 363(m) protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal.  Specifically, section 363(m) states:

> The reversal or modification on appeal of an authorization under [section 363(b)] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) promotes the "policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely."  *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (*quoting* 14 Collier on Bankruptcy ¶ 11-62.03 at 11-62-11 (14th ed. 1976)); *see also Allstate Inc. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith

31

transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal."); *in re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("[P]ursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal.").

57.    The Debtors and the Stalking Horse Bidder have entered into the Stalking Horse Purchase Agreement without collusion, in good faith, and through extensive arm's-length negotiations.  To that end, the Stalking Horse Bidder and the Debtors have engaged separate counsel and other professional advisors to represent their respective interests in the negotiation of the Stalking Horse Purchase Agreement and in the sale process generally.  To the best of the Debtors' knowledge, information, and belief, no party has engaged in any conduct that would cause or permit the Stalking Horse Purchase Agreement to be set aside under Bankruptcy Code section 363(m).

58.    Further, as set forth above, the Bidding Procedures are designed to produce a fair and transparent competitive bidding process.  Any asset purchase agreement with a Successful Bidder executed by the Debtors will be negotiated at arm's-length and in good faith. Accordingly, the Debtors seek a finding that any Successful Bidder (including the Stalking Horse Bidder, if named a Successful Bidder) is a good faith purchaser and is entitled to the full protections afforded by Bankruptcy Code section 363(m).

## **Waiver of Stay**

59.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  Bankruptcy Rule 6006(d) further

provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of fourteen (14) days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

60.     In light of the current circumstances and financial condition of the Debtors, the Debtors believe that in order to maximize the value of their estates and preserve jobs, the Sale should be consummated as soon as possible. Accordingly, the Debtors request that the Bidding Procedures Order and the Sale Order be effective immediately upon entry of each such order and that the 14-day stay periods under Bankruptcy Rules 6004(h) and 6006(d) be waived.

## Notice

61.     Notice of this Motion has been provided to: (a) the U.S. Trustee for the Southern District of New York; (b) the holders of the 30 largest unsecured claims against the Debtors; (c) counsel to the Stalking Horse Bidder; (d) the Consultation Parties; (e) the Prepetition Collateral Agent; (f) all persons and entities, known by the Debtors and their advisors, to have expressed an interest in a transaction with respect to any of the Debtors' Assets during the past twelve (12) months; (g) all persons and entities known by the Debtors to have any lien, claim, encumbrance, or other interest in any Asset (for whom identifying information and addresses are available to the Debtors) or who have filed requests for service with the Bankruptcy Court; (h) all Counterparties to Proposed Assigned Contracts; (i) any governmental authority known to have a claim in these chapter 11 cases; (j) the United States Attorney for the Southern District of New York; (k) the Office of the Attorney General in each state which the Debtors operate; (l) the Office of the Secretary of State in each state in which the Debtors operate or are organized; (m) any and all multiemployer plans (including each multiemployer pension plan) to which any of the Debtors is, or within the past five (5) years has been, a contributing employer, and any single employer

defined benefit plans to which any Debtor is or has been a contributing sponsor; (n) every labor organization with which any of the Debtors has, or within the past five (5) years has had, a collective bargaining agreement or similar agreement or arrangement; (o) the Federal Trade Commission; (p) the United States Attorney General/Antitrust Division of Department of Justice; (q) all applicable local environmental enforcement agencies; (r) the United States Environmental Protection Agency; and (s) all other persons directed by the Court (for whom identifying information and addresses are available to the Debtors).  The Debtors respectfully submit that no further notice is required.

62.    No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

*[Remainder of Page Left Intentionally Blank]*

WHEREFORE, the Debtors respectfully request entry of a final order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: August 23, 2020
      New York, New York

                          /s/ *Vincent Indelicato*
                          Vincent Indelicato
                          Timothy Q. Karcher
                          **PROSKAUER ROSE LLP**
                          Eleven Times Square
                          New York, New York 10036
                          Telephone:  (212) 969-3000
                          Facsimile:  (212) 969-2900

                          Charles A. Dale
                          **PROSKAUER ROSE LLP**
                          One International Place
                          Boston, MA 02110
                          Telephone:  (617) 519-9600
                          Facsimile:  (617) 519-9899

                          -and-

                          Steve Y. Ma
                          **PROSKAUER ROSE LLP**
                          2029 Century Park East, Suite 2400
                          Los Angeles, CA 90067-3010
                          Telephone:  (310) 557-2900
                          Facsimile:  (310) 557-2193

                          *Proposed Attorneys for Debtors*
                          *and Debtors in Possession*