# Exhibit C

**Stalking Horse Purchase Agreement**

STRICTLY CONFIDENTIAL
*Execution Version*

# ASSET PURCHASE AGREEMENT

by and among

## TLI BEDROCK LLC,

AS BUYER,

and

## KB US HOLDINGS, INC.,

**and its subsidiaries party hereto,**

AS SELLERS,

**Dated as of July 13, 2020**

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS; INTERPRETATION .................................................................. 1
    1.01    Definitions ........................................................................................ 1
    1.02    Other Definitional Provisions .......................................................... 13

ARTICLE II PURCHASE AND SALE ................................................................................ 14
    2.01    Acquired Assets ............................................................................... 14
    2.02    Excluded Assets ............................................................................... 16
    2.03    Assumed Liabilities .......................................................................... 17
    2.04    Excluded Liabilities ......................................................................... 18
    2.05    Assumption/Assignment of Contracts and Rights ............................. 18
    2.06    Good Faith Deposit. ......................................................................... 19
    2.07    Purchase Price .................................................................................. 20
    2.08    The Closing ...................................................................................... 20
    2.09    Closing Deliverables ........................................................................ 20

ARTICLE III REPRESENTATIONS AND WARRANTIES REGARDING SELLERS ........... 21
    3.01    Organization and Corporate Power ................................................... 21
    3.02    Authorization; Valid and Binding Agreement; No Breach ................. 21
    3.03    Financial Statements ........................................................................ 22
    3.04    Absence of Certain Developments ..................................................... 22
    3.05    Real Property ................................................................................... 23
    3.06    Tax Matters ..................................................................................... 23
    3.07    Material Contracts ........................................................................... 24
    3.08    Intellectual Property ........................................................................ 25
    3.09    Litigation ......................................................................................... 26
    3.10    Employee Benefit Plans .................................................................... 27
    3.11    Insurance ......................................................................................... 28
    3.12    Compliance with Laws ..................................................................... 29
    3.13    Environmental Compliance and Conditions ...................................... 30
    3.14    Affiliated Transactions ..................................................................... 30
    3.15    Employment and Labor Matters ....................................................... 30
    3.16    Brokerage ........................................................................................ 31

i

3.17 Suppliers .......................................................................................................... 31

3.18 Quality and Safety of Food & Beverage Products.......................................... 32

3.19 Title to Assets ................................................................................................. 32

3.20 No Other Representations and Warranties....................................................... 32

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF BUYER............................... 33

4.01 Organization and Power.................................................................................. 33

4.02 Authorization; Valid and Binding Agreement................................................ 33

4.03 No Breach ........................................................................................................ 33

4.04 Consents ........................................................................................................... 33

4.05 Litigation.......................................................................................................... 34

4.06 Brokerage ......................................................................................................... 34

4.07 Financing; Immediately Available Funds........................................................ 34

4.08 Sufficient Funds .............................................................................................. 34

4.09 Investigation..................................................................................................... 34

4.10 Financing.......................................................................................................... 34

ARTICLE V CERTAIN PRE-CLOSING COVENANTS ....................................................... 35

5.01 Conduct of the Business.................................................................................. 35

5.02 Cooperation ...................................................................................................... 36

5.03 Consents; Notices............................................................................................ 37

5.04 Access to Information ...................................................................................... 38

5.05 Contact with Customers, Suppliers and Other Business Relations.................... 39

5.06 Bankruptcy Court Matters............................................................................... 39

5.07 Public Announcements. ................................................................................... 42

5.08 Solicitation ....................................................................................................... 42

5.09 Bulk Sales ........................................................................................................ 43

5.10 Modified Labor Agreement Negotiation Period ............................................. 43

5.11 Replacement Deposits...................................................................................... 43

ARTICLE VI ADDITIONAL COVENANTS .......................................................................... 44

6.01 Director and Officer Liability.......................................................................... 44

6.02 Access to Books and Records.......................................................................... 44

6.03 Employee Matters ........................................................................................... 44

6.04 Charity Cash..................................................................................................... 47

6.05 Further Assurances........................................................................................... 47

6.06    Confidentiality Agreements; Post-Closing Confidentiality ................................. 47

6.07    Financing Assistance ................................................................................. 48

6.08    Financing.................................................................................................. 49

ARTICLE VII CONDITIONS TO CLOSING ........................................................ 49

7.01    Conditions to All Parties' Obligations ...................................................... 49

7.02    Conditions to Buyer's Obligations............................................................ 50

7.03    Conditions to Sellers' Obligations ............................................................ 51

7.04    Waiver of Conditions ............................................................................... 51

7.05    Frustration of Closing Conditions............................................................. 51

ARTICLE VIII TERMINATION .......................................................................... 51

8.01    Termination .............................................................................................. 51

8.02    Effect of Termination ............................................................................... 53

8.03    Termination Fee; Negotiated Expense Amount......................................... 53

ARTICLE IX TAX MATTERS............................................................................. 54

9.01    Books and Records; Cooperation.............................................................. 54

9.02    Transfer Taxes ......................................................................................... 54

9.03    Straddle Period Allocation ....................................................................... 55

9.04    Purchase Price Allocation ........................................................................ 55

ARTICLE X MISCELLANEOUS ........................................................................ 56

10.01   Survival ................................................................................................... 56

10.02   Press Releases and Communications ........................................................ 56

10.03   Expenses .................................................................................................. 56

10.04   Notices .................................................................................................... 56

10.05   Assignment .............................................................................................. 57

10.06   Severability .............................................................................................. 58

10.07   No Strict Construction .............................................................................. 58

10.08   Amendment and Waiver ........................................................................... 58

10.09   Complete Agreement ................................................................................ 58

10.10   Counterparts............................................................................................. 59

10.11   Governing Law ........................................................................................ 59

10.12   CONSENT TO JURISDICTION AND SERVICE OF PROCESS..................... 59

10.13   WAIVER OF JURY TRIAL....................................................................... 60

10.14   No Third Party Beneficiaries .................................................................... 61

10.15   Representation of Sellers and their Affiliates ........................................................ 61

10.16   No Additional Representations; Disclaimer; Non-Recourse ................................ 62

10.17   Conflict Between Transaction Documents .......................................................... 64

10.18   Specific Performance; Other Remedies ................................................................ 64

10.19   Release ................................................................................................................. 65

10.20   Electronic Delivery .............................................................................................. 66

10.21   Sale Without Chapter 11 Filing .......................................................................... 66

10.22   Buyer Deliveries .................................................................................................. 66

<u>Exhibits</u>

Exhibit A    -        Bidding Procedures Order

Exhibit B    -        Form of Bill of Sale and Assignment and Assumption Agreement

Exhibit C    -        Form of Intellectual Property Assignment and Assumption Agreement

Exhibit D    -        Debt Term Sheet

<u>ASSET PURCHASE AGREEMENT</u>

This ASSET PURCHASE AGREEMENT (this "<u>Agreement</u>") is made as of July 13, 2020, by and among TLI BEDROCK LLC, a New York limited liability company ("<u>Buyer</u>"), KB US Holdings, Inc., a Delaware corporation ("<u>Holdings</u>", and together with its wholly owned subsidiaries party hereto, collectively, "<u>Sellers</u>", and each a "<u>Seller</u>"). Capitalized terms used and not otherwise defined herein have the meanings set forth in <u>Section 1.01</u> hereof.

WHEREAS, Sellers are engaged in the business of owning and operating the specialty gourmet food retailers set forth in <u>Section 1.01</u> of the Disclosure Schedules (each, a "<u>Store</u>" and collectively, the "<u>Stores</u>") under the banners Kings Food Markets and Balducci's Food Lovers Market (the "<u>Business</u>");

WHEREAS, upon execution of this Agreement, subject to and in accordance with <u>Section 5.10</u> of this Agreement, Sellers and Buyers shall endeavor in good faith during the Modified Labor Agreement Negotiation Period to negotiate with unions related to the Business to modify any Union Agreements;

WHEREAS, Sellers intend to file voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") on or about August 12, 2020 in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>");

WHEREAS, Sellers desire to sell, transfer, convey, assign and deliver the Acquired Assets and to assign the Assumed Liabilities, and Buyer desires to purchase, accept and acquire such Acquired Assets and to assume such Assumed Liabilities, upon the terms and subject to the conditions set forth herein and in accordance with, inter alia, Sections 105, 363 and 365 of the Bankruptcy Code;

WHEREAS, the consummation of the transactions contemplated by this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court, under, inter alia, Sections 363 and 365 of the Bankruptcy Code; and

WHEREAS, the parties desire to consummate the proposed transaction as promptly as practicable after the Bankruptcy Court enters the Sale Order.

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties, conditions and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

ARTICLE I

DEFINITIONS; INTERPRETATION

1.01    <u>Definitions</u>. For purposes of this Agreement, the following terms, when used herein with initial capital letters, will have the respective meanings set forth below:

"<u>Acquired Assets</u>" has the meaning set forth in <u>Section 2.01</u>.

"<u>Action</u>" means any claim, action, hearing, arbitration, mediation, investigation, complaint, suit or other proceeding, at law or in equity, before or by any Governmental Body.

"<u>Affiliate</u>" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, Contract or otherwise.

"<u>Agreement</u>" has the meaning set forth in the preamble to this Agreement.

"<u>Allocation</u>" has the meaning set forth in <u>Section 9.04</u>.

"<u>Allocation Objection Notice</u>" has the meaning set forth in <u>Section 9.04</u>.

"<u>Ancillary Documents</u>" means the Bidding Procedures Order, the Escrow Agreement, the Bill of Sale, the Assignment and Assumption Agreement, the Intellectual Property Assignment Agreement and each other agreement, certificate and instrument delivered pursuant to, or in connection with, the transactions contemplated by this Agreement.

"<u>Assignment Order</u>" has the meaning set forth in <u>Section 5.06(c)(i)</u>.

"<u>Assumed Contracts</u>" has the meaning set forth in <u>Section 2.01</u>.

"<u>Assumed Lease</u>" has the meaning set forth in <u>Section 2.01</u>.

"<u>Assumed Liabilities</u>" has the meaning set forth in <u>Section 2.03</u>.

"<u>Auction</u>" has the meaning set forth in <u>Section 5.06(c)(ii)</u>.

"<u>Back-up Termination Date</u>" means the first to occur of (a) consummation of the transaction with the winning bidder at the Auction, (b) Buyer's receipt of notice from Sellers of the release by Sellers of Buyer's obligations under <u>Section 5.06(e)</u>, and (c) twenty (20) days after the entry of the Sale Order.

"<u>Bankruptcy Cases</u>" means the contemplated Chapter 11 cases of Sellers.

"<u>Bankruptcy Code</u>" has the meaning set forth in the Recitals.

"<u>Bankruptcy Court</u>" has the meaning set forth in the Recitals.

"<u>Bankruptcy Rules</u>" has the meaning set forth in <u>Section 5.06(d)</u>.

"<u>Benefit Plan</u>" means each management, employment, severance, retention, transaction bonus, change in control, consulting, relocation, repatriation or expatriation agreement and any salary, bonus, incentive, vacation, deferred compensation, incentive compensation, stock purchase, stock option, restricted stock, equity or equity-based, severance pay, termination pay, death and disability benefits, hospitalization, medical, life or other insurance, flexible benefits, supplemental unemployment benefits, profit-sharing, pension or retirement plan, policy, program, agreement or arrangement and each other employee benefit plan or arrangement sponsored,

maintained, contributed to or required to be contributed to by any Seller for the benefit of any current or former employee of any Seller or of any other entity for or with respect to which such Seller has any liability or potential liability, without regard to whether such Benefit Plan is subject to ERISA.

"Bidding Procedures Order" means the order of the Bankruptcy Court substantially in the form attached hereto as Exhibit A with such changes thereto that are reasonably acceptable to Buyer and Sellers.

"Business" has the meaning set forth in the Recitals.

"Business Benefit Plan" means any Benefit Plan that is not a Multiemployer Plan.

"Business Day" means any day other than a Saturday, Sunday or a day on which banks in New York, New York are not open for business.

"Buyer" has the meaning set forth in the preamble to this Agreement.

"Buyer Fundamental Representations" means the representations in Section 4.02 (Authorization; Valid and Binding Agreement) and Section 4.06 (Brokerage).

"Buyer Related Parties" means, collectively, Buyer, its Affiliates, and their respective owners, advisors and Representatives.

"Cash" means, as of 11:59 P.M. Eastern time on the Closing Date (but before taking into account the consummation of the transactions contemplated hereby), the aggregate of all cash (including for this purpose all food stamps and funds in the cash registers), all Cash Equivalents, restricted cash (including all cash posted to support letters of credit, performance bonds or other similar obligations), marketable securities, in each case, determined in accordance with GAAP (to the extent not addressed in the definition hereof), less the amount of any Closing Date Register Cash and Charity Cash. For the avoidance of doubt, Cash will be calculated net of issued but uncleared checks and drafts and will include checks, wire transfers in transit and drafts deposited or available for deposit for the account of any Seller.

"Cash Equivalents" means cash, checks, money orders, funds in time and demand deposits or similar accounts, marketable securities, short-term investments, and other cash equivalents and liquid investments.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended.

"Charity Cash" means approximately $35,000 in cash held by Holdings to be donated and/or used towards hunger elimination initiatives.

"Closing" has the meaning set forth in Section 2.08.

"Closing Date" has the meaning set forth in Section 2.08.

3

"Closing Date Register Cash" has the meaning set forth in Section 2.01(a).

"Code" means the Internal Revenue Code of 1986, as amended.

"Company Employee" means each individual employed by a Seller and classified for payroll tax reporting purposes as employed by a Seller, including employees who are on short-term disability, long-term disability, military leave, or any other approved leave of absence as of the Closing, and excludes any individual who has a Contract with a Seller as an independent contractor.

"Competing Bid" has the meaning set forth in Section 5.08.

"Confidentiality Agreement" means that certain confidentiality agreement, dated as of May 8, 2020, by and between Buyer and Holdings (as it may be amended from time to time in accordance with its terms).

"Consent" means any consent, approval, clearance, authorization, certification or permit of, filing with, or notification to, any Governmental Body.

"Contract" means any legally binding written or oral agreement, lease, license, contract, note, mortgage, indenture or other legally binding obligation.

"Contracting Party" has the meaning set forth in Section 10.19.

"Cure Cost Cap" means $300,000.

"Cure Costs" means all amounts payable in order to cure any and all defaults required to be cured under Section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption by and assignment of the Assumed Contracts by Buyer.

"Debt Financing" has the meaning set forth in Section 4.10.

"Debt Term Sheet" has the meaning set forth in Section 4.10.

"D&O Indemnified Person" has the meaning set forth in Section 6.01.

"DIP Facility" means Sellers' debtor-in-possession financing facility, entered into connection with the Bankruptcy Cases, as the same may be amended, restated, supplemented or refinanced from time to time, including any orders approving or authorizing Sellers' entry into and performance under such facility.

"Disclosure Schedules" means the disclosure schedules delivered by Sellers to Buyer concurrently with the execution and delivery of this Agreement.

"Documents" means all files, documents, instruments, papers, books, reports, records, databases, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer and supplier lists, databases and information, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating

instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), cost of pricing information, business plans, quality control records and procedures, blueprints, accounting, legal and tax files (including all related memoranda and analyses therein), all files, customer and supplier files and documents (including credit information), personnel files and employment records relating to employees (including, without limitation, applicable completed I-9 forms), supplier lists, records, literature and correspondence, including records relating to payroll, sales, expenses and the plans, specifications, passwords and combinations for the Facilities, together with other similar materials, in each case, to the extent related to the Business and used or held for use by Sellers, whether or not in electronic form.

"Electronic Delivery" has the meaning set forth in Section 10.20.

"Environmental Laws" means all applicable laws and regulations, judicial or administrative orders and other legally enforceable requirements of a Governmental Body concerning worker health and safety (to the extent relating to exposure to hazardous or toxic materials), pollution or protection of the environment, including all those relating to the generation, handling, transportation, treatment, storage, disposal, distribution, labeling, discharge, release, threatened release, control, or cleanup of any Hazardous Substances, as such of the foregoing are promulgated and in effect on or prior to the Closing Date.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended and in effect from time to time.

"Escrow Agent" means American Stock Transfer & Trust Company, LLC, a New York limited liability trust company.

"Escrow Agreement" means the Escrow Agreement, dated as of the date hereof, by and among Buyer, Sellers and the Escrow Agent.

"Excluded Assets" has the meaning set forth in Section 2.02.

"Excluded Liabilities" has the meaning set forth in Section 2.04.

"Extended Sale Order Deadline" has the meaning set forth in Section 5.06(d)(ii).

"Facilities" has the meaning set forth in Section 2.01.

"Final Order" means an order or judgment of the Bankruptcy Court (a) which is not the subject of a pending appeal, petition for certiorari, or other proceeding for review, rehearing or reargument, (b) which has not been reversed, stayed, modified or amended and (c) respecting which the time to appeal from or petition for certiorari or to seek review, rehearing or reargument of such order shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Bankruptcy Rules and other applicable law, and there shall not be in effect any preliminary or permanent injunction, stay or order or decree or ruling by any Governmental Body preventing consummation of the transactions contemplated by this Agreement.

"Financial Statements" has the meaning set forth in Section 3.03.

"Fraud" means an act in the making of a specific representation or warranty expressly set forth in Article III or Article IV of this Agreement, committed by the party making such express representation or warranty, with intent to deceive another party, and to induce him, her or it to enter into this Agreement or to consummate the transactions contemplated hereby, and requires: (a) an intentional false representation of fact expressly set forth in the representations and warranties set forth in this Agreement; (b) actual knowledge that such representation or warranty is false (as opposed to any fraud claim based on constructive knowledge, negligent or reckless misrepresentation or a similar theory) when made or as brought down to Closing; (c) a specific intention to induce the party to whom such representation or warranty was made to act or refrain from acting in reliance upon it; (d) causing that party, with ignorance of the falsity of such representation or warranty, to take or refrain from taking action; and (e) causing such party to suffer damage by reason of such reliance.

"Furnishings and Equipment" means all furniture, fixtures, trade fixtures, store models, shelving, and refrigeration equipment and other appliances owned by Sellers.

"GAAP" means United States generally accepted accounting principles as in effect on the date hereof, applied in a manner consistent with Sellers' past practice.

"Good Faith Deposit" has the meaning set forth in Section 2.06(a).

"Governmental Body" means any federal, state, local, municipal, foreign or other government or quasi-governmental authority or any department, agency, commission, board, subdivision, bureau, agency, instrumentality, court or other tribunal of any of the foregoing.

"Hazardous Substance" means petroleum or any hazardous substance or waste as defined in CERCLA.

"Holdings" has the meaning set forth in the preamble to this Agreement.

"Holdings Confidentiality Agreements" means those confidentiality agreements entered into prior to the Closing between Holdings or its Affiliate, on the one hand, and Persons expressing an interest in acquiring Holdings or any assets thereof, on the other hand, including any such confidentiality agreements entered into by Holdings or its Affiliates pursuant to the last sentence of Section 5.08.

"Indebtedness" means the principal amount, plus any related accrued and unpaid interest, fees and prepayment or other premiums or penalties, of all indebtedness for borrowed money of Sellers owed under a credit facility or evidenced by any note, debenture or other debt security. Notwithstanding the foregoing, Indebtedness does not include (a) any operating or lease obligations (other than capital leases), (b) any intercompany obligations, payables or loans of any kind or nature between or among any of Sellers, or (c) any letters of credit, performance bonds, bankers acceptances or similar obligations.

"Independent Accounting Firm" has the meaning set forth in Section 9.04.

"Initially Non-Assumed Contract" has the meaning set forth in Section 2.05(b).

"Insured Welfare Benefit Plan" means any Business Benefit Plan that provides life, disability, accidental death and dismemberment, dental, vision, voluntary accident, health, hospitalization or other medical, or similar insurance benefits to or for the benefit of current or former employees of a Seller and such employees' Plan-eligible dependents, where such Plan's benefits are provided exclusively or primarily through or under a group insurance contract or policy issued to and held by one or more of Sellers.

"Intellectual Property" means (a) all United States and foreign patents and patent applications; (b) all United States and foreign trade names, trade dress, trademarks, service marks, or internet domain names, including all goodwill associated therewith, together with all registrations and applications relating thereto; (c) all United States and foreign copyrights, original works of authorship (including rights in Software), together with all registrations and applications relating thereto; (d) all proprietary databases and data; (e) all industrial designs and any registrations and applications therefor throughout the world; (f) all inventions, invention disclosures, improvements, mask works, trade secrets, manufacturing, test and qualification processes, designs, know how, proprietary information, technical data, customer and vendor lists, and proprietary confidential information; and (g) any and all similar or equivalent rights to any of the foregoing anywhere in the world.

"Inventory" means all inventory of goods, merchandise, food, Supplies, beverages, tobacco inventory and other products (including, to the extent transferable to Buyer pursuant to the transactions contemplated hereby and under applicable law, alcohol and other alcoholic beverages) wherever located, including inventory on order for or in transit to or from Seller, in each case, that is, or is intended to be, offered for sale to customers at the Stores and owned by Sellers.

"IT Systems" has the meaning set forth in Section 3.08(d).

"knowledge" and any derivation thereof means (a) with respect to the knowledge of Sellers, the actual knowledge, after reasonable inquiry, of Judith Spires (Chief Executive Officer of Holdings) and Joe Parisi and (b) with respect to the knowledge of Buyer, the actual knowledge, after reasonable inquiry, of Andrew Siegel.

"Labor Appeal" has the meaning set forth in Section 7.01(c).

"Latest Balance Sheet" has the meaning set forth in Section 3.03.

"Leased Real Property" has the meaning set forth in Section 3.05(b).

"Liability" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due) regardless of when arising.

"Liens" means any lien (statutory or otherwise), mortgage, security interest, pledge, deposit or other encumbrance.

"<u>Liquor License Approvals</u>" has the meaning set forth in Section **Error! Reference source not found.**.

"<u>Liquor Licenses</u>" means all liquor licenses (including beer and wine licenses) held by each Seller.

"<u>Material Adverse Effect</u>" means an event, change, effect, matter, occurrence or development (collectively, the "<u>Events</u>") that, individually or in the aggregate, would reasonably be expected to be, or is, materially adverse to the Business, the Acquired Assets and the Assumed Liabilities, taken as a whole, except any Event related to or resulting from (a) changes in the general business or economic conditions affecting the retail grocery industry; (b) national or international political or social conditions or events, including the engagement by the United States in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States; (c) changes in any credit, debt, financial, banking or securities markets or in interest or exchange rates (including any disruption thereof and any decline in the price of any security or any market index); (d) changes in GAAP or accounting rules; (e) changes or proposed changes in laws, rules, regulations, orders or other binding directives issued by any Governmental Body; (f) the taking of any action requested by Buyer or which is contemplated by this Agreement or any Ancillary Document; (g) the identity of Buyer or its Affiliates or the announcement, pendency or completion of this Agreement, the Ancillary Documents or the transactions contemplated hereby or thereby or Buyer's disclosure of its plans or intentions with respect to the conduct of the Business after the Closing (including, in each case, the impact thereof on relationships, contractual or otherwise, with, or actual or potential loss or impairment of, customers, suppliers, vendors, partners, employees or Governmental Bodies); (h) any filing or motion made under Sections 1113 or 1114 of the Bankruptcy Code; (i) any failure by Sellers or the Business to meet any projections, forecasts or estimates of revenue or earnings (as distinguished from any Event that caused such failure); (j) any Event related to, or that is caused by any delay in consummating the Closing in accordance with <u>Section 2.08</u> as a result of (i) any violation or breach by Buyer of any covenant, agreement, representation or warranty contained in this Agreement which has prevented the satisfaction of any condition to the obligations of Sellers at the Closing or (ii) Buyer's failure to consent to any actions with respect to which Sellers' make a reasonable request for consent with respect to actions restricted by <u>Section 5.01(b)</u>; (k) any epidemic, pandemic, disease outbreak or public health crisis (including the COVID-19 virus); or (l) the Bankruptcy Cases and reasonably anticipated Events thereof on the Business, the Acquired Assets or the Assumed Liabilities; <u>provided</u> that any of the matters described in clauses (a) through (e) or (k) shall be taken into account in determining whether there is (or would reasonably be expected to be) a Material Adverse Effect if, and to the extent, that there is a disproportionate adverse effect on the Business, the Acquired Assets or the Assumed Liabilities, compared to others operating in the retail grocery industry.

"<u>Material Contract</u>" or "<u>Material Contracts</u>" has the meaning set forth in <u>Section 3.07(a)</u>.

"<u>Modified Labor Agreement Negotiation Period</u>" has the meaning set forth in <u>Section 5.10</u>.

"<u>Modified Labor Agreements</u>" has the meaning set forth in <u>Section 6.03(a)</u>.

"<u>Multiemployer Plan</u>" means any Benefit Plan that is a "multiemployer plan" within the meaning of Section 3(37) of ERISA.

"<u>Negotiated Expense Amount</u>" means $750,000.

"<u>Offices</u>" means Sellers' administrative offices in Parsippany, New Jersey and Rockville, Maryland.

"<u>Organizational Documents</u>" means, with respect to any entity, (a) the certificate or articles of incorporation and by-laws, the certificate of formation and partnership agreement or operating agreement (as applicable), (b) any organizational documents comparable to those described in clause (a) as may be applicable to such entity pursuant to any applicable law and (c) with respect to clauses (a) and (b), any amendments thereto.

"<u>Owned Intellectual Property</u>" means any Intellectual Property owned by Sellers and primarily held for use in the Business or the Acquired Assets.

"<u>Permits</u>" means registrations, licenses, exemptions, authorizations and permits of any Governmental Body.

"<u>Permitted Lien Costs</u>" has the meaning set forth in the definition of "Permitted Liens."

"<u>Permitted Lien Cap</u>" means $250,000.

"<u>Permitted Lien Overage Costs</u>" means the amount of any Permitted Lien Costs in excess of the Permitted Lien Cap.

"<u>Permitted Liens</u>" means (a) statutory Liens for current Taxes not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings by any Seller or that may thereafter be paid without penalty, (b) mechanic's, carriers', workers', repairers', and similar statutory Liens arising or incurred in the ordinary course of business for amounts which are not delinquent, (c) with respect to Leased Real Property, zoning, entitlement, building and other land use regulations imposed by any Governmental Body having jurisdiction over the Leased Real Property which are not violated by the current use and operation of the Leased Real Property, (d) covenants, conditions, restrictions, easements, and other similar matters of record affecting title to the Leased Real Property which do not materially impair the occupancy or use of the Leased Real Property for the purposes for which it is currently used or proposed to be used in connection with the Business, (e) public roads and highways, (f) matters which would be disclosed on an accurate survey of each parcel of real property, (g) Liens arising under worker's compensation, unemployment insurance, social security, retirement, and similar legislation, (h) purchase money Liens and Liens securing rental payments under capital lease arrangements, (i) other Liens arising in the ordinary course of business which are not material in amount and not incurred in connection with the borrowing of money, (j) Liens arising under the Perishable Agricultural Commodities Act (PACA), the Packers and Stockyards Act (PSA) or similar laws in connection with the purchase of agricultural or meat and dairy products in the ordinary course of business ("Agricultural Liens"), and (k) Liens that will be released, discharged or otherwise extinguished pursuant to the Sale Order, which in the case of clauses (a), (b), (g), (h) and (i) (the aggregate amount secured by liens described in such clauses, "<u>Permitted Lien Costs</u>"), do not, individually or in the aggregate, exceed the Permitted Lien Cap and are not for amounts as to which

payment and enforcement is stayed under the Bankruptcy Code or pursuant to orders of the Bankruptcy Court. For the avoidance of doubt, Agricultural Liens shall not count towards the amount of Permitted Lien Costs.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a Governmental Body.

"Personal Element" means a natural person's last name, telephone number, email address, mailing address or any other information, alone or in combination, that allows the identification of such natural person.

"Personal Information" means in, addition to any definition for any similar term provided by applicable Law (e.g., "personal data" or "personally identifiable information"), any information that identifies, could be used to identify, or is otherwise associated with an individual person, including, but not limited to, User Data.

"Petition Date" means the date on which the Bankruptcy Cases are filed in the Bankruptcy Court.

"Pre-Closing Tax Period" means (a) any taxable period ending on or before the Closing Date and (b) the portion of any Straddle Period beginning on the first day of such Straddle Period and ending at the close of business on the Closing Date.

"Principles of Equity" has the meaning set forth in Section 3.02(a).

"Privacy Laws" mean any and all applicable laws and legal requirements relating to the receipt, collection, compilation, use, storage, processing, sharing, safeguarding, security, disposal, destruction, disclosure or transfer (including cross-border) of Personal Information.

"Purchase Price" has the meaning set forth in Section 2.07.

"Registered Intellectual Property" has the meaning set forth in Section 3.08(a).

"Rehired Employee" has the meaning set forth in Section 6.03(a).

"Rehired Employees' Employment Date" has the meaning set forth in Section 6.03(e).

"Rejected Deposits" means all of Sellers' security deposits, prepaid rent, prepaid expenses, lease deposits and other cash deposits with third parties (including landlords), in each case, except those paid pursuant to, or otherwise in connection with, any Assumed Contract.

"Related Order" means the Sale Order, the Assignment Order and any other order of the Bankruptcy Court necessary to consummate the transaction contemplated hereunder.

"Released Person" has the meaning set forth in Section 10.19(a).

"Releasing Person" has the meaning set forth in Section 10.19(a).

"Replacement Contracts" has the meaning set forth in Section 5.11.

"Replacement Deposits" has the meaning set forth in Section 5.11.

"Representatives" of any Person means such Person's directors, managers, officers, employees, agents, attorneys, accountants, consultants, professional advisors or other representatives.

"Retained Documents" has the meaning set forth in Section 2.02(a).

"Review Period" has the meaning set forth in Section 9.04.

"Sale Hearing" has the meaning set forth in Section 5.06(c)(i).

"Sale Order" has the meaning set forth in Section 5.06(d).

"Sale Order Deadline" has the meaning set forth in Section 5.06(d)(ii).

"Scheduled Closing Date" has the meaning set forth in Section 2.08.

"Securities Act" means the Securities Act of 1933, as amended.

"Sellers" has the meaning set forth in the preamble to this Agreement.

"Seller Fundamental Representations" means the representations in Section 3.02 (Authorization; Valid and Binding Agreement) and Section 3.16 (Brokerage).

"Seller Related Parties" means, collectively, each Seller, its Affiliates and their respective owners and Representatives and each of their respective successors and assigns.

"Sellers' Representatives" has the meaning set forth in Section 5.08.

"Software" means all computer software programs, together with any error corrections, updates, modifications, or enhancements thereto, in both machine-readable form and human readable form, including all firmware and all comments and any procedural code.

"Store" has the meaning set forth in the preamble to this Agreement.

"Straddle Period" means any taxable period beginning before the Closing Date and ending after the Closing Date.

"Supplemental Assumption Motion" has the meaning set forth in Section 2.05(b).

"Supplemental Assumption Notice" has the meaning set forth in Section 2.05(b).

"Supplemental Assumption Period" has the meaning set forth in Section 2.05(b).

"Supplemental Contracts" has the meaning set forth in Section 2.05(b).

11

"Supplies" means cleaning supplies (including materials, solutions and waxes), small wares, office supplies, production supplies and any similar items at the Facilities.

"Tax" or "Taxes" means any federal, state, local or foreign income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, ad valorem/personal property, stamp, excise, occupation, sales, use, transfer, value added, alternative minimum, estimated or other tax or imposition, including any interest, penalty or addition thereto.

"Tax Authority" means any domestic, foreign, federal, national, state, county or municipal or other local government, any subdivision, agency, commission or authority thereof, or any quasi-governmental body exercising any Tax authority or power with respect to Taxes.

"Tax Returns" means any return, report, information return or other document (including schedules or any related or supporting information) filed or required to be filed with any Tax Authority in connection with the determination, assessment or collection of any Tax or the administration of any laws, regulations or administrative requirements relating to any Tax.

"Third Party Liquor License" means all liquor licenses (including beer and wine licenses) held by any third party pursuant to which such third party sells liquor or other alcoholic beverages in any Store, whether as a tenant or subtenant of any Seller.

"Termination Date" has the meaning set forth in Section 8.01(b).

"Termination Fee" has the meaning set forth in Section 5.06(b).

"Transfer Taxes" has the meaning set forth in Section 9.02.

"Union Agreement" means any and all Contracts between any Seller, on the one hand, and any union, labor organization, or work council on the other hand, on any subject with respect to any Company Employee, including collective bargaining agreements, side letters, memoranda of understanding, memoranda of agreements, settlement agreements, card check neutrality agreements, and recognition agreements.

"User Data" means, with respect to end users of any website of Sellers or the Business and any related mobile applications of the Business: (a) all data related to impression and click-through activity of such end users, including user identification; (b) all data that contains or can be associated with a Personal Element; and (c) all derivatives and aggregations of clauses (a) and (b) that contain a Personal Element.

"WARN Act" has the meaning set forth in Section 5.03(b).

"Willful Breach" means an action or failure to act by one of the parties hereto that constitutes a breach of this Agreement, and such action was taken or such failure occurred with such party's knowledge or intention that such action or failure to act would constitute a breach of this Agreement, and such breach (a) resulted in, or contributed to, the failure or inability of any of the conditions set forth in Article VII to be satisfied or (b) resulted in, or contributed to, the Closing not being consummated at the time the Closing would have occurred pursuant to Section 2.08.

1.02    Other Definitional Provisions.

(a)    Accounting terms which are not otherwise defined in this Agreement have the meanings given to them under GAAP.  To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under GAAP, the definition set forth in this Agreement will control.

(b)    Any reference to any particular Code section or any other law or regulation will be interpreted to include any revision of or successor to that section regardless of how it is numbered or classified.

(c)    All references in this Agreement to Exhibits, Disclosure Schedules, Articles, Sections, subsections and other subdivisions refer to the corresponding Exhibits, Disclosure Schedules, Articles, Sections, subsections and other subdivisions of or to this Agreement unless expressly provided otherwise.  The table of contents and the titles appearing at the beginning of any Articles, Sections, subsections or other subdivisions of this Agreement the Exhibits are for convenience only, do not constitute any part of this Agreement or such Exhibit, and will be disregarded in construing the language hereof.

(d)    Exhibits and Disclosure Schedules to this Agreement are incorporated herein for all purposes.

(e)    The words "this Agreement," "herein," "hereby," "hereunder" and "hereof," and words of similar import, refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited.  The words "this Article," "this Section" and "this subsection," and words of similar import, refer only to the Article, Section or subsection hereof in which such words occur.

(f)    All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

(g)    Pronouns in masculine, feminine or neuter genders will be construed to state and include any other gender, and words, terms and titles (including terms defined herein) in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires.

(h)    The word "threatened" means threatened in writing.

(i)    All references to days or months will be deemed references to calendar days or months unless otherwise expressly specified.

(j)    The word "including" and words of similar import shall mean "including without limitation" (unless otherwise specified).

(k)    The phrase "date hereof" means the date of this Agreement without giving effect to any amendments, modifications or supplements hereto.

ARTICLE II

PURCHASE AND SALE

2.01    Acquired Assets. Upon the terms and subject to the conditions set forth in this Agreement, to the maximum extent permitted by Section 363 of the Bankruptcy Code, at the Closing, Sellers shall sell, transfer and deliver to Buyer, and Buyer shall purchase, acquire and accept from Sellers, on an "as is, where is" basis and without any representation or warranty (other than those representations and warranties set forth in this Agreement) on the part of Sellers as to fitness, merchantability or otherwise, all right, title and interest of any kind or nature owned, licensed or leased by Sellers, including goodwill and other intangibles of Sellers, as of the Closing Date in and to all assets, properties and rights used or held  for use by, for or on behalf of, Sellers in the operation of the Business, including the assets, properties and rights set forth below (the "Acquired Assets"), free and clear of all claims (as defined in Section 101 of the Bankruptcy Code) and other Liens (other than Permitted Liens and the Assumed Liabilities) to the maximum extent permitted by Section 363(f) of the Bankruptcy Code:

(a)    (i) register cash (including for this purpose, food stamps) left at the Stores in the ordinary course of business following the close of business on the Closing Date (which amount of such register cash shall be not less than $275,000 for all Stores) (the "Closing Date Register Cash") and (ii) Charity Cash;

(b)    with respect to each Store, accounts receivable and other current assets of Sellers (other than any Excluded Assets);

(c)    all Inventory (including private label inventory held for Sellers in suppliers' warehouses, that is, or is intended to be, offered for sale to customers at the Stores, but excluding alcoholic beverage inventories in jurisdictions where, and to the extent, applicable law does not permit Buyer to take title to such inventories until it obtains the requisite Liquor License Approvals from the relevant Governmental Body; provided, however, Sellers shall transfer, assign, convey and deliver to Buyer such alcoholic beverage inventories in each instance upon issuance of the relevant Liquor License Approval or other authorization from the relevant Governmental Body (whichever occurs first));

(d)    all Furnishings and Equipment located at the Stores, offices and storage facilities of Sellers (collectively, the "Facilities");

(e)    the Leases set forth on Section 2.01(d) of the Disclosure Schedule under the heading "Assumed Leases" (the "Assumed Leases"), together with (to the extent of Sellers' interest therein) the buildings, fixtures and improvements located on or attached to such real property, and all rights arising therefrom, and all tenements, hereditaments, appurtenances and other real property rights appertaining thereto, and all rights of Sellers under any non-disturbance agreement with the lessor of an Assumed Lease or its lenders, subject to the rights of the applicable landlord (including rights to ownership or use of such property) under the Assumed Leases;

14

(f)      all rights under each of the Contracts set forth on <u>Section 2.01(f)</u> of the Disclosure Schedules under the heading "Assumed Contracts", other than those Contracts that  expire or that are terminated prior to the Closing in accordance with their respective terms, together with all Contracts entered into or acquired by any Seller in connection with the operation of the Business at the Stores between the date hereof and the Closing (subject to compliance with <u>Section 5.01</u>), including, in each case, the right to possess or use the property that is the subject of the Assumed Contracts; provided that Sellers shall not reject or terminate any Contract used or held exclusively in the operation of the Stores without Buyer's written consent prior to the foregoing deadlines (such Contracts, together with the Assumed Leases, the "<u>Assumed Contracts</u>");

(g)      rights in respect any other rebate, payment, promotional allowance, reimbursement or refund related to the Stores;

(h)      to the extent assignable or transferable, all warranties related to any of the foregoing;

(i)      all Permits and any Liquor Licenses of Sellers related to the Business and assignable to Buyer under applicable law (and, for the avoidance of doubt, solely to the extent the applicable Governmental Body consents to or otherwise approves the assignment or transfer of the applicable Permit or Liquor License; provided Sellers shall only transfer, assign, convey, and deliver to Buyer such Permits or Liquor Licenses, in each instance, upon issuance of such requisite consent or approval or Liquor License Approval, as the case may be);

(j)      all in-store processors, front-end systems, point-of-sale systems (including self-checkout equipment), credit card readers, computers, computer equipment, hardware, software, peripherals, pin pads and direct access storage devices used or held for use in the Facilities;

(k)      any Owned Intellectual Property;

(l)      all customer data and information derived from branded loyalty promotion and other similar information related to customer purchases at the Stores;

(m)      causes of action, lawsuits, judgments, claims and demands of any nature related to the Business (other than under this Agreement or any Ancillary Document), whether arising by way of counterclaim or otherwise, in each case, to the extent arising from the Owned Intellectual Property, Assumed Contracts or otherwise related to the Acquired Assets or the Assumed Liabilities including, without limitation, any claims arising under Chapter 5 of the Bankruptcy Code;

(n)      all Documents (other than the Retained Documents);

(o)      the Insured Welfare Benefit Plans, together with any assets or other funding vehicles related to any such Insured Welfare Benefit Plans, and to the extent assignable or otherwise transferable to Buyer, any Contracts (including any group insurance contracts or policies) related to such Insured Welfare Benefit Plans to which any Seller is party (which

Contracts shall be considered Assumed Contracts), and any rebates, refunds, credits, or returns of premium arising under or in respect of any contract or policy of insurance assigned to and assumed by Buyer in connection with the assumption of an Insured Welfare Benefit Plan;

(p)    all of Sellers' security deposits, prepaid rent and prepaid expenses previously paid by Sellers to fulfill Sellers' obligations under the Assumed Leases or Assumed Contracts;

(q)    all proceeds under insurance policies and rights of recovery relating to any Acquired Asset;

(r)    all other properties, assets and rights owned by any Seller as of the Closing Date, or in which such Seller has an interest, which are used exclusively in the Business and which are not otherwise Excluded Assets; and

(s)    the amount of any Replacement Deposits, calculated in accordance with Section 5.11;

provided, however, notwithstanding anything to the contrary set forth in this definition, the Acquired Assets shall not include any Excluded Assets.

2.02    Excluded Assets.  Notwithstanding any other provision of this Agreement to the contrary, the Acquired Assets shall not include the following assets, properties or rights (the "Excluded Assets"):

(a)    all books and records that Sellers are required by law to retain or that Sellers determine are necessary or advisable to retain, including all (i) organizational documents, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates, and other similar documents relating to Sellers' organization, maintenance and existence; and (ii) books and records related to any claims, obligations or liabilities which are Excluded Liabilities (collectively, the "Retained Documents"); provided that Buyer shall have the right to make copies of any portion of the Retained Documents and records related to the Business, the Acquired Assets, or Assumed Liabilities;

(b)    any Tax refund, rebate, abatement, reimbursement, deposit, prepayment, credit, attribute, or other Tax asset of or with respect to any Seller all Tax Returns pertaining to Taxes paid or payable by Sellers;

(c)    all capital stock or equity securities held by any Seller;

(d)    all Permits that are not part of the Acquired Assets as provided herein;

(e)    except as described in Section 2.01(q), all insurance policies and binders and all rights thereunder, including all rights to recoveries, refunds and credits and to make claims thereunder;

16

(f)  all of Sellers' rights under this Agreement or any Ancillary Document;

(g)  all of Sellers' rights under any Contracts related to any Excluded Asset, unless such Contract is an Assumed Contract;

(h)  all Union Agreements (excluding the Modified Labor Agreements, if any);

(i)  all Contracts other than the Assumed Contracts;

(j)  adequate assurance deposits posted in accordance with Section 366 of the Bankruptcy Code;

(k)  all bank accounts of Sellers;

(l)  all Cash and Cash Equivalents of Sellers (other than the Closing Date Register Cash and Charity Cash);

(m)  those items set forth on Section 2.02(m) of the Disclosure Schedule under the heading "Excluded Assets;" and

(n)  the Rejected Deposits, as reduced by the amount of Replacement Deposits pursuant to Section 5.11.

As promptly as practicable following the Closing Date (and in any event within fifteen (15) Business Days), Sellers shall remove at their expense all of the Excluded Assets that are located at the Stores. Any Excluded Assets not timely removed by Sellers may be disposed of by Buyer in its sole discretion, without liability on the part of Buyer.

2.03  Assumed Liabilities.  Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, Buyer agrees to assume, pay, perform and discharge, promptly when payment or performance is due or required, the following (the "Assumed Liabilities"):

(a)  all Liabilities arising from the ownership, possession or use of the Acquired Assets from and after the Closing Date;

(b)  all Liabilities under the Assumed Contracts arising from and after the Closing Date (other than any Cure Costs or Permitted Lien Overage Costs in excess of the Cure Cost Cap);

(c)  all Cure Costs and Permitted Lien Overage Costs up to the Cure Cost Cap;

(d)  all Modified Labor Agreements; and

(e)  all Transfer Taxes allocated to Buyer pursuant to Section 9.02 and all Taxes attributable to any breach of any covenant or the inaccuracy of any representation or warranty made by Buyer.

provided, however, that notwithstanding anything to the contrary set forth in this definition, the
Assumed Liabilities shall not include any Excluded Liabilities or any Liability other than as
expressly set forth in this Section 2.03.

2.04    Excluded Liabilities.  Notwithstanding any other provision of this Agreement to the
contrary, the Assumed Liabilities shall not include any of the following liabilities or obligations
(the "Excluded Liabilities"):

(a)    any Liability not relating to or arising out of the Business or the Acquired
Assets, including any Liability exclusively relating to or exclusively arising out of the
Excluded Assets;

(b)    any Liability of Sellers for Taxes (except for any Taxes provided for in
2.03(e)) or constituting Cure Costs less than the Cure Cost Cap);

(c)    all indebtedness of Sellers for borrowed money, all accounts payable
(except for Cure Costs less than the Cure Cost Cap), and any claims or rights of recovery
against Sellers that are not Assumed Liabilities;

(d)    all Liabilities with respect to the Union Agreements for any action or
inaction of any Seller (or any predecessor of any Seller) occurring prior to or on the Closing
Date;

(e)    all Liabilities with respect to current or former employees of any Seller or
any individuals claiming to be Company Employees, for any action or inaction of any
Seller (or any predecessor of any Seller);

(f)    any Liability, whether civil, or criminal in nature, relating to any Liquor
License and the sale or service of alcoholic beverages thereunder, where the circumstances
upon which such Liability is predicated occurred prior to the Closing Date, unless expressly
assumed by Buyer;

(g)    any and all Liabilities arising under, out of, or in connection with, any
Benefit Plan (including any Business Benefit Plan) not expressly assumed by Buyer; and

(h)    all Liabilities of Sellers under this Agreement or any Ancillary Document
and the transactions contemplated hereby or thereby.

2.05    Assumption/Assignment of Contracts and Rights.

(a)    The Assumed Contracts shall be assigned by Sellers and assumed by Buyer
at the Closing pursuant to Section 365 of the Bankruptcy Code.  Buyer shall have sole
responsibility for paying any Cure Costs up to the Cure Cost Cap and Sellers shall have the
responsibility for paying Cure Costs in excess of the Cure Cost Cap, in either case, due in
connection with the assumption and assignment of the Assumed Contracts.

(b)    In the event that there are Contracts to which any Seller is a party not
included as an Assumed Contract (each, an "Initially Non-Assumed Contract"), Buyer shall

have the right to direct Sellers in writing prior to the Closing not to reject any Initially Non-Assumed Contract specified in such writing for a period from Closing to not more than thirty (30) days after Closing (the "Supplemental Assumption Period"). During the Supplemental Assumption Period, Buyer may provide written notice (a "Supplemental Assumption Notice") to Sellers that Buyer elects to add some or all of such Contracts to Schedule 2.01(f) of the Disclosure Schedules, and such Contracts (the "Supplemental Contracts") so added shall constitute Assumed Contracts. Sellers shall file a supplemental motion (a "Supplemental Assumption Motion") in the Bankruptcy Court to assume and assign such Supplemental Contracts to the extent not already covered in the Bidding Procedures Order. Buyer shall (i) have sole responsibility to pay any Cure Cost up to the Cure Cost Cap in connection with the assumption and assignment of each Supplemental Contract, and (ii) pay to Sellers all costs and expenses incurred by Sellers in respect of such Supplemental Contract from the date Sellers receive the Supplemental Assumption Notice to the date of the entry of a Final Order in connection with the applicable Supplemental Assumption Motion relating to such Supplemental Contract; provided, Buyer shall not pay any such costs and expenses in respect of any Supplemental Contract not included in the Contract List (as defined in Schedule 2.01(d) of the Disclosure Schedule).

(c)    Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Acquired Asset or any right thereunder if an attempted assignment, without the consent of a third party, would constitute a breach or in any way adversely affect the rights of Buyer or Sellers thereunder. If the assignment of an Assumed Contract is not attainable pursuant to Section 105, 363 and/or 365 of the Bankruptcy Code (including, without limitation, because of Buyer's failure to pay applicable Cure Costs or prove adequate assurance of future performance in respect of any Assumed Contract under Section 365(b) of the Bankruptcy Code), then such Assumed Contract shall not be transferred hereunder and the Closing shall proceed with respect to the remaining Assumed Contracts without any reduction in the Purchase Price.

2.06    Good Faith Deposit.

(a)    Simultaneously with the execution of this Agreement, Buyer and Sellers have executed the Escrow Agreement and Buyer shall deposit with the Escrow Agent cash in immediately available federal funds by wire transfer to an account designated by the Escrow Agent, an amount equal to $7.5 million (the "Good Faith Deposit"), to be applied as provided in Section 2.06(b). The Good Faith Deposit shall be held in escrow by the Escrow Agent in an interest bearing bank account pursuant to the terms of the Escrow Agreement.

(b)    The parties shall cause the Escrow Agent to disburse the Good Faith Deposit and interest earned thereon to Sellers (i) at the Closing as a credit against the Purchase Price, (ii) if this Agreement is terminated pursuant to Section 8.01(e) or Section 8.01(f), or (iii) if Buyer terminates this Agreement pursuant to Section 8.01(b) on or after the Termination Date (as extended pursuant to Section 8.01(b)) and at the time of such termination the conditions set forth in Section 7.01(c)(i)(a) and Section 7.01(c)(ii) (solely in the event of a Labor Appeal) shall have been satisfied. Except as described in the previous sentence, the parties shall cause the Escrow Agent to return the Good Faith

Deposit to Buyer within five (5) Business Days after any termination of the Agreement pursuant to Section 8.01. The provisions of this Section 2.06(b) shall survive any termination of this Agreement pursuant to Section 8.01.

2.07    Purchase Price.  In addition to the assumption of the Assumed Liabilities, in consideration for the sale, transfer and delivery of the Acquired Assets, at the Closing, Buyer shall deliver to Sellers $75 million, minus any Permitted Lien Overage Costs (the "Purchase Price") by wire transfer of immediately available federal funds to a bank account (or accounts) as shall be designated in writing no later than one day prior to the Closing Date by Sellers to Buyer, which amount shall be reduced by the amount of the Good Faith Deposit (together with interest earned thereon) disbursed to Sellers by the Escrow Agent as a credit against the Purchase Price in accordance with Section 2.06(b).

2.08    The Closing.  The closing of the transactions contemplated by this Agreement (the "Closing") will take place at the offices of Baker & Hostetler LLP located at 45 Rockefeller Plaza, New York, New York 10111 or such other mutually agreeable location in New York City, on the third Business Day following satisfaction of the conditions to the Closing set forth in Article VII (other than those conditions that by their nature are to be satisfied at the Closing) (the "Scheduled Closing Date") or such other date as Buyer and Holdings may mutually agree.  The date of the Closing is herein referred to as the "Closing Date." The Closing will be deemed to occur at 11:59 P.M.  Eastern time on the Closing Date.

2.09    Closing Deliverables.

(a)    At the Closing, Sellers will deliver or cause to be delivered to Buyer the following:

(i)    a certificate of Holdings executed by a duly authorized officer thereof, dated as of the Closing Date, stating that the conditions set forth in Section 7.02(a) and Section 7.02(b) have been satisfied;

(ii)    a duly completed Form W-9 executed by each Seller (or if a Seller is a disregarded entity for U.S. federal income tax purposes, a Form W-9 executed by the Person treated as its regarded owner for U.S. federal income purposes);

(iii)    a duly executed bill of sale and assignment and assumption agreement between Sellers and Buyer substantially in the form of Exhibit B (the "Bill of Sale and Assignment and Assumption Agreement");

(iv)    duly executed assignments of the Owned Intellectual Property, substantially in the form of Exhibit C (the "IP Assignment and Assumption Agreements");

(v)    a statement setting forth in reasonable detail the Permitted Lien Costs and the Permitted Lien Overage Costs (if any), which shall be delivered to Buyer one (1) Business Day prior to the Closing Date; and

(vi)    a certified copy of the Sale Order entered by the Bankruptcy Court.

(b)      At the Closing, Buyer will deliver or cause to be delivered to Sellers the following:

(i)      the aggregate Purchase Price, *less* the amount of the Good Faith Deposit (and any interest accrued thereon), by wire transfer of immediately available funds of the Purchase Price to the account(s) designated in writing by Holdings;

(ii)      evidence reasonably satisfactory to Holdings that all Cure Costs up to the Cure Cost Cap with respect to the Assumed Contracts have been paid or will be paid by Buyer in accordance with the Sale Order;

(iii)      a certificate of Buyer executed by a duly authorized officer thereof, dated as of the Closing Date, stating that the conditions set forth in Section 7.03(a) and Section 7.03(b) have been satisfied;

(iv)      the Bill of Sale duly executed by Buyer;

(v)      the Assignment and Assumption Agreement duly executed by Buyer; and

(vi)      the IP Assignment and Assumption Agreements duly executed by Buyer.

(c)      At the Closing, each of Holdings and Buyer shall deliver to the Escrow Agent, the joint written instructions contemplated by the Escrow Agreement, duly executed by Holdings and Buyer.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES REGARDING SELLERS

Except as set forth on the Disclosure Schedules, Sellers represent and warrant to Buyer as of the date hereof and as of the Closing Date as follows:

3.01    Organization and Corporate Power.  Each Seller is a legal entity duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and  has all requisite corporate power and authority and all authorizations, licenses, Permits, and Liquor Licenses necessary to own and operate its properties and to carry on the Business as now conducted (including, without limitation, all necessary Permits and Liquor Licenses relating to food preparation, handling, and sale of liquor, tobacco, and lottery sales), except where the failure to hold such authorizations, licenses or Permits would not have a Material Adverse Effect. Each Seller is qualified to do business in every jurisdiction in which its ownership, leasing or operation of property and assets or the conduct of its business as now conducted requires it to qualify, except where the failure to be so qualified would not have a Material Adverse Effect.

3.02    Authorization; Valid and Binding Agreement; No Breach.

(a)    Subject to the entry and effectiveness of the Bidding Procedures Order, the Sale Order and any Related Order, the execution, delivery and performance by each Seller of this Agreement and each Ancillary Document to which such Seller is a party and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite action on the part of such Seller. Assuming that this Agreement and each Ancillary Document to which Sellers are party is a valid and binding obligation of Buyer, and subject to the entry and effectiveness of the Bidding Procedures Order, the Sale Order and any Related Order, this Agreement and each such Ancillary Document constitute a valid and binding obligation of Sellers, enforceable in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect and to general equitable principles (collectively, "Principles of Equity").

(b)    Except as set forth on Schedule 3.02(b), and subject to the entry of the Sale Order and any Related Order, the execution, delivery and performance by each Seller of this Agreement and each Ancillary Document to which each Seller is a party and the consummation of the transactions contemplated hereby and thereby do not conflict with or result in any breach of, constitute a default under, result in a violation of, result in the creation of any Lien upon any assets of any Seller, or require any authorization, consent, approval, exemption or other action by or notice to any Governmental Body or other third party (in each case, except as would be excused by or unenforceable as a result of the entry or effectiveness of the Sale Order and any Related Order), under (i) any Seller's Organizational Documents, or (ii) the provisions of any Material Contract to which any Seller is bound, Permit or Liquor License, in either case, that relates to the Acquired Assets or the Business, or any law, statute, rule or regulation or order, judgment, injunction, or decree to which any Seller is subject other than (A) in the case of clause (ii), any such breaches, defaults, violations or rights that would not have a Material Adverse Effect, (B) the Liquor License Approvals and (C) any such authorizations, consents, approvals, exemptions or other actions the failure of which to obtain would not reasonably be expected to prohibit or materially delay any Seller's ability to consummate the transactions contemplated under this Agreement or to have any adverse effect on the Acquired Assets.

3.03    Financial Statements.  Schedule 3.03(a) consists of:  (a) the unaudited consolidated balance sheet of Holdings as of March 28, 2020 (the "Latest Balance Sheet") and the related consolidated statement of operations of Holdings for the 12-month period then ended, and (b) the audited consolidated balance sheets and statements of operations and cash flows of Holdings for the fiscal years ended March 31, 2019 and April 1, 2018 (all such financial statements referred to in clauses (a) and (b), the "Financial Statements").  The Financial Statements present fairly, in all material respects, the consolidated financial position and consolidated results of operations of Sellers (taken as a whole) as of the times and for the periods referred to therein in accordance with GAAP, consistently applied (subject in the case of the unaudited financial statements to (i) the absence of footnote disclosures and (ii) changes resulting from customary year-end adjustments in accordance with past practice).

3.04    Absence of Certain Developments.  Since the date of the Latest Balance Sheet through the date hereof, except as contemplated herein or as set forth on Schedule 3.04, Sellers have operated the Business in the ordinary course of business consistent with past practice.  Since

the date of the Latest Balance Sheet, there has not occurred any event, condition, change or effect that has had, or would reasonably be expected to have a Material Adverse Effect.

3.05   Real Property.

(a)   One of the Sellers (i) owns good title to all of the personal property shown to be owned by Sellers on the Latest Balance Sheet, and (ii) holds, pursuant to valid and enforceable leases, all of the personal property used in the operation of the Business that is owned by any other party, in each case, free and clear of all Liens (except for Permitted Liens), except for assets disposed of by any Seller in the ordinary course of business consistent with past practice since the date of the Latest Balance Sheet.

(b)   The real property demised by the Assumed Leases set forth on Schedule 3.05(b)(i) (the "Leased Real Property") constitutes all of the real property leased by any Seller with respect to the Business. Schedule 3.05(b)(i) sets forth a true, correct and complete list of all locations of the Leased Real Property.  Except as set forth on Schedule 3.05(b)(ii), (i) each Assumed Lease is valid and binding on the Seller party thereto and, to the knowledge of Sellers, against any other party thereto, enforceable in accordance with its terms, subject to Principles of Equity, (ii) such Assumed Lease constitutes the entire agreement to which the applicable Seller is a party with respect to the real property leased thereunder, (iii) each Seller is in occupancy of its respective demised premises under its respective Assumed Lease and none of Sellers has assigned, sublet, transferred or conveyed any interest in such Assumed Lease or the real property leased thereunder, (iv) all accrued and currently payable rents and other payments required thereunder to be paid by such Seller have been paid, (v) no Seller is (and, to Sellers' knowledge, no other party thereto is) in default in any material respect under, or in breach of, such lease, (vi) to Sellers' knowledge, there are no condemnation or eminent domain proceedings pending, contemplated or threatened against, (vii) no Seller has received written notice of any violation of applicable law pertaining to the Leased Real Property, (viii) to Sellers' knowledge, each applicable Seller's possession and quiet enjoyment of the Leased Real Property under each Assumed Lease had not been disturbed, and to Sellers' knowledge, there are no disputes with respect to such Assumed Lease, and (ix) neither the whole nor any significant portion of any Leased Real Property has been damaged or destroyed by fire or other casualty. Each Seller has delivered or made available to Buyer true, correct and complete copies of each of the Assumed Leases described on Schedule 3.05(b)(i), and none of such Assumed Leases has been modified in any material respect, except to the extent that such modifications are disclosed by the copies delivered by the copies delivered or made available to Buyer. Subject to the entry of the Sale Order and any Related Order, no Consent is required under any Assumed Lease in connection with the transactions contemplated by this Agreement.

(c)   No Seller owns any real property or is a party to any contract, option or other right to purchase or acquire any real property.

3.06   Tax Matters.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:

(a)    All income and material federal, state, local and foreign Tax Returns required to be filed by Sellers with respect to the Acquired Assets or the Assumed Liabilities have been timely filed when due (taking into account all valid extensions of due dates) and all such Tax Returns are true, correct and complete in all material respects.  All Taxes, whether or not shown to be due and payable on such Tax Returns, that are due and payable by any Seller with respect to the Acquired Assets or the Assumed Liabilities have been timely paid in full by the due date thereof. Except as described on Schedule 3.06(a), no claim has ever been made in writing by any taxing authority in any jurisdiction with respect to which a Seller does not file or has not filed Tax Returns that such Seller is or may be subject to taxation by that jurisdiction.

(b)    In all material respects, each Seller has (i) withheld and paid over to the appropriate Tax Authority all Taxes it is required to withhold from amounts paid or owing to any employee, independent contractor, creditor, or other third party under applicable laws, (ii) where applicable, retained all records or forms required to support or qualify the status as such of any Person referenced in the preceding clause, and  (iii) retained any forms or other documents supporting the exemption of any person from Tax that such Seller was otherwise required to collect, withhold or pay.

(c)    The representations and warranties in this Section 3.06 shall constitute the sole and exclusive representations and warranties by Sellers with respect to Taxes, and no representation or warranty in this Section 3.06 shall be deemed to apply directly or indirectly to any period after the Closing.

3.07    Material Contracts.

(a)    Except as set forth on Schedule 3.07(a), as of the date hereof, no Seller is party to any of the following (each, a "Material Contract" and, collectively, the "Material Contracts"):

(i)    any Contract that contains a non-competition covenant that prohibits any Seller or any of its Affiliates from conducting the Business or owning the Acquired Assets in any geographic location, except for any such Contract that may be cancellable without any payment by such Seller or any of its Affiliates, as applicable, on notice of sixty (60) or fewer days;

(ii)    any Union Agreement or Contract with any labor union that covers any Company Employee, other than as set forth on Schedule 3.15;

(iii)    any Contract for the employment of any Company Employee providing for fixed compensation in excess of $150,000 per annum;

(iv)    any guaranty of any obligation for Indebtedness;

(v)    any Contract, the primary purpose of which is to provide indemnity rights;

(vi)     any lease or agreement under which it is lessee of, or holds or operates any personal property primarily for use in connection with the Business and owned by any other party, for which the annual rental exceeds $125,000;

(vii)     any lease or agreement under which it is lessor of or permits any third party to hold or operate any property, real or personal, primarily held for use in connection with the Business, for which the annual rental exceeds $20,000;

(viii)     any Contract for the purchase by any Seller of products or services in connection with the Business, under which the undelivered balance of such products and services has a selling price in excess of $250,000 (other than purchase orders entered into in the ordinary course of business);

(ix)     any Contract with any vendor for merchandise resold by any Seller in connection with the Business which contains any minimum requirements, exclusivity, "most favored nation," or similar provisions;

(x)     any Contract with any Governmental Body; or

(xi)     any Contract relating to any (A) pending acquisition or disposition of any business or Person by any Seller, (B) completed acquisition or disposition of any business or Person (whether by purchase, merger, consolidation or otherwise) by any Seller with material surviving obligations thereunder on the part of any Seller or (C) joint venture, partnership, strategic alliance or other similar agreement, in each case, in connection with the Business.

(b)     Buyer has been given access to a true and correct copy of all Material Contracts, together with all material amendments, waivers or other changes thereto.

(c)     Except as set forth on Schedule 3.07(a), as of the date hereof (i) other than as a result of the Bankruptcy Cases, no Seller is in material default under any Material Contract, (ii) to Sellers' knowledge, each other party to each of the Material Contracts is not in material default thereunder, and (iii) to Sellers' knowledge, excluding the effect of the Bankruptcy Cases, no event has occurred that with the passage of time or giving of notice or both would constitute a material breach or material default by any party under any Material Contract, except, in the case of the foregoing clauses (i) and (iii), for any breach or default, individually or in the aggregate, (x) that would not reasonably be expected to be material to the Business, the Acquired Assets, or the Assumed Liabilities or (y) that has been cured or will be cured as a result of the payment of the applicable Cure Costs and entry and effectiveness of the Sale Order and any other Related Order.

3.08     Intellectual Property.

(a)     All of the patents, internet domain names, social media accounts, registered trademarks, registered service marks, registered copyrights, and applications for any of the foregoing owned by any Seller (collectively, "Registered Intellectual Property") are set forth on Schedule 3.08(a).  One of Sellers owns and possesses all right, title, and interest in and to each Registered Intellectual Property, free and clear of all Liens other than

Permitted Liens and a Seller owns, free and clear of all Liens other than Permitted Liens, or has a license or other right to use, all other Intellectual Property material to the conduct of the Business, except for any Excluded Assets.

(b)     The Registered Intellectual Property included in the Acquired Assets are subsisting and, to Sellers' knowledge, valid and enforceable in their respective jurisdictions of registration in accordance with the applicable laws of such jurisdictions. The foregoing will not be construed as any representation that any Registered Intellectual Property included in the Acquired Assets will issue on any application therefor.   All filing, examination, issuance, and post-registration fees associated with or required with respect to the Registered Intellectual Property included in the Acquired Assets that were due prior to the Closing have been timely paid.

(c)     No Registered Intellectual Property included in the Acquired Assets is involved in or, in the three (3) years prior to the date hereof, has been involved in, any opposition, cancellation or similar proceeding, and no such proceeding is threatened in writing. (i) To Sellers' knowledge, no Seller is infringing, misappropriating, or otherwise violating the Intellectual Property rights of any other Person, (ii) to Sellers' knowledge, no Person is currently infringing, misappropriating, or otherwise violating, any Owned Intellectual Property, and (iii) there is not pending before any Governmental Body any claim, Action, or proceeding alleging any of the foregoing (in clauses (i) or (ii)) or contesting the use, validity, enforceability, or ownership of any Owned Intellectual Property.

(d)     To Sellers' knowledge, there have been no breaches, security incidents, misuse of or unauthorized access to or disclosure of any Personal Information by or on behalf of Sellers in violation of Privacy Laws.   To Sellers' knowledge, no Seller has received notice of any claims or investigations or inquiries by Governmental Bodies related to, or been charged with, the violation of any Privacy Laws with respect to Personal Information. To Sellers' knowledge, there are no facts or circumstances that could reasonably form the basis of any such notice or claim.

(e)     Each Seller and each Affiliate thereof owns or has a valid right to access and use pursuant to a valid, written Contract all computer systems, networks, hardware, technology, databases, websites, and equipment used to process, store, maintain and operate data, information, and functions used in and material to the Business (the "IT Systems").  The IT Systems have not suffered any material malfunction, failure, or security breach.

(f)     Notwithstanding any other provision of this Agreement, the representations and warranties contained in Section 3.08(a) through Section 3.08(e) constitute the sole and exclusive representations and warranties of Sellers related to Intellectual Property matters.

3.09    Litigation.

(a)     Except as set forth on Schedule 3.09 and other than the Bankruptcy Cases, as of the date hereof, there are no Actions pending or, to Sellers' knowledge, threatened

against any Seller, at law or in equity, or before or by any Governmental Body, to which any Seller is a party or relating to any Acquired Assets or the Business, or that challenge the validity or enforceability of this Agreement or any Ancillary Documents or that seeks to enjoin or prohibit the consummation of the transactions contemplated hereby and thereby, and no Seller is subject to any outstanding judgment, order or decree (i) relating to any Acquired Asset or the Business or (ii) of any Governmental Body, that would materially adversely affect the Acquired Assets or the Business or prevent or materially delay the consummation of the transactions contemplated in this Agreement.

(b)    This Section 3.09 does not relate to (i) ERISA or other laws regarding employee benefit matters, which are governed exclusively by Section 3.10, (ii) employment and labor matters, which are governed exclusively by Section 3.15, (iii) Environmental Laws, which are governed exclusively by Section 3.13 or (iv) tax laws, which are governed exclusively by Section 3.06.

3.10    Employee Benefit Plans.

(a)    Schedule 3.10(a) contains a true and complete list of each material Benefit Plan.  Each Business Benefit Plan is sponsored or maintained by a Seller.  Each of the Benefit Plans that is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service (provided that the foregoing is limited to Sellers' knowledge with respect to any Multiemployer Plans), and (to Sellers' knowledge with respect to any Multiemployer Plans), no facts or circumstances exist that would adversely affect the qualified status of any such Benefit Plan.  Except as would not reasonably be expected to have a Material Adverse Effect or as set forth on Schedule 3.10(a), and limited to Sellers' knowledge with respect to any Multiemployer Plans, each Benefit Plan has been maintained and administered in compliance in form and in operation in all respects in accordance with its terms and with applicable law, including the requirements of the Code and ERISA.

(b)    With respect to each Benefit Plan, to Sellers' knowledge, all required contributions of any Seller due on or before the Closing Date have been made within the time periods prescribed by ERISA and the Code, and all contributions for any period ending on or before the Closing Date that are not yet due have been made or properly accrued on or before the Closing Date in accordance with GAAP or otherwise reflected on the Financial Statements.

(c)    Except as set forth on Schedule 3.10(c), none of the Benefit Plans is subject to Title IV of ERISA nor provides for medical, life, or disability insurance benefits to retired or former employees of any Seller (other than as required under Code Section 4980B, or similar state law).  Except as set forth on Schedule 3.10(c), no Seller is a participating or contributing employer in or to any "multiemployer plan" (as defined in Section 3(37) of ERISA) with respect to employees of any Seller nor has any Seller received notice of any claim or demand for a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA, respectively) that has not been satisfied in full.

(d)    No Benefit Plan is, and no Seller has any liability with respect to, any (i) "plan maintained by more than one employer" within the meaning of Section 413(c) of the Code or (ii) "multiple employer welfare arrangement" within the meaning of Section 3(40) of ERISA.

(e)    Each Seller is in material compliance with the Patient Protection and Affordable Care Act and all regulations thereunder as applicable to such Seller, including specifically and without limitation Sections 4980D and 4980H of the Code.

(f)    Each Business Benefit Plan that constitutes a "nonqualified deferred compensation plan" (within the meaning of Section 409A of the Code) has been operated and maintained, in form and operation, in all material respects in accordance with all applicable requirements of Section 409A of the Code and all applicable guidance.

(g)    There are no Actions on behalf of, with respect to or against any of the Business Benefit Plans, or any trusts or individual or group contracts or policies related thereto, or any fiduciaries acting (or, obligated to act) with respect to any such Business Benefit Plans, and, to Sellers' knowledge, there are no facts that would reasonably be expected to give rise thereto (other than the ordinary and usual claims for benefits by participants, dependents or beneficiaries).  To Sellers' knowledge, there have been no non-exempt "prohibited transactions" (as defined in Section 406 of ERISA or Section 4975 of the Code) or breaches of fiduciary duty with respect to any Business Benefit Plan.  None of the Business Benefit Plans are presently under audit or examination (nor has notice been received by any Seller of a potential audit or examination) by any Governmental Body.

(h)    No current or former employee, officer, director or other individual service provider of any Seller is entitled to any gross-up, make-whole or other additional payment in respect of any Tax imposed under Section 4999 or 409A of the Code or interest or penalty related thereto.

(i)    Except as set forth on Schedule 3.10(i), neither the execution of this Agreement nor the consummation of the transactions contemplated by this Agreement will (i) result in any payment becoming due or payable, or required to be provided, from Sellers to any employee, officer, director, stockholder or other service provider of Sellers (whether current, former or retired) or their beneficiaries, (ii) accelerate the time of payment, funding or vesting, or increase the amount of compensation or benefits due to any employee, officer, director, stockholder or other service provider of Sellers (whether current, former or retired) or their beneficiaries, or (iii) limit or restrict the ability of Sellers (or any successor) to amend or terminate any Business Benefit Plan.  No amount that could be payable by a Seller (whether in cash or property or the vesting of property) as a result of the consummation of the transactions contemplated by this Agreement to any employee, officer, director, stockholder or other service provider of Sellers under any Benefit Plan or otherwise would reasonably be expected to be non-deductible by reason of Section 280G of the Code or to be subject to an excise tax under Section 4999 of the Code.

3.11    Insurance.  Schedule 3.11 lists each material insurance policy providing coverage for the Acquired Assets maintained by Sellers.  As of the date hereof, (a) all insurance policies of

Sellers are in full force and effect, (b) no written notice of default or termination has been received by Sellers in respect of any such insurance policy, and (c) all premiums due on such insurance policies have been paid in full.

3.12    Compliance with Laws.

(a)    Except as set forth on Schedule 3.12(a), to Sellers' knowledge, each Seller (i) is in compliance with all Permits and laws applicable to the Acquired Assets, except where any noncompliance would not reasonably be expected to have a Material Adverse Effect, (ii) possesses all material Permits required under applicable law to carry on the Business as currently being conducted, and (iii) to Sellers' knowledge, there are no proceedings pending or, to the knowledge of Seller, threatened which may reasonably be expected to result in the revocation, cancellation or suspension thereof. Except as set forth on Schedule 3.12(a), the consummation of the transactions contemplated hereby will not result in any such revocation, cancellation or suspension of any Permit, nor require Sellers or Buyer to make any filing or take any action in order to maintain the validity of any Permit applicable to the Acquired Assets.

(b)    Schedule 3.12(b) sets forth a complete and correct list of all (i) Liquor Licenses held or used by each Seller, including the Person in whose name such license is issued, dated of issuances and renewal date and (ii) all Third Party Liquor Licenses. Each of the Sellers and, to the knowledge of Sellers, each holder of a Third Party Liquor License, is in material compliance with all applicable state, municipal and other governmental laws, regulations and rules with respect to the sale of liquor and other alcoholic beverages and has the right to sell liquor and other alcoholic beverages at retail within each of the Stores, subject to and in accordance with all applicable provisions of the Liquor Licenses or Third Party Liquor Licenses, as the case may be.  Except as set forth on Schedule 3.12(b), since December 31, 2018, (i) there have been no legal proceedings brought or, to the knowledge of Sellers, threatened to be brought by or before a Governmental Body in respect of any such Liquor License or the activities of such Seller in connection with any such Liquor License (or in connection with any other liquor licenses previously held or used by such Seller), (ii) no such Liquor License is subject to any due but unpaid tax obligation owed to a Governmental Body, the outstanding nature of which would preclude transfer of such Liquor License from any of the Sellers to Buyer, and (iii) no such Liquor License has been threatened by a Governmental Body to be revoked, limited or not renewed. The execution, delivery and performance by each Seller of this Agreement and each Ancillary Document to which any Seller is a party and the consummation of the transactions contemplated hereby and thereby does not require any consent, authorization, exemption or other action by or notice to any Governmental Body or other third party with respect to any Third Party Liquor License.

(c)    None of Sellers nor any of their Affiliates has, directly or indirectly, taken any action with respect to the Business or the Acquired Assets that violates any anti-corruption, anti-bribery, trade or economic sanction, anti-money laundering or similar law that is applicable to the Business or the Acquired Assets (whether by virtue of jurisdiction of organization or conduct of business).  There is no Action pending or, to the knowledge

of Sellers, threatened with respect to a Seller's or any of its Affiliates' conduct of the Business relating to any of the foregoing laws.

(d)    This Section 3.12 does not relate to (i) ERISA or other laws regarding employee benefit matters, which are governed exclusively by Section 3.10, (ii) employment and labor matters, which are governed exclusively by Section 3.15, (iii) Environmental Laws, which are governed exclusively by Section 3.13 or (iv) tax laws, which are governed exclusively by Section 3.06.

3.13    Environmental Compliance and Conditions.  Except as set forth on Schedule 3.13:

(a)    To Sellers' knowledge, each Seller is in material compliance with all applicable Environmental Laws, except for such instances of noncompliance that would not reasonably be expected to have a Material Adverse Effect.

(b)    To Sellers' knowledge, Sellers hold and are in compliance with all material Permits required under applicable Environmental Laws to operate at the Leased Real Property and to carry on the Business as now conducted.

(i)    there is no Action pursuant to any Environmental Law pending or, to the knowledge of Sellers, threatened in writing against any Seller that would reasonably be expected to have a Material Adverse Effect, and

(ii)    no Seller is a party to or subject to any judgment, order or decree of any Governmental Body issued pursuant to an Environmental Law that would reasonably be expected to have a Material Adverse Effect.

(c)    To Sellers' knowledge, there are no Hazardous Substances present in the environment associated with any Leased Real Property or property operated by any Seller that require remedial action by any Seller pursuant to any applicable Environmental Law, except where such presence would not reasonably be expected to have a Material Adverse Effect.

(d)    Notwithstanding any other provision of this Agreement, the representations and warranties contained in this Section 3.13 and Section 3.05(b), constitute the sole and exclusive representations and warranties of Sellers relating to Environmental Laws.

3.14    Affiliated Transactions.  Except as set forth on Schedule 3.14, no officer, director, controlling shareholder or Affiliate of any Seller nor, to Sellers' knowledge, any individual in such officer's, director's or controlling shareholder's or Affiliate's immediate family is a party to any material agreement, Contract, commitment or transaction with any Seller (other than employment-related matters) or has any material interest in any of the Acquired Assets.

3.15    Employment and Labor Matters.

(a)    Except as set forth on Schedule 3.15, (i) no Seller is a party to or bound by any Union Agreement; (ii) within the past three years, no Seller has experienced any strike, slowdown, work stoppage, lockout or material labor dispute, claim of unfair labor

practices, grievances (other than routine individual grievances), arbitration decisions, or other material dispute (nor has there been any such material dispute, to the knowledge of Sellers, threatened in writing; (iii) there are no material disputes pending or, to Sellers' knowledge, threatened in writing with respect to any current or former Company Employees; (iv) there are no current union representation questions involving employees of any Seller; and (v) to Sellers' knowledge there are no demands for recognition for any Company Employees or union organizing efforts among Company Employees underway.

(b)     No other organization is a joint or co-employer of the Company Employees.

(c)     Except as set forth on Schedule 3.15(c), there are, and since January 1, 2018, there have been no, Contracts with independent contractors or sole proprietors to perform services that are the same or substantially similar to services performed by current or former Company Employees; nor are there any material disputes pending or, to Sellers' knowledge, threatened in writing with respect to any independent contractor engaged by any Seller.

(d)     Except as set forth on Schedule 3.15(d): (i) each Seller is in compliance in all material respects with all applicable laws respecting employment and labor including those laws respecting worker classification, overtime pay and wages and hours, paid time off, employee leave, employment discrimination, harassment, immigration, layoffs (including the WARN Act), workers' compensation, termination and severance pay, human rights, occupational health and safety, equal opportunity, labor relations, collective bargaining and the payment of social security and other employment-related Taxes; (ii) since January 1, 2018, there has been no wage and hour investigation, employment discrimination charge, or written complaint pertaining to any such charge against or affecting any Seller in respect of the Business , nor has any Seller received written notice of the intent of any Governmental Body responsible for the enforcement of labor, employment, occupational health and safety or workplace safety and insurance/workers compensation laws, including any state labor relations board or equal opportunity agency or any court or tribunal, to conduct an investigation of such Seller relating to the Business, nor has any written complaint or complaint been filed against any Seller.

3.16    Brokerage. Except as set forth on Schedule 3.16, there are no claims for brokerage commissions, finders' fees or similar compensation in connection with the transactions contemplated by this Agreement or the Ancillary Documents based on any arrangement or agreement made by or on behalf of any Seller or any of their respective Affiliates.

3.17    Suppliers. Schedule 3.17 sets forth an accurate and complete list of the ten (10) largest third-party suppliers (based on the total amount purchased from such supplier) (each, a "Material Supplier") of the Business for the 12-month period ended December 31, 2019. No Seller has received any written notice from any such Material Supplier stating that such supplier has terminated or materially diminished, or intends to terminate or materially diminish, its relationship with any Seller. Since the beginning of the current fiscal year, Sellers have made all material payments to the Material Suppliers pursuant to the terms of any Contract or arrangement between any Seller and any Material Supplier, in each case, consistent with the Sellers' payment practices in the ordinary course of business (including, without limitation, subject to good faith disputes and

customary reconciliations of amounts owed), and, to the knowledge of Sellers, the business relationship with each Material Supplier is in good standing.

3.18    <u>Quality and Safety of Food & Beverage Products</u>. Each of Sellers' practices with respect to the storage, preparation, handling, labeling, and sale for each of the food, tobacco, and beverage products (including alcoholic beverages) stored, prepared, handled, labeled, or sold at the Stores are in compliance with applicable laws (including all laws relating to food, tobacco, and beverage (including alcoholic beverages) storage, preparation, handling, labeling, and sale) in all material respects. No Seller has any liability for recall of any food, tobacco, or beverage products, nor any liability to any Person as a result of the possession or use of any of the food, tobacco, or beverage products (including alcoholic beverages) stored, prepared, handled, labeled, or sold in connection with the Business. There are no Actions pending or, to the knowledge of Sellers, threatened against any Seller with respect to any violations of such laws (including all laws relating to food, tobacco, and beverage (including alcoholic beverages) storage, preparation, handling, labeling, and sale). No Seller has received any written notice as to any claim or allegation of injury or death to any Person, any claim for punitive damages, any claim for contribution or indemnification or other economic damages, or any claim for injunctive relief or product recall in connection with any food, tobacco, or beverage product (including alcoholic beverages) stored, prepared, handled, labeled, or sold in connection with the Business. Sellers have made available to Buyer true and complete copies of all reports resulting from any audits and inspections conducted by third parties of the quality or safety management practices completed since January 1, 2018 with respect to the quality and safety of food, tobacco, and beverage products (including alcoholic beverages) at the Stores.

3.19    <u>Title to Assets</u>.  Sellers have good and valid title to, or the right to use, all of the Acquired Assets, free and clear of all Liens (other than Permitted Liens). Upon the entry and effectiveness of the Sale Order and any Related Order, Sellers will have the power and right to convey such title or rights to use, all of the Acquired Assets, free and clear of all Liens (other than Permitted Liens), to the maximum extent permitted by the provisions of the Bankruptcy Code.

3.20    <u>No Other Representations and Warranties</u>.    EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES REGARDING SELLERS CONTAINED IN THIS <u>ARTICLE III</u>, NO SELLER MAKES ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, AND SELLERS HEREBY DISCLAIM ANY SUCH REPRESENTATION OR WARRANTY WITH RESPECT TO THE EXECUTION AND DELIVERY OF THIS AGREEMENT AND THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  BUYER WILL ACQUIRE THE ACQUIRED ASSETS WITHOUT ANY REPRESENTATION OR WARRANTY AS TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, IN AN "AS IS" CONDITION AND ON A "WHERE IS" BASIS, EXCEPT AS OTHERWISE EXPRESSLY REPRESENTED OR WARRANTED IN THIS AGREEMENT.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to each Seller as of the date hereof and as of the Closing Date as follows:

4.01    Organization and Power.  Buyer is a limited liability company, duly organized, validly existing and in good standing under the laws of the state of its organization, with full corporate power and authority to enter into this Agreement and the Ancillary Documents, consummate the transactions contemplated hereby and thereby and perform its obligations hereunder and thereunder.

4.02    Authorization; Valid and Binding Agreement.  The execution, delivery and performance by Buyer of this Agreement and each Ancillary Document to which Buyer is a party and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite action on the part of Buyer, and no other proceedings on Buyer's part are necessary to authorize the execution, delivery or performance by Buyer of this Agreement or such Ancillary Documents.  Assuming that this Agreement and each Ancillary Document to which Buyer is a party is a valid and binding obligation of each Seller, this Agreement and each such Ancillary Document constitutes a valid and binding obligation of Buyer, enforceable in accordance with its terms, except as enforceability may be limited by Principles of Equity.

4.03    No Breach.  The execution and delivery by Buyer of this Agreement and any Ancillary Document to which it is a party, the consummation of the transactions contemplated hereby and thereby and the performance of its obligations hereunder and thereunder will not conflict with or result in any material breach of, constitute a material default under, result in a material violation of, result in the creation of any material Lien upon any material assets of Buyer, or require any material authorization, consent, approval, exemption or other material action by or notice to any Governmental Body or other third party, under (a) Buyer's Organizational Documents other than such consents as have been obtained as of the date hereof or (b) the provisions of any material indenture, mortgage, lease, loan agreement or other material agreement or instrument to which Buyer is bound, or any law, statute, rule or regulation or order, judgment or decree to which Buyer is subject other than in the case of clause (b), any such breaches, defaults, violations or Liens that, individually or in the aggregate, would not materially delay the ability of Buyer to perform any of its obligations under this Agreement or the Ancillary Documents to which Buyer is a party.

4.04    Consents.  Other than as may be required in connection with obtaining the Sale Order and any Related Order, Buyer is not required to submit any notice, report or other filing with any Governmental Body in connection with the execution, delivery or performance by it of this Agreement, each Ancillary Document to which it is a party or the consummation of the transactions contemplated hereby and thereby.  Other than the Sale Order and any Related Order, no consent, approval or authorization of any Governmental Body or any other party or Person is required to be obtained by Buyer in connection with its execution, delivery and performance of this Agreement, each Ancillary Document to which it is a party or the consummation of the transactions contemplated hereby and thereby.

33

4.05     Litigation.  There are no Actions pending or, to Buyer's knowledge, threatened in writing against Buyer, at law or in equity, or before or by any Governmental Body, nor is Buyer subject to any outstanding judgment, order or decree of any Governmental Body which would reasonably be expected to adversely affect Buyer's performance under this Agreement, each Ancillary Document to which it is a party or the consummation of the transactions contemplated hereby and thereby.

4.06     Brokerage.  There are no claims for brokerage commissions, finders' fees or similar compensation in connection with the transactions contemplated by this Agreement based on any arrangement or agreement made by or on behalf of Buyer or any of its Affiliates.

4.07     Financing; Immediately Available Funds.  Buyer has, on the date hereof, the financial capability to consummate the transactions contemplated by this Agreement and the Ancillary Documents on the terms and subject to the conditions set forth herein, and will have all such capability in advance of the Closing Date.  Buyer affirms that it is not a condition to Closing or to any of its obligations under this Agreement or any Ancillary Document that Buyer obtains financing for the transactions contemplated by this Agreement and the Ancillary Documents.

4.08     Sufficient Funds.  Without limiting the last sentence of Section 4.07, assuming that Buyer shall have received the proceeds of the Debt Financing, Buyer will have, upon the Closing, immediately available funds sufficient to enable it to perform all of Buyer's obligations under this Agreement, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, Buyer in connection with the transactions contemplated hereby. Buyer has not incurred, and is not contemplating or aware of, any obligation, commitment, restriction or other liability of any kind, in each case that would impair or adversely affect such resources, funds or capabilities.

4.09     Investigation.  Buyer acknowledges that, except for the representations and warranties set forth in this Agreement, it is relying on its own independent investigation and analysis in entering into the transactions contemplated hereby.  Buyer is knowledgeable about the industries in which the Business operates and is capable of evaluating the merits and risks of the transactions contemplated by this Agreement and is able to bear the substantial economic risk of such investment for an indefinite period of time.  To Buyer's knowledge, Buyer has been afforded full access to the books and records, facilities and personnel of the Business for purposes of conducting a due diligence investigation and has conducted a full due diligence investigation of the Business, the Acquired Assets, the Assumed Liabilities and the Assumed Contracts.  For the avoidance of doubt, nothing herein shall affect Buyer's right to rely on the representations and warranties set forth in this Agreement.

4.10     Financing.  Buyer has provided to Sellers a true, correct and complete copy of (i) the fully executed debt term sheet attached hereto as Exhibit D (the "Debt Term Sheet"), pursuant to which certain lenders party thereto have proposed, subject solely to the terms and conditions expressly set forth therein, to provide the amounts set forth therein to Buyer for the purpose of funding the transactions contemplated by this Agreement (the "Debt Financing").

ARTICLE V

CERTAIN PRE-CLOSING COVENANTS

5.01    Conduct of the Business.

(a)    From the date hereof until the earlier of the Closing Date and the date on which this Agreement is terminated pursuant to Section 8.01, except (i) as set forth on Schedule 5.01, (ii) as specifically required or contemplated by this Agreement, (iii) as required by applicable law (including the Bankruptcy Code), (iv) as required by any order of the Bankruptcy Court or (v) with the prior written consent of Buyer (which consent will not be unreasonably withheld, conditioned or delayed and notice of which consent or rejection shall be provided by Buyer within five Business Days following any such request from Sellers.  Sellers will use commercially reasonable efforts to:

(i)    conduct the Business in the ordinary course of business (including without limitation, maintain the cash in the registers located at each Store in the ordinary course); and

(ii)    maintain and preserve intact the Business's goodwill;

provided, however, that the parties acknowledge that any inability to perform the covenants provided in this Section 5.01 to the extent due to the impact of the Covid-19 pandemic shall not be deemed to be a violation of this Section 5.01(a).

(b)    From the date hereof until the earlier of the Closing Date and the date on which this Agreement is terminated pursuant to Section 8.01, except (i) as set forth on Schedule 5.01, (ii) as specifically required or contemplated by this Agreement, (iii) as required by applicable law (including the Bankruptcy Code or any law, regulation, or order of any Governmental Body in respect of the Covid-19 pandemic), (iv) as required by any order of the Bankruptcy Court or (v) with the prior written consent of Buyer (which consent will not be unreasonably withheld, conditioned or delayed and notice of which consent or rejection shall be provided by Buyer within five Business Days following any such request from Sellers.  Sellers will not take or permit any of the following actions:

(i)    amend or modify the Organizational Documents of any Seller;

(ii)    declare, set aside or pay any dividend or other distribution of assets in respect of its capital stock, in each case, other than dividends and distributions by any Seller to another Seller;

(iii)    subject any Acquired Assets to any Liens other than (A) Permitted Liens, (B) Liens between Sellers, (C) any Liens securing any DIP Facility and (D) Liens incurred in connection with participation in any relief programs offered under the CARES Act or similar legislation arising from the Covid-19 pandemic for which Sellers may be eligible;

35

(iv)      sell, lease, transfer or otherwise dispose of any Acquired Assets other than sales, leases, transfers or dispositions (A) by and among Sellers, (B) of obsolete, broken or unsalable equipment or other assets no longer used or usable in the Business or (C) of inventory in the ordinary course of business;

(v)       sell, assign or transfer any Intellectual Property;

(vi)      make or commit to make capital expenditures in excess of $250,000 in the aggregate;

(vii)     change in any material respect any of its material accounting principles, practices or methods, except as may be required by any Governmental Body or to comply with changes in GAAP or applicable law;

(viii)    except to the extent required by law or by any existing employee benefit plan, Union Agreement or employment Contract in existence as of the date hereof or as otherwise done in the ordinary course of business (A) grant any bonuses, severance or equity incentive award, or increase the compensation or benefits of any Person or alter any such Person's title, (B) pay any pension, severance or retirement benefits not required by any existing plan or similar agreement (C) make or grant any increase in any employee benefit plan or similar arrangement, or amend or terminate any existing employee benefit plan or similar arrangement or severance agreement or employment Contract or adopt any new employee benefit plan or similar arrangement or severance agreement or employment Contract or (D) hire or promote any employee who provides services primarily to the Business;

(ix)      acquire (by merging or consolidating with, purchasing all or substantially all of the assets or capital stock of, or by any other manner acquiring) any Person;

(x)       enter into any Contract that if entered into prior to the date hereof would be a Material Contract or amend in any material respect or terminate or extend any Material Contract;

(xi)      waive, release, assign, settle or compromise any claim, Action or proceeding in respect of the Business, the Assumed Liabilities or the Acquired Assets, other than in the ordinary course of business consistent with past practice or to the extent covered by insurance, involving only the payment of money damages in an amount not to exceed $75,000, with respect to any single Action, or $200,000, in the aggregate among all such Actions; or

(xii)     agree or commit to do any of the foregoing.

5.02    <u>Cooperation</u>.

(a)      Through the earlier of the Closing and the date on which this Agreement is terminated in accordance with <u>Section 8.01</u>, each party shall, and shall cause its Affiliates

to, use its reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws to consummate and make effective the transactions contemplated hereby as soon as practicable, including satisfaction, but not waiver, of the conditions to Closing set forth in Article VII.

(b)    Without limiting the generality of the foregoing, neither Buyer nor any Seller shall take any action, or permit any of their respective subsidiaries to take any action, to materially diminish the ability of any party to consummate, or materially delay any party's ability to consummate, the transactions contemplated hereby, including any action that is intended or would reasonably be expected to result in any of the conditions to any party's obligations to consummate the transactions contemplated hereby set forth in Article VII to not be satisfied.

(c)    The obligations of Sellers pursuant to this Section 5.02 shall be subject to any orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Cases), and each of Sellers' obligations as a debtor-in-possession to comply with any order of the Bankruptcy Court (including the Bidding Procedures Order and the Sale Order) and Sellers' duty to seek and obtain the highest or otherwise best price for the Business as required by the Bankruptcy Code.

5.03    Consents; Notices.

(a)    Without limiting the generality of Section 5.02, each party shall use its reasonable best efforts to obtain all Consents necessary in connection with the consummation of the transactions contemplated hereunder prior to the Closing, and to cooperate in connection with any inquiry by a Governmental Body in connection with the transactions contemplated hereunder.  Notwithstanding anything herein to the contrary, neither Buyer nor any Seller shall have any obligation to agree to amend or modify any Contract or pay any fee to any third party (including filing or other fees payable to Governmental Bodies) for the purpose of obtaining any such Consent, or any costs and expenses of any third party resulting from the process of obtaining such Consent, in each case, except for each party's respective obligation to pay Cure Costs in accordance with Section 2.05 with respect to any Assumed Contract. Each party shall timely make or cause to be made all filings and submissions under laws applicable to it as may be required for the consummation of the transactions contemplated hereunder.  Buyer acknowledges that certain Consents and waivers with respect to the transactions contemplated hereunder may be required from third parties under certain Assumed Contracts and that obtaining such Consents is not a condition to the consummation of the transactions contemplated hereunder.

(b)    With respect to any obligations under the under the federal Worker Adjustment and Retraining Notification Act of 1988 ("WARN Act"), or any similar Laws related to plant closings, relocations, mass layoffs and employment losses (collectively "WARN Obligations") that may arise with respect to the Business or as a result of the transaction contemplated hereby, Sellers shall be responsible for any WARN Obligations

arising solely as a result of any employment losses occurring prior to the Closing Date, and Buyer shall be responsible for any WARN Obligations arising as a result of any employment losses occurring upon or following the Closing Date. In addition, Buyer covenants and agrees that from and after the Closing Date, Buyer will not implement any action that would cause any pre-Closing action of Sellers (that would not otherwise trigger notice obligations under the WARN Act) to be a violation of the WARN Act; provided, however, that Sellers shall provide to Buyer on or prior to the Closing Date a schedule reflecting all layoffs of permanent employees implemented by Sellers with respect to Company Employees, by location, during the ninety (90) day period preceding the Closing Date. "Employment Loss" for the purpose of this Section 5.03(b) shall have the same meaning as in the WARN Act and/or any similar Laws related to plant closings, relocations, mass layoffs and employment losses.

(c)    At Buyer's sole cost and expense, Sellers shall assist Buyer with the preparation, filing and prosecution of each application, petition or other filing with any Governmental Body with respect to obtaining the necessary consents and approvals pertaining to transfer and/or issuance of the Liquor Licenses to Buyer ("Liquor License Approvals"), including, at Buyer's sole cost and expense, (i) making reasonably available to the Buyer the Sellers' employees responsible for managing the Sellers' Liquor Licenses and Sellers' Liquor License counsel (subject to compliance with ethical rules) to assist and consult with Buyer on the Liquor License Approvals, and (ii) participating in any legal proceedings reasonably requested by Buyer to obtain such Liquor Licenses.

5.04    Access to Information.

(a)    Subject to the terms of the Confidentiality Agreement and applicable laws, during the period from the date hereof through the earlier of the Closing and the date on which this Agreement is terminated in accordance with Article VIII, Sellers shall permit Buyer and its authorized Representatives to have reasonable access, during normal business hours and upon reasonable advance notice, to the offices, management-level employees and books and records of the Business, and shall furnish, or cause to be furnished, to Buyer such financial, Tax and operating data and other information with respect to such Persons and their respective offices, employees, businesses and operations as Buyer shall from time to time reasonably request. All access and investigation pursuant to this Section 5.04 shall be coordinated through Holdings' Chief Executive Officer (or the designee of Holdings' Chief Executive Officer) and in such a manner as not to interfere with the normal operations of the businesses of Sellers.

(b)    Notwithstanding anything herein to the contrary, no Seller shall be required to provide access to or to disclose information where such access or disclosure would reasonably be expected to (i) violate or prejudice the rights of its customers, (ii) jeopardize any attorney-client, accountant-client or other privilege or other immunity or protection from disclosure of Sellers, (iii) contravene any law, Contract or any other obligation of confidentiality, (iv) jeopardize trade secret protection or result in the disclosure of competitively sensitive information or (v) relate to the Business' sale process, including any information related to proposals from other Persons relating to any other potential transaction with Sellers or their Affiliates. Sellers shall have the right to have one or more

of its Representatives present at all times during any visits, examinations, discussions or contacts contemplated by this Section 5.04.

(c)    The terms of the Confidentiality Agreement shall continue in full force and effect.    Buyer shall hold, and shall cause its Representatives (as defined in the Confidentiality Agreement) to hold, any Proprietary Information (as defined in the Confidentiality Agreement) and other information provided to them in connection with the transactions contemplated hereunder in confidence in accordance with the terms of the Confidentiality Agreement, which terms shall apply to Buyer as if it was a party thereto and a "Recipient" thereunder.

5.05    Contact with Customers, Suppliers and Other Business Relations.    Prior to the Closing, Buyer and its Representatives will not contact or communicate with the employees, customers, suppliers, partners and other business relations of Sellers regarding the business, operations, assets, financial condition or prospects of the Business, Sellers or the transactions contemplated hereby without prior consultation with and written approval of Holdings (which approval may be withheld in its sole discretion).

5.06    Bankruptcy Court Matters.

(a)    Stalking Horse Bidder.    Buyer and Sellers acknowledge and agree that Buyer, or its permitted designee, is a "Stalking Horse Bidder" for the Acquired Assets of Sellers, and the Purchase Price and terms of this Agreement shall constitute the initial offer for the Acquired Assets of Sellers.

(b)    Approval of Termination Fee.    In the event that this Agreement is terminated pursuant to Section 8.01(h), Sellers shall pay Buyer a fee equal to $2,625,000 plus reimbursement of Buyer's reasonable and documented out-of-pocket expenses up to $550,000 ("the "Termination Fee") to compensate the Buyer for its efforts in connection with it being the "stalking horse" bidder for the Acquired Assets, including the costs (including those of attorneys, investment banking, accounting and other professional fees and expenses) the Buyer incurred in performing due diligence, negotiating and documenting the terms of this Agreement and representing its interests with respect to the proposed sale and Sellers' Bankruptcy Case.    The Termination Fee constitutes first priority administrated expenses of Sellers pursuant to Section 503(b) of the Bankruptcy Code and shall be paid within two (2) days from the closing proceeds of any closing with a party other than Buyer in connection with the Acquired Assets, and without further order of or application to the Bankruptcy Court and shall be subject to a "Carve-Out" under any DIP Facility.    The parties agree that the Termination Fee shall be the full and liquidated damages of Buyer arising out of any termination of this Agreement pursuant to Section 8.01(h).

(c)    Bankruptcy Court Filings.

(i)    As soon as reasonably practicable following the execution of this Agreement and the commencement of the Bankruptcy Cases, Sellers shall file with the Bankruptcy Court a motion seeking entry of the Bidding Procedures Order

(which shall be in form and substance reasonably satisfactory to Buyer), and shall use its reasonable best efforts to diligently prosecute such motion.

(ii)     Provided Buyer is selected as the winning bidder at the auction undertaken in accordance with the Bidding Procedures Order (the "Auction"), if any, or if no Competing Bid is submitted with respect to the Acquired Assets, Sellers shall diligently seek entry of the Sale Order and any Related Orders by the Bankruptcy Court necessary to consummate the transactions contemplated hereunder in accordance with the terms and conditions of the Bidding Procedures Order, including, without limitation, any and all Assignment Orders (the "Assignment Order"), which shall be in form and substance reasonably satisfactory to Buyer and which shall provide for the assumption and assignment to Buyer of the Assumed Contracts. In furtherance of and in no way limiting the foregoing, should Buyers be unable to negotiate Modified Labor Agreements with the unions representing Company Employees, as contemplated in Section 6.03(a), Sellers shall take all reasonably necessary or appropriate actions to comply with the requirements of Section 1113 of the Bankruptcy Code to reject or modify the Union Agreements. Sellers shall seek entry of an order waiving any stay requirement under, *inter alia*, Federal Rules of Bankruptcy Procedures 6004 and 6006. Buyer understands the requirements of Section 1113 of the Bankruptcy Code and agrees to use good faith best efforts to cooperate with Sellers in ensuring compliance with any applicable provisions thereof, including but not limited to providing complete and reliable information to allow the unions to evaluate proposals to modify the existing Union Agreements.

(iii)    Buyer and Sellers understand and agree that the consummation of the transactions contemplated by this Agreement is subject to approval by the Bankruptcy Court. Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and any Related Orders including a finding of adequate assurance of future performance by Buyer, including by furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of future performance by Buyer under this Agreement and the Assumed Contracts and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. Buyer shall not, without the prior written consent of Sellers, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Acquired Assets hereunder.

(iv)    Sellers shall file such motions or pleadings as may be appropriate or necessary to assume and assign the Assumed Contracts and to determine the amount of the Cure Costs; provided, that, except to the extent otherwise expressly provided in Section 2.05(b) hereof, nothing herein shall preclude Sellers from filing such motions, including upon commencement of the Bankruptcy Cases, to reject any Contracts that are not Assumed Contracts.

(d)    Bankruptcy Court Milestones. Sellers shall comply with the following timeline:

(i)    No later than twenty-one (21) days from the Petition Date, the Bankruptcy Court shall have held the hearing to consider approval of the Bidding Procedures Order.

(ii)    No later than sixty (60) days from the Petition Date (the "Sale Order Deadline"), Sellers shall obtain entry of (x) the Assignment Order and (y) an order, which shall be in form and substance satisfactory to Sellers and Buyer and which shall approve the transactions contemplated by this Agreement (the "Sale Order"), including, but not limited to, the sale of all of the Acquired Assets free and clear of all Liens (except Permitted Liens) and shall, without limitation, contain findings of fact and conclusions of law that: (I) Buyer is a good faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code and the sale contemplated by this Agreement does not violate and is not subject to avoidance under Section 363(n) of the Bankruptcy Code; (II) all of the requirements of Sections 363 and 365 of the Bankruptcy Code have been satisfied; (III) any Liens on the Acquired Assets shall attach to the proceeds received by Sellers pursuant to this Agreement and to the extent, and with the same validity, priority, perfection and enforceability, as such Liens had with respect to the Acquired Assets; (IV) notice of the hearing on the transactions contemplated by this Agreement was (A) given to all holders of claims (as defined in Section 101 of the Bankruptcy Code) or interests entitled to receive such notice under, and in accordance with the applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and (B) constitutes such notice as is appropriate under the particular circumstances and in accordance with the Bankruptcy Code and applicable law; (V) neither Buyer nor its designees shall be considered successors of Sellers or any of Sellers' Affiliates, except as expressly assumed in writing by Buyer pursuant to this Agreement; (VI) if the Bankruptcy Court determines that the law so permits, the transfer of the Acquired Assets shall not be subject to the imposition or payment of any transfer, stamp or similar tax, and there shall not be in effect any preliminary or permanent injunction, stay, order, decree or ruling limiting the effect of the Sale Order by a court of competent jurisdiction; (VII) none of the Buyer, its designee or the Acquired Assets shall have assumed or shall have Liability for the Union Agreements or any Liability relating to the termination of any contribution to or other obligations with respect to any Multiemployer Pension Plan, and the modifications or amendments, if any, to any Union Agreement requested or agreed to by Buyer and included in an Modified Labor Agreement are approved thereby; and (VIII) provisions for the Bankruptcy Court's retention of jurisdiction over matters arising out of or related to this Agreement and the transactions contemplated hereby; provided, however, that if, as of the Sale Order Deadline, this Agreement has not otherwise terminated for any reason and the Sale Order has not been entered, the Sale Order Deadline shall automatically be extended by thirty (30) days (the "Extended Sale Order Deadline") and the parties agree to diligently pursue entry of the Sale Order on or before the Extended Sale Order Deadline.

(e)    Back-up Bidder.  Sellers and Buyer agree that, in the event that Buyer is not the winning bidder at the Auction, if and only if (i) Buyer submits the second highest or

second best bid at the Auction for the Acquired Assets which is memorialized by an acceptable agreement incorporating terms established at the Auction, or the terms of this Agreement constitute the second highest or best bid for the Acquired Assets, and (ii) Sellers give written notice to Buyer on or before the Back-up Termination Date, stating that Sellers (A) failed to consummate the sale of the Acquired Assets with the winning bidder, and (B) terminated the purchase agreement with the winning bidder, Buyer shall promptly consummate the transactions contemplated hereby upon the terms and conditions as set forth herein, or as set forth on the record of the Auction, including the Purchase Price, as the same may be increased by Buyer at the Auction.

5.07    <u>Public Announcements.</u> Unless otherwise required by applicable law, until the expiration of the Modified Labor Agreement Negotiation Period, each of the parties to this Agreement shall not (and shall cause their respective Representatives not to) make any public announcements in respect of this Agreement or any Ancillary Document or the transactions contemplated hereby or thereby. In addition,  until the expiration of the Modified Labor Agreement Negotiation Period, the parties and their respective Representatives shall keep confidential and not disclose to any third party the terms of this Agreement, the Ancillary Documents and the transactions contemplated hereunder and thereunder, which the parties hereby agree shall constitute "Proprietary Information," subject to the terms and conditions of the Confidentiality Agreement; <u>provided</u>, <u>however</u>, the parties may take such actions and make such disclosures as are required or contemplated by this Agreement, including with respect to the negotiations with labor unions, the arrangement of the Debt Financing and the DIP Facility, the obtainment of third party consents and the preparation for the filing of the Bankruptcy Cases. Notwithstanding the foregoing, Sellers shall have the right in their sole discretion to respond to any private or public leaks of such information as Sellers deem appropriate, provided that Sellers shall provide updates to Buyer as to any such actions.

5.08    <u>Solicitation</u>. This Agreement is subject to the consideration by Sellers of higher or better competing bids (including credit bids) in respect of all or any part of the Acquired Assets, including, from and after its entry, in accordance with the Bidding Procedures Order (whether in combination with other assets of Sellers or otherwise, and whether by sale or proposal of a plan of reorganization that vests control over the Acquired Assets in a Person other than Buyer) (each a "<u>Competing Bid</u>"). Except to the extent reasonably required  by the fiduciary duties of the directors of the Company, from the date hereof to the expiration of the Modified Labor Agreement Negotiation Period, neither Sellers nor any of their Affiliates nor any of their respective managers, employees, agents or representatives including, without limitation, any attorneys or accountants (collectively, the "<u>Sellers' Representatives</u>") shall (directly or indirectly) (a) initiate contact with, solicit, encourage or respond to any inquiries or proposals by, or enter into any discussions or negotiations or agreements or understandings with, any corporation, partnership, group or other entity regarding the transactions contemplated hereby or any similar transaction or (b) afford any access to the properties, books and records of Sellers to any such Person (which, for the avoidance of doubt, shall not require Sellers to request the return or destruction of any such books and records furnished to any such Person prior to the date hereof); provided however, that, (i) Sellers and Sellers' Representatives shall not be prohibited from considering any unsolicited Competing Bid that is received by Sellers or Sellers' Representatives not otherwise in violation of the terms of this Section 5.08 and (ii) following the expiration of the Modified Labor Agreement Negotiation Period, Sellers are permitted to and to cause their Representatives and Affiliates to, initiate contact

with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer and its Affiliates and Representatives) in connection with a Competing Bid, including, to (and to cause their Representatives and Affiliates to) respond to any inquiries or offers to purchase all or any part of the Acquired Assets, (including supplying information relating to the Business and Sellers to prospective purchasers). Sellers shall require any party conducting due diligence on the Business to execute and deliver to Sellers a confidentiality agreement (which confidentiality agreement must be no less restrictive with respect to the treatment of confidential information by such party than the Confidentiality Agreement).

   5.09   <u>Bulk Sales</u>. Sellers and Buyer hereby waive compliance with the requirements and provisions of "bulk-transfer" or similar laws of any jurisdiction that may otherwise be applicable with respect to the sale, conveyance, assignment or transfer of any or all of the Acquired Assets to Buyer.

   5.10   <u>Modified Labor Agreement Negotiation Period</u>. Notwithstanding <u>Section 5.05</u> or any other provision of this Agreement, during the period beginning on the date of this Agreement and continuing until the earlier of (a) Buyer notifying Sellers in writing that it is terminating such period, (b) the date Buyer enters into a Modified Labor Agreement with each union representing Company Employees covered by a Union Agreement, (c) 11:59 p.m. Eastern time on the thirtieth (30th) day following the date of this Agreement, or (d) Sellers notifying Buyer in writing that Sellers' fiduciary duties require the Company to file for Chapter 11 no later than three days after such notice is provided (the "<u>Modified Labor Agreement Negotiation Period</u>"), Buyer and its Representatives may contact and communicate with representatives of unions representing Company Employees in order to seek, negotiate and agree to Modified Labor Agreements with respect to such union-represented Company Employees, <u>provided that</u>, Buyer shall coordinate with and provide reasonable notice to Sellers in advance of any direct conversations and/or negotiations with any collective bargaining agent, Buyer shall keep Sellers apprised of the status of such negotiations and developments as promptly as practicable, and Buyer shall undertake such conversations and/or negotiations in a good faith effort to reach agreement on mutually satisfactory modifications to the Union Agreements with each respective union. In connection therewith and in furtherance thereof, each of Sellers shall, and shall cause their Representatives to, reasonably cooperate with Buyer and its Representatives to facilitate such communications and negotiations, including to provide such employee data as Buyer may reasonably request in connection with such negotiations. Sellers hereby consent and agree to the conduct by Buyer and its Representatives of such activities. Nothing in this <u>Section 5.10</u> shall require Buyer to agree to the terms of any Modified Labor Agreement during the Modified Labor Agreement Negotiation Period or to assume any Union Agreement.

   5.11   <u>Replacement Deposits</u>. During the period between the date hereof and the Closing, Buyer may negotiate with third-parties to replace any Contract that constitutes Excluded Assets as of the date hereof (each, an "<u>Excluded Contract</u>") with a new Contract covering substantially similar subject matter as such Excluded Contract (each, a "<u>Replacement Contract</u>"). If, prior to the Closing Date, Buyer (i) enters into any Replacement Contract (with effectiveness subject to consummation of the transactions contemplated by this Agreement) and (ii) provides written certification to Sellers (the "<u>Replacement Contract Notice</u>") that identifies such Replacement Contract, the subject matter thereof, the Excluded Contract such Replacement Contract intends to replace (the "Replaced Contract"), and the amount of any upfront cash deposit required under such Replacement Contract (such deposit, a "<u>Replacement Deposit</u>"), then the amount of any Rejected

43

Deposit corresponding to the Replaced Contract actually returned to the Sellers shall be promptly remitted to the Buyer in an amount up to the amount of such Replacement Deposit corresponding to such Replacement Contract as set forth in the Replacement Contract Notice; provided, that (i) in no case shall the aggregate amount of the Rejected Deposits be reduced below zero dollars ($0.00); and (ii) the Sellers shall not have any obligation to pay Buyer any portion of any Rejected Deposit that it does not actually receive, whether because of offset or counterclaim asserted by the counterparty, unwillingness or inability to pursue recovery of such Rejected Deposit or otherwise. Notwithstanding the foregoing, nothing in this <u>Section 5.11</u> shall require the Buyer to agree to the terms of any Replacement Contract.

ARTICLE VI

<u>ADDITIONAL COVENANTS</u>

6.01   <u>Director and Officer Liability</u>.  On or prior to Closing, Seller will, at Sellers' expense, obtain and fully pay for irrevocable "tail" insurance policies naming the current and former officers, directors, employees or any successor, assign, heir, executor, administrator or representative of the Business (each, a "<u>D&O Indemnified Person</u>") as direct beneficiaries with a claims period of at least six years from the Closing Date from an insurance carrier with the same or better credit rating as Sellers' current insurance carrier with respect to officers' and directors' liability insurance and fiduciary liability insurance in an amount and scope, and with terms, conditions, retentions and levels of coverage including as coverage relates to deductibles and exclusions at least as favorable as Sellers' existing policies with respect to matters existing or occurring at or prior to the Closing Date. Buyer, at Sellers' expense, will maintain such insurance policies in full force and effect for the full term and not cancel or change such insurance policies in any respect.

6.02   <u>Access to Books and Records</u>.  From and after the Closing, Buyer will provide Holdings and its authorized Representatives information reasonably requested by Holdings or such Representatives regarding the business and operations of Sellers prior to the date hereof, including by providing either (a) reasonable access (for the purpose of examining and copying), during normal business hours, to the personnel, books and records of or relating to the Acquired Assets, the Assumed Liabilities or the Assumed Contracts for a period of one  (1) year following the Closing or (b) a copy, at Sellers' expense, of such books and records. For a period of six years after the Closing, unless otherwise consented to in writing by Holdings, Buyer will not, and will not permit any of its Affiliates to, destroy, alter or otherwise dispose of any material books and records of or relating to the Acquired Assets, the Assumed Liabilities or the Assumed Contracts, or any portions thereof, relating to periods prior to the Closing Date without first giving reasonable prior notice to Holdings and offering to surrender to Holdings such books and records or such portions thereof. Without limiting the generality of the foregoing, from and after the Closing, Buyer will provide Sellers (at no added cost or expense to Buyer) with reasonable assistance, support and cooperation with Sellers' wind-down and related activities (e.g., helping to locate documents or information related to prosecution or processing of insurance/benefit claims); provided that such assistance, support and cooperation does not interfere unreasonably with the normal business operations of Buyer.

6.03   <u>Employee Matters</u>.

44

(a)    Effective as of the Closing Date, Buyer shall offer to employ a sufficient number of Company Employees so as not to trigger any obligation to provide notice in accordance with the WARN Act.  For each Company Employee who is offered employment, and whose employment is not otherwise assumed by Buyer, such offer shall include (A) base salary or hourly wages and incentive compensation opportunities no less favorable than he or she was eligible to receive immediately prior to the Closing and (B) employee benefits (including perquisites, vacation, retirement and savings plans and severance) and other terms and conditions of employment that are economically comparable, in the aggregate, to those in effect immediately prior to the Closing. In the case of union-represented Company Employees, such offers shall be consistent with the terms and conditions established by (i) agreement between the union representing such employees and the Buyer as a Modified Labor Agreement ("Modified Labor Agreements"), (ii) an order of a bankruptcy court, or (iii) otherwise in the Buyer's discretion to the extent permitted by federal labor law. Any Company Employee who becomes employed by Buyer pursuant to this Section 6.03(a) is a "Rehired Employee".

(b)    If Buyer fails to offer employment to any Company Employee, it shall be liable for, and shall reimburse Sellers for (and indemnify Sellers from and against), any severance paid by Sellers to such employees and all other costs, liabilities, claims, damages and expenses incurred by Sellers as a result of such failure. If any Rehired Employee is subsequently terminated by Buyer within the six (6) month period after the Closing Date, then Buyer shall make severance payments to such Rehired Employee in an amount that is not less than the amount of severance that such Rehired Employee would have been entitled to receive from Sellers (if such Rehired Employee had been terminated by Sellers as of the Closing Date).

(c)    From and after the Closing, Buyer shall continue to honor, pay, perform and satisfy any and all liabilities, obligations and responsibilities to, or in respect of, each Company Employee, and each former employee and officer of Sellers, as of the Closing arising under the terms of, or in connection with, any Business Benefit Plan in accordance with the terms thereof. On or before the first regular scheduled payroll date on or following the Closing Date, Buyer shall pay (to the extent not previously paid) all amounts accrued by Sellers as of the Closing in respect of each Rehired Employee in respect of all periods through the Closing under the bonus plans identified on Schedule 6.03(c).

(d)    Except as otherwise provided by a Modified Labor Agreement, for purposes of eligibility, vesting, and solely with respect to vacation and severance, accrual and entitlement to benefits, under the benefit and compensation plans, programs, Contracts and arrangements of Buyer and its Affiliates in which Rehired Employees are eligible to participate following the Closing (each, a "Buyer Plan"), Buyer shall, or shall cause its Affiliates to, credit each Rehired Employee with his or her years of service with Sellers and any predecessor Persons, to the same extent as such employee was entitled immediately prior to the Closing to credit for such service under any similar Benefit Plan, except where such crediting would result in duplication of benefits. The Buyer Plans shall use commercially reasonable efforts to credit such Rehired Employees for any deductibles and out-of-pocket expenses paid prior to the Closing Date in satisfying any deductibles and

out-of-pocket expenses in the applicable plan year to which such deductibles and out-of-pocket expenses relate.

(e)     Sellers shall be liable for all workers' compensation claims arising out of injuries with an identifiable date of occurrence sustained by Sellers' employees prior to the Closing. Buyer shall be liable for all workers' compensation claims arising out of injuries with an identifiable date of occurrence, sustained by Rehired Employees on and after the dates (hereinafter, "Rehired Employees' Employment Date") Buyer hires them, including injuries sustained by a Rehired Employee on or after the Rehired Employees' Employment Date that are aggravations, exacerbations or re-injuries of medical conditions or diagnoses resulting from injuries that were sustained before the Rehired Employees' Employment Date. Sellers shall be liable for all workers' compensation claims arising out of injuries or occupational diseases without an identifiable date of occurrence or exposure, originating from within Sellers' facilities and which are alleged to have been sustained or contracted prior to the Closing Date, provided such claims are filed with the appropriate workers' compensation authority within forty-five (45) days after the Rehired Employees' Employment Date. Buyer shall be liable for all workers' compensation claims arising out of injuries or occupational diseases without an identifiable date of occurrence or exposure, which are alleged to have been sustained or contracted either before or after the Rehired Employees' Employment Date, provided that, in the case of any such injuries or diseases allegedly sustained before the Rehired Employees' Employment Date, such claims are filed with the appropriate workers' compensation authority more than forty-five (45) days after the Rehired Employees' Employment Date.

(f)     Buyer shall maintain employee records transferred to Buyer hereunder for a period of not less than four (4) years and during that period will afford Sellers reasonable access to such records during Buyer's normal business hours. Buyer shall use best efforts maintain the confidentiality of such records according to reasonable industry practices and limit access thereto in a manner consistent with Buyer's treatment of its employee records.

(g)     Effective as of the Closing, Buyer shall, or shall cause its Affiliates to, provide COBRA and any other required continuation coverage to each Rehired Employee with respect to which a qualifying event occurred on or before the Closing Date.

(h)     Effective as of the Closing, Sellers shall assign, and Buyer shall, or shall cause its Affiliates to, adopt and assume, each Insured Welfare Benefit Plan and all of Sellers' rights, obligations, and liabilities thereunder.

(i)     Buyer and Sellers agree to (i) treat the Buyer as a "successor employer" and each Seller as a "predecessor" within the meaning of Sections 3121(a)(1) and 3306(b)(1) of the Code with respect to Rehired Employees for purposes of taxes imposed under the United States Federal Unemployment Tax Act and the United States Federal Insurance Contributions Act and (ii) use their reasonable best efforts to cooperate with each other to avoid the filing of more than one Internal Revenue Service Form W-2 with respect to each Rehired Employee for the calendar year in which such person became a Rehired Employee.

(j)      Buyer and Sellers specify that the "Asset Purchase Transaction Exception" set forth in Section 1.409A-1(h)(4) of the Treasury Regulations shall apply to the transactions contemplated under this Agreement so that each Rehired Employee who provides services to Buyer and its Affiliates after and in connection with the transactions contemplated hereby will not be treated as having experienced a separation of service for purposes of applying the provisions of any Business Benefit Plan that is a nonqualified deferred compensation plan and is assumed by Buyer under or in connection with the consummation of this Agreement.

(k)      Notwithstanding anything in this Section 6.03 to the contrary, nothing contained herein, whether express or implied, shall be treated as an amendment or other modification of any Benefit Plan, Buyer Plan or other employee benefit plan, program or arrangement of Buyer or its Affiliates, or shall limit the right of Buyer to amend, terminate or otherwise modify any Benefit Plan or any employee benefit plan, program or arrangement of Buyer or its Affiliates following the Closing Date in accordance with the terms thereof.  The Parties hereto acknowledge and agree that all provisions contained in this Section 6.03 are included for the sole benefit of the Parties hereto, and that nothing in this Agreement, whether express or implied, shall create any third party beneficiary or other rights (i) in any other Person, including any employees or former employees of Sellers, any participant in any Benefit Plan, Buyer Plan or any employee benefit plan, program or arrangement of Buyer or its Affiliates, or any dependent or beneficiary thereof, or (ii) to continued employment with Buyer or any of its Affiliates (including, after the Closing, any Seller).

6.04    Charity Cash.  Buyer will use the Charity Cash for donation and/or use towards hunger elimination initiatives in a manner directed and consistent with its intended use by Holdings.

6.05    Further Assurances.  From time to time, as and when requested by any party hereto and at such requesting party's expense, any other party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting party may reasonably deem necessary or desirable to evidence and effectuate the transactions contemplated by this Agreement; provided, however, Sellers shall be entitled to take such actions as are required in connection with the discharge of their fiduciary duties during the Bankruptcy Cases (including soliciting higher or better offers for the Acquired Assets).

6.06    Confidentiality Agreements; Post-Closing Confidentiality.  From time to time, as and when requested by any party hereto and at such requesting party's expense, any other party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting party may reasonably deem necessary or desirable to evidence and effectuate the transactions contemplated by this Agreement; provided, however, Sellers shall be entitled to take such actions as are required in connection with the discharge of their fiduciary duties during the Bankruptcy Cases (including soliciting higher or better offers for the Acquired Assets as provided in the Bidding Procedures Order).

(a)     Sellers and Buyer hereby agree that the Confidentiality Agreement shall terminate, and no party shall have any further obligations thereunder, effective concurrently with the Closing.

(b)     Effective at the Closing, Holdings hereby assigns to Buyer the rights under the Holdings Confidentiality Agreements to enforce the non-use, non-disclosure and return or destruction of "Confidential Information" (as such term is defined in the Holdings Confidentiality Agreements) to the extent related to the Business, the Acquired Assets and the Assumed Liabilities and the non-solicitation provisions with respect to the Rehired Employees; provided, that Holdings retains all other rights and remedies thereunder.

(c)     For a period of ten (10) years following the Closing Date, Sellers shall not, and shall cause their Affiliates and their respective directors and officers not to, disclose to any Person other than the directors, officers, employees and authorized representatives of Buyer and its Affiliates, or use or otherwise exploit for their benefit, any Confidential Information, except (i) pursuant to any Order, as required in any Action or as otherwise required by applicable law, (ii) to enforce its rights and remedies under this Agreement or (iii) disclosure of Confidential Information in connection with the Bankruptcy Cases shall not constitute a breach of this Section 6.06(c); provided, however, that in the event disclosure is required by applicable law or in connection with the Bankruptcy Cases, Sellers shall, to the extent reasonably possible, provide Buyer with prompt notice of such requirement prior to making any disclosure so that Buyer may seek at its own cost and expense an appropriate protective order.  "Confidential Information" shall mean any proprietary or confidential information to the extent related to the Business, the Acquired Assets or the Assumed Liabilities, excluding any information that (x) is (as of the Closing Date) or becomes generally available to the public other than as a result of a breach of this Section 6.06(c) or (y) becomes available to Sellers, their Affiliates or their respective directors and officers after the Closing Date on a non-confidential basis from a source other than Buyer or their Affiliates, provided that such source is not bound by a confidentiality agreement with or other contractual, legal or fiduciary obligation of confidentiality to Buyer or its Affiliates or any other person with respect to such information.

6.07    Financing Assistance.

(a)     In order to assist with obtaining Buyer's financing for the transactions contemplated by this Agreement (including the Debt Financing Buyer will enter into in connection with the transactions contemplated hereby), prior to the Closing, Holdings and each other Seller shall use their commercially reasonable efforts, and shall cause their Representatives to use their commercially reasonable efforts to provide such reasonable assistance and cooperation as Buyer may reasonably request (at Buyer's sole cost and expense to the extent of any out-of-pocket costs), including (i) by cooperating with prospective lenders in performing their due diligence, and (ii) helping to procure reasonably requested certificates or documents available to Sellers, including customary real estate title documentation and estoppel certificates; provided that none of such certificates or documents shall become effective prior to the Closing.

(b)     Buyer acknowledges and agrees that Sellers and their respective Affiliates, directors, officers, employees, agents and representatives have no responsibility for, and shall not incur any liability to any Person (and shall not be obligated to take any action that would reasonably be expected to result in personal liability to a director, officer or other personnel) under, any financing that Buyer may raise in connection with the transactions contemplated hereby (including, without limitation, the Debt Financing) or any cooperation provided pursuant to Section 6.07(a). Buyer, its Affiliates and Buyer's financing sources shall further include a conspicuous disclaimer in any marketing materials for the Debt Financing to the effect that none of Sellers or their respective Affiliates or Representatives has any responsibility for the content of, and disclaim all responsibility for, any oral or other disclosure with respect to the Debt Financing.

6.08   Financing.  Buyer shall, and shall cause its Affiliates, to use reasonable best efforts to take, or cause to be taken, all appropriate action, do, or cause to be done, all things necessary, proper or advisable under applicable law, and to execute and deliver, or cause to be executed and delivered, such instruments and documents as may be required, to (i) arrange and obtain the Debt Financing as promptly as practicable prior to the Closing Date on the terms and subject to the conditions set forth in the Debt Term Sheet. Buyer shall, and shall cause its Affiliate to, refrain from taking, directly or indirectly, any action that is reasonably likely to result in the failure of any of the conditions set forth in the Debt Term Sheet, (ii) perform and satisfy its obligations under the Debt Term Sheet and any definitive agreement with respect thereto at or prior to Closing, (iii) enforce its rights under the Debt Term Sheet and the financing agreements and (iv) cause the financing sources and any other Persons providing financing to fund the Debt Financing no later than the Closing. Buyer shall provide to Sellers copies of all documents and material correspondence relating to the Debt Financing and shall keep Sellers informed on a reasonably current basis (and in any event, within two (2) Business Days) of any material developments in respect of the financing process relating thereto. If any portion of the Debt Financing becomes unavailable on the terms and conditions contained in the Debt Term Sheet, Buyer shall promptly notify Sellers, and Buyer shall use its reasonable best efforts to obtain, as promptly as practicable following the occurrence of such event, replacement debt arrangements in an aggregate principal amount equal to or greater than the Debt Financing that are not less favorable in the aggregate (as determined by Buyer in its reasonable judgment) to Buyer and Sellers than those contained in the Debt Term Sheet; provided that any such replacement debt arrangements shall not (a) be subject to any additional or modified conditions or other contingencies to the funding of the Debt Financing than those set forth in the Debt Term Sheet or (b) otherwise be reasonably likely to impair or delay the funding of the Debt Financing or the Closing. For the avoidance of doubt and notwithstanding anything to the contrary in this Section 6.08, Buyer acknowledges and agrees that its obligations to consummate the transactions contemplated by this Agreement on the terms and subject to the conditions set forth herein are not conditioned upon the availability or consummation of the Debt Financing or receipt of the proceeds therefrom.

## ARTICLE VII

## CONDITIONS TO CLOSING

7.01   Conditions to All Parties' Obligations.  The respective obligations of each party to consummate the transactions contemplated by this Agreement are subject to the satisfaction or, to

the extent permitted, waiver in writing, of each of the following conditions at or prior to the Closing:

(a)     no judgment, decree or order entered by any Governmental Body shall be in effect which would prevent the consummation of any of the transactions contemplated hereby;

(b)     no law shall have been enacted or promulgated by any Governmental Body that prevents, or makes illegal, the consummation of the transactions contemplated hereby; and

(c)     (i) the Bankruptcy Court shall have entered, by the Extended Sale Order Deadline, each of (a) the Sale Order, (b) the Assignment Order and (c) any Related Order (if any), and (ii) in the event, and only in the event, the Sale Order is appealed and such appeal challenges the validity of the Sale Order's findings of fact and conclusions of law that none of Buyer, its designee or the Acquired Assets will assume or will have Liability for the Union Agreements or any Liability relating to the termination of any contribution to or other obligations with respect to any Multiemployer Pension Plan (a "Labor Appeal"), the Sale Order shall have become a Final Order (and no order staying, reversing, modifying or amending such Sale Order shall be in effect on the Closing Date) on or before the Termination Date (as it may be extended in accordance with Section 8.01(b)). For the avoidance of doubt, the Sale Order need not become a Final Order for purposes of this Section 7.01(c)(ii), except in the event of a Labor Appeal.

7.02    Conditions to Buyer's Obligations.  The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction or, to the extent permitted, waiver in writing, of each of the following conditions at or prior to the Closing:The representations and warranties of Sellers (i) set forth in the Seller Fundamental Representations shall be true and correct in all material respects as of the Closing as if made on and as of the Closing (except to the extent expressly made as of an earlier date, in which case as of such date), and (ii) set forth in Article III (other than the Seller Fundamental Representations), without giving effect to any materiality or "Material Adverse Effect" qualifications therein, shall be true and correct as of the Closing as if made on and as of the Closing (except to the extent expressly made as of an earlier date, in which case as of such date), except, in the case of this clause (ii), where the failure to be so true and correct would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)     Sellers shall have performed and complied in all material respects with the covenants, agreements, and obligations required to be performed by them under this Agreement at or prior to the Closing.

(c)     Sellers shall have delivered or caused to be delivered to Buyer each of the deliveries required to be made to Buyer pursuant to Section 2.09(a).

(d)     All authorizations, consents, orders and approvals of the Bankruptcy Court necessary for the consummation of the transaction contemplated by this Agreement shall have been obtained, including, but not limited to, those set forth in Section 7.01(c), and

Purchaser shall have received from the Bankruptcy Court all other orders, approvals and consents required to transfer the Acquired Assets and to consummate the transactions contemplated by this Agreement.

7.03    Conditions to Sellers' Obligations.  The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction or, to the extent permitted, waiver in writing, of each of the following conditions at or prior to the Closing:

(a)    The representations and warranties of Buyer (i) set forth in the Buyer Fundamental Representations shall be true and correct in all material respects as of the Closing as if made on and as of the Closing (except to the extent expressly made as of an earlier date, in which case as of such date), and (ii) set forth in Article IV (other than the Buyer Fundamental Representations), without giving effect to any materiality or "material adverse effect" qualifications therein, shall be true and correct as of the Closing as if made on and as of the Closing (except to the extent expressly made as of an earlier date, in which case as of such date), except, in the case of this clause (ii), where the failure to be so true and correct would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on, or a material delay in, the ability of Buyer to consummate the transactions contemplated hereby.

(b)    Buyer shall have performed and complied in all material respects with the covenants, agreements, and obligations required to be performed by Buyer under this Agreement at or prior to the Closing.

(c)    Buyer shall have delivered or caused to be delivered each of the deliveries required to be made to Sellers pursuant to Section 2.09(b).

7.04    Waiver of Conditions.  All conditions to the Closing will be deemed to have been satisfied or waived from and after the completion of Closing.

7.05    Frustration of Closing Conditions.   No party may rely on the failure of any condition set forth in this Article VII to be satisfied if such failure was caused by such party's breach of this Agreement.

## ARTICLE VIII

## TERMINATION

8.01    Termination.  This Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of Buyer and Holdings;

(b)    by either Buyer or Holdings at any time after 5:00 P.M.  Eastern time on the date that is 120 days after the Petition Date (as may be extended in accordance with this Section 8.01(b), the "Termination Date") if the Closing shall not have occurred on or prior to such date; provided, however, that if on such date each of the conditions set forth in Article VII (other than the condition set forth in Section 7.01(c)(ii)) shall have been satisfied or waived or shall then be capable of being satisfied, then the Termination Date

shall automatically be extended to the date that is 240 days after the Petition Date; provided, further, that neither party shall have the right to terminate this Agreement pursuant to this Section 8.01(b) if the Closing shall not have occurred on or prior to the Termination Date due to such party's or any of its Affiliates' failure to perform any covenants or breach of any representation or warranty of such party set forth in this Agreement.

(c)      by either Buyer or Holdings, if any restraint or any judgment, order or decree of any Governmental Body or applicable law of the type set forth in Section 7.01 permanently prohibiting the consummation of the transactions contemplated hereby shall have become final and non-appealable;

(d)      by Buyer, if any representation or warranty of Sellers set forth in Article III shall be or shall have become inaccurate or Sellers shall have breached or failed to perform any of its covenants set forth in this Agreement, which inaccuracy, breach or failure to perform would give rise to the failure of any of the conditions set forth in Section 7.02, and which inaccuracy, breach or failure to perform cannot be cured by Sellers, as the case may be, or, if capable of being cured, shall not have been cured prior to the earlier of (i) two (2) Business Days prior to the Termination Date and (ii) the date that is thirty (30) calendar days after receipt by Holdings of notice in writing from Buyer specifying the nature of such inaccuracy, breach or failure to perform and requesting that it be cured; provided that Buyer shall not have the right to terminate this Agreement pursuant to this Section 8.01(d) if Buyer is then in breach of this Agreement and such breach would give rise to the failure of any of the conditions set forth in Section 7.03;

(e)      by Holdings, if any representation or warranty of Buyer set forth in Article IV shall be or shall have become inaccurate or Buyer shall have breached or failed to perform any of its covenants set forth in this Agreement (including to consummate the transactions contemplated hereby in accordance herewith), which inaccuracy, breach or failure to perform would give rise to the failure of any of the conditions set forth in Section 7.03, and which inaccuracy, breach or failure to perform cannot be cured by Buyer or, if capable of being cured, shall not have been cured prior to the earlier of (i) two (2) Business Days prior to the Termination Date and (ii) the date that is thirty (30) calendar days after receipt by Buyer of notice in writing from Holdings specifying the nature of such inaccuracy, breach or failure to perform and requesting that it be cured; provided that Holdings shall not have the right to terminate this Agreement pursuant to this Section 8.01(e) if it or any other Seller is then in breach of this Agreement and such breach would give rise to the failure of any of the conditions set forth in Section 7.02;

(f)      by Holdings, if (i) all of the conditions of the obligations to Buyer at the Closing have been satisfied or waived (other than those conditions that by their nature are to be satisfied at the Closing, and which conditions could be satisfied if the Closing were to occur on such date), (ii) Buyer fails to complete the Closing on the date that the Closing should have occurred pursuant to Section 2.08, (iii) Holdings has notified Buyer in writing that Sellers stand ready, willing and able to consummate the Closing, and (iv) Buyer has not consummated the Closing within two (2) Business Days of the delivery by Holdings to Buyer of written notice of its intent to terminate this Agreement pursuant to this

Section 8.01(f), and, in each case, Sellers stood ready, willing and able to consummate the Closing on that date;

(g)      by Buyer, if the Sale Order does not contain findings of fact and conclusions of law that none of Buyer, its designee or the Acquired Assets shall have assumed or shall have Liability for the Union Agreements or any Liability relating to the termination of any contribution to or other obligations with respect to any Multiemployer Pension Plan, in each case, except pursuant to Modified Labor Agreements; or

(h)      by Sellers or Buyer, if (i) (x) Sellers enter into a definitive agreement with respect to a Competing Bid and (y) the Bankruptcy Court enters an order approving a Competing Bid, or (ii) the Bankruptcy Court enters an order that precludes the consummation of the transactions contemplated hereby on the terms and conditions set forth in this Agreement, subject to Buyer's right to payment of the Termination Fee, if applicable, in accordance with the provisions of Section 5.06(b).

The party desiring to terminate this Agreement pursuant to any of clause (b), (c), (d) or (e) of this Section 8.01 shall give written notice of such termination to the other party in accordance with Section 10.04 specifying the provision or provisions hereof pursuant to which such termination is effected.

8.02      Effect of Termination.  In the event of the termination of this Agreement by either Buyer or Holdings as provided above, the provisions of this Agreement will immediately become void and of no further force or effect (other than this Section 8.02, Section 2.06, Section 5.06, Section 8.03, Article I, and Article X hereof which will survive the termination of this Agreement and remain valid and binding obligations of each of the parties) and there will be no liability (other than (a) in the case of Sellers, the payment of any Termination Fee or Negotiated Expense Amount payable pursuant to the terms of this Agreement and, for the avoidance of doubt, the return of the Good Faith Deposit and (b) in the case of Buyer, the forfeiture of the Good Faith Deposit pursuant to the terms of Section 2.06(b)(ii) or (iii)) on the part of any of the parties to one another, except for Willful Breaches; provided, however, that the maximum Liability of (i) Sellers under this Agreement shall not exceed the amount of the Termination Fee and, for the avoidance of doubt, the return of the Good Faith Deposit and (ii) Buyer under this Agreement shall not exceed the amount of the Good Faith Deposit.  Nothing in this Article VIII will be deemed to impair the right of any party to compel specific performance by another party of its obligations under this Agreement.

8.03      Termination Fee; Negotiated Expense Amount.  If this Agreement is terminated in accordance with Section 8.01(g) or Section 8.01(h), Sellers shall pay Buyer (a) in the case of termination pursuant to Section 8.01(g), Buyer's reasonable and documented out-of-pocket expenses up to the Negotiated Expense Amount promptly (and in any event within two (2) Business Days of such termination) in immediately available funds by wire transfer to an account designated by Buyer, and (b) in the case of termination pursuant to Section 8.01(h), the Termination Fee in accordance with the provisions of Section 5.06(b). If this Agreement is terminated by Buyer in accordance with Section 8.01(b) on or after the Termination Date (as extended pursuant to Section 8.01(b)) and at the time of such termination the condition set forth in Section 7.01(c)(ii) shall not then be satisfied because of any ongoing appeal that challenges the

validity of any Sale Order's findings of fact and conclusions of law that none of Buyer, its designee or the Acquired Assets shall have assumed or shall have Liability for the Union Agreements or any Liability relating to the termination of any contribution to or other obligations with respect to any Multiemployer Pension Plan, Sellers shall pay Buyer its reasonable and documented out-of-pocket expenses up to the Negotiated Expense Amount promptly (and in any event within two (2) Business Days of such termination) in immediately available funds by wire transfer to an account designated by Buyer. The Buyer and Sellers agree and acknowledge that the amounts payable pursuant to this <u>Section 8.03</u> are commercially reasonable and necessary to induce Buyer to enter into this Agreement and consummate the transaction contemplated hereby. For the avoidance of doubt, the covenants set forth in this <u>Section 8.03</u> are continuing obligations, separate and independent from the other obligations of the parties hereto (and shall not limit Buyer's other rights and remedies under or in respect of this Agreement, except as expressly set forth herein) and shall survive termination of this Agreement.

ARTICLE IX

<u>TAX MATTERS</u>

9.01    <u>Books and Records; Cooperation</u>.    Without limiting <u>Section 6.01</u>, Buyer and Holdings shall provide the other party and its Affiliates with such assistance as may reasonably be requested by the other party in connection with the preparation of any Tax Return, any audit or other examination by any Tax Authority, any Tax refund claim, or any judicial or administrative proceedings related to liability for Taxes (other than any proceeding between Buyer and Sellers), and each will retain and provide the requesting party (to the extent reasonably requested and at the requesting party's expense) with any records or information which may be relevant to such Tax Return, audit or examination, refund claim, proceedings or determination.  However, in no event shall (i) Sellers have access to any of the Tax Returns or other books and records of Buyer or any of its Affiliates (other than Tax Returns primarily related to the Acquired Assets) or (ii) Buyer have access to any of the Tax Returns of Sellers or other books and records of or any of its Affiliates (other than Tax Returns primarily related to the Acquired Assets).  Any information obtained pursuant to this <u>Section 9.01</u> or pursuant to any other Section hereof providing for the sharing of information or review of any Tax Return or other schedule relating to Taxes shall be kept confidential by the parties hereto, except as necessary to be disclosed in connection with such return, audit or examination, refund claim, proceedings or determination, or as required by applicable law.

9.02    <u>Transfer Taxes</u>.    All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the other agreement, document or instrument contemplated hereby (including any real property transfer Tax and any other similar Tax), as well as any related Tax Return preparation and filing costs (collectively, "<u>Transfer Taxes</u>"), shall be borne solely by Buyer.  Accordingly, if any Seller is required by law to pay any such Transfer Taxes, Buyer shall promptly reimburse such Seller for the amount of such Transfer Taxes actually paid by such Seller. Each Tax Return with respect to Transfer Taxes will be prepared and filed by the party that customarily has primary responsibility for filing such Tax Return pursuant to applicable law.  The parties will each timely sign and deliver (or cause to be timely signed and delivered) such

54

certificates or forms as may be necessary or appropriate (and will each otherwise cooperate) to establish any available exemption from (or otherwise reduce) any such Taxes or fees.

9.03    <u>Straddle Period Allocation</u>.    To the extent it is necessary for purposes of this Agreement to determine the allocation of Taxes among a Straddle Period, the amount of any Taxes based on or measured by income, receipts, payroll or sales for the Pre-Closing Tax Period will be determined based on an interim closing of the books as of the close of business on the Closing Date (and for such purpose, the taxable period of any partnership or other pass through entity in which Sellers or any of their subsidiaries hold a beneficial interest will be deemed to terminate at such time) and the amount of other Taxes for a Straddle Period that relates to the Pre-Closing Tax Period will be deemed to be the amount of such Tax for the entire taxable period multiplied by a fraction, the numerator of which is the number of days in the taxable period ending on the Closing Date and the denominator of which is the number of days in such Straddle Period.

9.04    <u>Purchase Price Allocation</u>.    Within thirty (30) days after the Purchase Price is finally determined hereunder, Holdings shall deliver to Buyer an allocation of the final Purchase Price (and the Assumed Liabilities treated as consideration for U.S. federal Income Tax purposes) among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (and any similar provision of state, local and foreign law, as appropriate) (the "<u>Allocation</u>").    Buyer shall have the right, for a period of fifteen (15) days after such delivery (the "<u>Review Period</u>"), to review such Allocation.    If Buyer notifies Holdings that it objects to the Allocation, by delivering to Holdings a written notice of its specific objections to the Allocation before the end of the Review Period (the "<u>Allocation Objection Notice</u>"), Holdings shall consider any reasonable objections raised by Buyer and negotiate with Buyer in good faith, for a period of fifteen (15) days (or such longer period as the parties shall mutually agree), the resolution of such disputed items.    It is understood and agreed by the parties that if Buyer does not deliver the Allocation Objection Notice to Holdings before the end of the Review Period, Buyer shall be deemed to have agreed to the Allocation delivered by Holdings.    If Buyer has agreed in writing to the Allocation originally delivered to Buyer by Holdings (or is deemed to have agreed to such Allocation under this <u>Section 9.04</u>), or if Buyer has timely delivered the Allocation Objection Notice to Holdings but the parties have resolved all of the disputed items with Buyer and Holdings each having agreed in writing to the final Allocation, such final Allocation shall be conclusive and binding on Buyer, Sellers and each party's respective Affiliates.    If Buyer and Holdings are unable to agree on the Allocation after good faith consultation, the disputed items shall be referred for resolution to a nationally recognized accounting firm reasonably acceptable to Holdings and Buyer (the "<u>Independent Accounting Firm</u>"), the expenses (including engagement fees) of which shall be borne equally by Buyer, on the one hand, and Sellers collectively, on the other hand.    The Independent Accounting Firm shall resolve any disputed matters as promptly as practicable, and the Independent Accounting Firm's decision with respect to any such matter shall be conclusive and binding on Buyer, Sellers and each party's respective Affiliates.    None of Buyer, Sellers and each party's respective Affiliates will take any position inconsistent with the final Allocation on any Tax Return (including IRS Form 8594) or in any audit or Tax proceeding, in each case, unless otherwise required by applicable law or by a final determination by a Governmental Body.

## ARTICLE X

## MISCELLANEOUS

10.01   Survival.  Except for any covenant that by its terms is to be performed (in whole or in part) by any party following the Closing, none of the representations, warranties, or covenants of any party set forth in this Agreement or in any certificate delivered pursuant to Section 7.02(c) or Section 7.03(c) shall survive, and each of the same shall terminate and be of no further force or effect as of, the Closing.

10.02   Press Releases and Communications.  No press release or public announcement related to this Agreement or the Ancillary Documents or the transactions contemplated herein or therein or any other announcement or communication to the employees, customers or suppliers of the Business will be issued or made by any party hereto prior to the Closing without the joint approval of Buyer and Sellers, unless required by law (in the reasonable opinion of counsel) in which case Buyer and Sellers will have the right to review such press release, announcement or communication prior to its issuance, distribution or publication; provided, however, that the foregoing will not restrict or prohibit (a) Buyer or any of its Affiliates from making any announcement to its employees, customers and other business relations to the extent Buyer or such Affiliate reasonably determines in good faith that such announcement is necessary or advisable or (b) any disclosure required under any Contract to which Buyer or any of its Affiliates is a party.

10.03   Expenses.  Except as otherwise expressly provided herein (including Section 6.01, Section 8.02 and Section 9.02), each party will each pay its own expenses (including attorneys' and accountants' fees and expenses) in connection with the negotiation of this Agreement and the Ancillary Documents, the performance of its obligations hereunder and thereunder the consummation of the transactions contemplated hereby and thereby (whether consummated or not).

10.04   Notices.  All notices, requests, claims, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been duly given or made pursuant to this Section 10.04 (a) when personally delivered, (b) the day (except if not a Business Day then the next Business Day) on which the same has been delivered if sent by a reputable national overnight air courier service or (c) when received, if sent by certified or registered mail, postage prepaid, return receipt requested or (d) on the day such communication was sent via electronic mail to the e-mail address set forth below for the Person to whom such notice, request, claim, demand or other communication is directed, unless the sender receive a "bounce back" or similar indication that the e-mail was not delivered to the recipient.  Notices, requests, claims, demands and other communications, in each case to the respective parties, will be sent to the applicable address set forth below, unless another address has been previously specified in writing:

Notices to Buyer:

TLI Bedrock
10 Grand Central Tower

29th Floor
New York, New York 10017

Attn:  Andrew Siegel, Manager
Email:  asiegel@benensoncapital.com

with a copy to (which will not constitute notice):

Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York, 10111

Attn: Steven H. Goldberg, Esq., Jorian Rose, Esq.
Facsimile: (212) 589-4201
Email: sgoldberg@bakerlaw.com, jrose@bakerlaw.com

Notices to Sellers:

KB US Holdings, Inc.
700 Lanidex Plaza
Parsippany, NJ 07054
_____


Attn: Judith Spires, CEO
Email:  jspires@kingssm.com

with a copy to (which will not constitute notice):

Proskauer Rose LLP
Eleven Times Square
New York, New York 10036
Attn:  Daniel I. Ganitsky, Esq., Vincent Indelicato, Esq.
Facsimile:  (212) 969-2900
Email:  dganitsky@proskauer.com, vindelicato@proskauer.com

10.05   Assignment.  Neither this Agreement nor any of the rights, interests or obligations
hereunder shall be assigned, in whole or in part, by operation of law or otherwise, by any of the
parties without the prior written consent of the other parties; provided that following the Closing,
each party may assign its rights, interests and obligations hereunder to its Affiliates but such
assignment shall not relieve such party of its obligations or liabilities hereunder.  Subject to the
preceding sentence, this Agreement shall be binding upon, inure to the benefit of and be
enforceable by the parties and their respective successors and permitted assigns.  Any purported
assignment not permitted under this Section 10.05 shall be null and void.  Notwithstanding the
foregoing, Buyer may assign this Agreement or any of its rights or obligations hereunder to any
Affiliate of Buyer, provided that such assignment shall not relieve Buyer of its obligations
hereunder.

10.06  <u>Severability</u>.   Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement, and the parties will amend or otherwise modify this Agreement to replace any prohibited or invalid provision with an effective and valid provision that gives effect to the intent of the parties to the maximum extent permitted by applicable law.

10.07  <u>No Strict Construction</u>.  The language used in this Agreement will be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction will be applied against any Person.  The Disclosure Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to sections of this Agreement; <u>provided</u> <u>however</u>, each section of the Disclosure Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Disclosure Schedules to the extent reasonably apparent on the face of such disclosure.  Capitalized terms used in the Disclosure Schedules and not otherwise defined therein have the meanings given to them in this Agreement.  The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement or the Disclosure Schedules or Exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the ordinary course of business, and no party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement or the Disclosure Schedules or Exhibits in any dispute or controversy between the parties as to whether any obligation, item or matter not described or included in this Agreement or in any Disclosure Schedule or Exhibit is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or is within or outside of the ordinary course of business for purposes of this Agreement.  The information contained in this Agreement and in the Disclosure Schedules and Exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any party hereto to any third party of any matter whatsoever (including any violation of law or breach of contract).

10.08  <u>Amendment and Waiver</u>.  Any provision of this Agreement may be amended, modified, supplemented or waived if, and only if, such amendment, modification, supplement or waiver is in writing and signed, in the case of an amendment, modification or supplement, by Buyer and Sellers, or in the case of a waiver, by the party against whom the waiver is to be effective.  No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.  No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

10.09  <u>Complete Agreement</u>.  This Agreement (including the Disclosure Schedules and the exhibits) and the documents referred to herein (including the Confidentiality Agreement and the Ancillary Documents) contain the complete agreement by, between and among the parties relating to the subject matter contained herein and therein and supersede any prior understandings,

agreements or representations by, between or among the parties, written or oral, which may have related to the subject matter hereof or thereof in any way. The parties agree that prior drafts of this Agreement and the Related Documents and of any provision herein or therein will be deemed to not provide any evidence as to the meaning of any provision hereof or thereof, the intent of the parties with respect hereto or thereto and that such drafts will be deemed joint work product of the parties. The parties hereto have voluntarily agreed to define their rights, liabilities and obligations respecting the sale and purchase of the Acquired Assets and the assumption of the Assumed Liabilities exclusively in contract pursuant to the express terms and provisions of this Agreement; and the parties hereto expressly disclaim that they are owed any duties or are entitled to any remedies not expressly set forth in this Agreement. Furthermore, the parties each hereby acknowledge that this Agreement embodies the justifiable expectations of sophisticated parties derived from arm's-length negotiations; all parties to this Agreement specifically acknowledge that no party has any special relationship with another party that would justify any expectation beyond that of an ordinary buyer and an ordinary seller in an arm's-length transaction.

10.10   Counterparts. This Agreement may be executed in multiple counterparts (including by means of telecopied signature pages or electronic transmission in portable document format (pdf)), any one of which need not contain the signatures of more than one party, but all such counterparts taken together will constitute one and the same instrument.

10.11   Governing Law. This Agreement, and all Actions (whether in contract, tort or otherwise) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution, performance, non-performance, interpretation, termination or construction of this Agreement (including any Action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement) or the legal relationships of the parties hereto will be governed by and construed in accordance with the internal laws of the State of Delaware applicable to agreements executed and performed entirely within such State, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

10.12   CONSENT TO JURISDICTION AND SERVICE OF PROCESS. EACH OF THE PARTIES TO THIS AGREEMENT IRREVOCABLY SUBMITS AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURTS IN RESPECT OF THE INTERPRETATION AND ENFORCEMENT OF THE PROVISIONS OF THIS AGREEMENT AND ANY ANCILLARY DOCUMENT DELIVERED IN CONNECTION HEREWITH, THE LEGAL RELATIONSHIP OF THE PARTIES AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY. EACH PARTY ALSO WAIVES, AND AGREES NOT TO ASSERT: (I) ANY DEFENSE TO JURISDICTION OR VENUE IN THE CHOSEN COURTS FOR ANY ACTION RELATING TO THE INTERPRETATION OR ENFORCEMENT OF THIS AGREEMENT AND ANY ANCILLARY DOCUMENT DELIVERED IN CONNECTION HEREWITH, THE LEGAL RELATIONSHIP OF THE PARTIES AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY; (II) THAT THIS AGREEMENT MAY NOT BE ENFORCED IN OR BY THE BANKRUPTCY COURTS; (III) THAT THEIR PROPERTY IS EXEMPT OR IMMUNE FROM EXECUTION; OR (IV) THAT THE ACTION IS BROUGHT IN AN INCONVENIENT FORUM; PROVIDED, HOWEVER, THAT (X) IF THE BANKRUPTCY CASES HAVE NOT BEEN COMMENCED OR (Y) UPON THE CLOSING

OF THE BANKRUPTCY CASES, THE PARTIES AGREE TO UNCONDITIONALLY AND IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE DELAWARE COURTS OF CHANCERY LOCATED IN WILMINGTON, DELAWARE OR (BUT ONLY TO THE EXTENT THE CHANCERY COURT DECLINE JURISDICTION) THE DELAWARE STATE COURTS OR THE UNITED STATES DISTRICT COURT LOCATED IN WILMINGTON, DELAWARE AND ANY APPELLATE COURT THEREFROM.    THE PARTIES INTEND THAT ALL FOREIGN JURISDICTIONS WILL ENFORCE ANY DECREE OF THE BANKRUPTCY COURT IN ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.    EACH PARTY TO THIS AGREEMENT FURTHER AGREES THAT SERVICE OF PROCESS WITH RESPECT TO ANY ACTION GOVERNED BY THIS SECTION 10.12 MAY BE MADE UPON A PARTY BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO SUCH PARTY AT ITS ADDRESS AS PROVIDED IN SECTION 10.04.    THE PROVISIONS OF SECTION 10.13 BELOW RELATING TO THE WAIVER OF JURY TRIAL SHALL APPLY TO ANY SUCH PROCEEDING.    EACH PARTY AGREES THAT ANY FINAL AND NON-APPEALABLE JUDGMENT AGAINST IT IN ANY PROCEEDING DESCRIBED IN THIS SECTION 10.12 SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN ANY OTHER JURISDICTION WITHIN OR OUTSIDE OF THE UNITED STATES BY SUIT ON SUCH JUDGMENT, A CERTIFIED COPY OF WHICH SHALL BE CONCLUSIVE EVIDENCE OF THE FACT AND AMOUNT OF SUCH JUDGMENT.    THE PARTIES AGREE THAT ANY OF THEM MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF KNOWING AND VOLUNTARY AND BARGAINED AGREEMENT BETWEEN THE PARTIES.

　　10.13 WAIVER OF JURY TRIAL.    EACH PARTY HERETO HEREBY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES.    ACCORDINGLY AND TO THE EXTENT PERMITTED BY LAW, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE ANCILLARY DOCUMENTS, THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY OR THE RELATIONSHIP BETWEEN THE PARTIES, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE AND REGARDLESS OF WHICH PARTY INITIATES SUCH ACTION.    THE PARTIES TO THIS AGREEMENT EACH AGREE AND CONSENT THAT ANY SUCH ACTION SHALL BE DECIDED BY COURT TRIAL IN THE CHOSEN COURTS WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE IRRECOVABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.    EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT: (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER; (B) EACH SUCH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER; (C) EACH SUCH PARTY MAKES THIS WAIVER VOLUNTARILY;

AND (D) EACH SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 10.13</u>.

    10.14    <u>No Third Party Beneficiaries</u>.

        (a)    Except as provided in <u>Section 10.14(b)</u>, nothing in this Agreement, express or implied, is intended to confer upon any Person other than the parties to this Agreement, or any of their respective successors or permitted assigns, any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement.

        (b)    The limitations in <u>Section 10.14(a)</u> shall not apply to the provisions of:

            (i)    <u>Section 6.01</u> and this <u>Section 10.14</u>, to the extent it applies to D&O Indemnified Persons, which shall be express third-party beneficiaries of, and shall be entitled to rely on, such provisions;

            (ii)    <u>Section 10.15</u> and this <u>Section 10.14</u>, to the extent it applies to Proskauer, which shall be an express third-party beneficiary of, and shall be entitled to rely on, such provisions; and

            (iii)    <u>Section 10.19</u> and this <u>Section 10.14</u>, to the extent it applies to Released Persons, which shall be express third-party beneficiaries of, and shall be entitled to rely on, such section.

        (c)    Except as set forth in this <u>Section 10.14,</u> no Person shall be a third party beneficiary of this Agreement.

    10.15    <u>Representation of Sellers and their Affiliates</u>.  Buyer agrees, on its own behalf and on behalf of the Buyer Related Parties, that (a) Sellers and their Affiliates have retained Proskauer Rose LLP to act as their counsel in connection with the transactions contemplated by this Agreement as well as other past  matters; (b) Proskauer Rose LLP have not acted as counsel for any other Person in connection with the transactions contemplated by this Agreement and no Person other than Sellers and their Affiliates has the status of a Proskauer Rose LLP client for conflict of interest or any other purpose as a result thereof, and (c) following the Closing, Proskauer Rose LLP may serve as counsel to Sellers and their Affiliates in connection with any matters related to this Agreement and the transactions contemplated hereby, including any litigation, claim or obligation arising out of or relating to this Agreement or the transactions contemplated by this Agreement notwithstanding any representation by Proskauer Rose LLP prior to the Closing Date of any Seller.  Buyer (on behalf of itself and its subsidiaries) hereby (i) waive any claim they have or may have that Proskauer Rose LLP has a conflict of interest or is otherwise prohibited from engaging in such representation and (ii) agree that, in the event that a dispute arises after the Closing between Buyer or Sellers or any of their Affiliates, Proskauer Rose LLP may represent Sellers or any of their Affiliates in such dispute even though the interests of such Person(s) may be directly adverse to Buyer or any Seller and even though Proskauer Rose LLP may have represented a Seller or other Persons in a matter substantially related to such dispute and may be handling other ongoing matters for a Buyer Related Party.  Buyer represents that Buyer's own

attorney has explained and helped Buyer evaluate the implications and risks of waiving the right to assert a future conflict against Proskauer Rose LLP, and Buyer's consent with respect to this waiver is fully informed. Buyer (on behalf of itself and its subsidiaries) also further agree that, as to all communications among Proskauer Rose LLP, on the one hand, and Sellers or Sellers' Affiliates and Representatives, on the other hand, that relate in any way to the transactions contemplated by this Agreement, the attorney client privilege and the expectation of client confidence belongs to Sellers and may be controlled by Sellers and will not pass to or be claimed by Buyer or any of its Affiliates. In addition, if the Closing occurs, all of the client files and records in the possession of Proskauer Rose LLP related to this Agreement and the transactions contemplated hereby will continue to be property of (and be controlled by) Sellers will retain any copies of such records or have any access to them. Without limiting the foregoing, Buyer on behalf of itself, its Affiliates, subsidiaries and their respective current and future members, partners, equityholders, Representatives and each of the successors and assigns of the foregoing (the "Waiving Parties"), hereby acknowledge and agree that all (x) emails and other communications from or among any Seller Related Party or any Affiliates, directors, managers, officers, employees, agents, advisors, attorneys, accountants, consultants or other representatives of any Seller Related Party concerning, related to or in respect of the sale process, this Agreement or any agreement entered into in connection with herewith or related hereto (including all prior drafts), the assets, liabilities, operations, prospects and condition of any Sellers and their businesses as related to the foregoing, and any other matter relating to any of the foregoing (whether or not such email or other communication is entitled to any attorney-client or other privilege) and (y) documents or materials created by or on behalf of any Seller Related Party in connection with, in preparation for, related to or arising out of the sale process, any prior sale processes, this Agreement or any agreement entered into in connection herewith or related hereto (including all prior drafts) and the subject matter hereof and thereof, or any dispute or proceeding arising out of or relating to, the sale process, this Agreement, any agreement entered into in connection herewith, the transactions contemplated hereby or any matter relating to any of the foregoing, will be exclusively owned and controlled by Sellers and will not pass to or be claimed by Buyer thereof and from and after the Closing neither Buyer nor any other Person purporting to act on behalf thereof or any of the Waiving Parties will seek to access, obtain, use, rely on or otherwise disclose the same, including, without limiting the foregoing, by or through any legal or other process, without in each case first obtaining Sellers' consent, which may be granted or withheld in its sole discretion. In furtherance of the foregoing, Buyer acknowledges that it would be impractical to remove all such emails and communications from the records (including emails and other electronic files) of Sellers and that any possession of Buyer of any of the foregoing will not affect or alter the ownership of such emails and communications. Notwithstanding the foregoing, in the event that a dispute arises between Buyer or any Seller and a third party other than a party to this Agreement (or an Affiliate thereof) after the Closing, Sellers may assert the attorney client privilege to prevent disclosure of confidential communications by Proskauer Rose LLP to such third party; provided, however, that no Seller may waive such privilege without the prior written consent of Sellers.

10.16  No Additional Representations; Disclaimer; Non-Recourse. Subject in all cases to the provisions of 0:

(a)    Buyer acknowledges that it has conducted to its satisfaction an independent investigation of the Business, the Acquired Assets and the Assumed Liabilities, and, in making its determination to proceed with the transactions contemplated by this Agreement,

Buyer has relied solely on the results of its own independent investigation and the representations and warranties of Sellers expressly and specifically set forth in Article III, as qualified by the Disclosure Schedules. The representations and warranties of Sellers expressly and specifically set forth in Article III, as qualified by the Disclosure Schedules, constitute the sole and exclusive representations, warranties, and statements of any kind of any of Sellers to Buyer in connection with the transactions contemplated hereby, and Buyer understands, acknowledges and agrees that all other representations, warranties, and statements of any kind or nature expressed or implied (including any relating to the future or historical financial condition, results of operations, prospects, assets or liabilities of the Business, Sellers, or the quality, quantity or condition of the Acquired Assets) are specifically disclaimed by Sellers. All representations and warranties set forth in this Agreement are contractual in nature only. No Person is asserting the truth of any representation and warranty set forth in this Agreement; rather the parties have agreed that should any representations and warranties of any party prove untrue, the other party will have the specific rights and remedies herein specified as the exclusive remedy therefor, but that no other rights, remedies or causes of action (whether in law or in equity or whether in contract or in tort) are permitted to any party hereto as a result of the untruth of any such representation and warranty. NO SELLERS MAKE OR PROVIDE, AND BUYER HEREBY WAIVES, ANY WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, AS TO THE QUALITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, CONFORMITY TO SAMPLES, OR CONDITION OF THE BUSINESS, THE ACQUIRED ASSETS, THE ASSUMED LIABILITIES OR THE ASSUMED CONTRACTS OR ANY PART THEREOF. BUYER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF SELLERS EXPRESSLY AND SPECIFICALLY SET FORTH IN ARTICLE III, AS QUALIFIED BY THE DISCLOSURE SCHEDULES, (X) BUYER IS ACQUIRING THE ACQUIRED ASSETS, THE ASSUMED LIABILITIES AND THE ASSUMED CONTRACTS ON AN "AS IS, WHERE IS" BASIS AND (Y) NEITHER SELLERS NOR ANY OTHER PERSON (INCLUDING, ANY STOCKHOLDER, MEMBER, OFFICER, DIRECTOR, EMPLOYEE OR AGENT OF ANY OF THE FOREGOING, WHETHER IN ANY INDIVIDUAL, CORPORATE OR ANY OTHER CAPACITY) IS MAKING, AND BUYER IS NOT RELYING ON, ANY REPRESENTATIONS, WARRANTIES, OR OTHER STATEMENTS OF ANY KIND WHATSOEVER, WHETHER ORAL OR WRITTEN, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, AS TO ANY MATTER CONCERNING THE BUSINESS, THE ACQUIRED ASSETS, THE ASSUMED LIABILITIES, THE ASSUMED CONTRACTS, THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, OR THE ACCURACY OR COMPLETENESS OF ANY INFORMATION PROVIDED TO (OR OTHERWISE ACQUIRED BY) BUYER.

(b)    This Agreement and the Ancillary Documents may only be enforced against, and any claim or suit based upon, arising out of, or related to this Agreement or the Ancillary Documents, or the negotiation, execution or performance of this Agreement or the Ancillary Documents, may only be brought against the named parties to this Agreement or such Ancillary Documents and then only with respect to the specific obligations set forth herein and therein with respect to the named parties to this Agreement or such Ancillary Documents (in all cases, as limited by the provisions of 0). No Person

who is not a named party to this Agreement or the Ancillary Documents, including any past, present or future director, officer, employee, incorporator, member, partner, stockholder, Affiliate, agent, attorney or representative of Sellers or any of their respective Affiliates, will have or be subject to any liability or indemnification obligation (whether in contract, tort or otherwise) to Buyer or any other Person resulting from (nor will Buyer have any claim with respect to) (i) the distribution to Buyer, or Buyer's use of, or reliance on, any information, documents, projections, forecasts or other material made available to Buyer in certain "data rooms," confidential information memoranda or management presentations in expectation of, or in connection with, the transactions contemplated by this Agreement, or (ii) any claim based on, in respect of, or by reason of, the Business, the Acquired Assets, the Assumed Liabilities or the Assumed Contracts, including any alleged non-disclosure or misrepresentations made by any such Persons, in each case, regardless of the legal theory under which such liability or obligation may be sought to be imposed, whether sounding in contract, tort or otherwise, or whether at law or in equity, or otherwise; and each party hereto waives and releases all such liabilities and obligations against any such Persons.

(c)     In connection with the investigation by Buyer and its Affiliates of the Business, the Acquired Assets, the Assumed Liabilities and the Assumed Contracts, Buyer and its Affiliates have received or may receive from Sellers certain projections, forward-looking statements and other forecasts and certain business plan information. Buyer acknowledges on behalf of itself and its Affiliates that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that Buyer is familiar with such uncertainties, that Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to it (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans), and that Buyer and its Affiliates will have no claim against anyone with respect thereto. Accordingly, Buyer acknowledges, on behalf of itself and its Affiliates, that neither Sellers, nor any member, officer, director, employee or agent of any of the foregoing, whether in an individual, corporate or any other capacity, make any representation, warranty, or other statement with respect to, and Buyer is not relying on, such estimates, projections, forecasts or plans (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans), and Buyer agrees that it and its Affiliates have not relied thereon.

10.17    Conflict Between Transaction Documents.    The parties hereto agree and acknowledge that to the extent any terms and provisions of this Agreement are in any way inconsistent with or in conflict with any term, condition or provision of any other agreement, document or instrument contemplated hereby, this Agreement will govern and control.

10.18    Specific Performance; Other Remedies.

(a)     The provisions of this Agreement are uniquely related to the desire of the parties and their respective Affiliates to consummate the transactions contemplated hereunder, and the transactions contemplated hereunder represent a unique business opportunity at a unique time for each of the parties and their respective Affiliates; therefore (i) irreparable damage would occur if any provision of this Agreement were not performed

in accordance with its terms or otherwise breached and, (ii) although monetary damages may be available for the breach of such covenants, obligations and undertakings, monetary damages would be an inadequate remedy therefor.  Accordingly each party agrees, on behalf of itself and its Affiliates, that if any party hereto breaches or threatens to breach any provision of this Agreement, the counterparty shall be entitled to an injunction or injunctions, specific performance and other equitable relief to prevent or restrain such breaches or threatened breaches of this Agreement, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the terms and provisions of this Agreement.  Any party seeking an injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the terms and provisions of this Agreement shall not be required to provide, furnish or post any bond or other security in connection with or as a condition to obtaining any such order or injunction, and each party irrevocably waives any right it may have to require the provision, furnishing or posting of any such bond or other security.  If any Action should be brought in equity to enforce the provisions of this Agreement, no party shall allege, and each party waives the defense, that there is an adequate remedy at law.  The rights in this <u>Section 10.18</u> are in addition to any other remedy to which a party may be entitled at law or in equity (subject to the limitations herein), and the exercise by a party of one remedy shall not preclude the exercise of any other remedy.

(b)    To the extent any party brings any Action to enforce specifically the performance of the terms and provisions of this Agreement (other than an action to enforce specifically any provision that expressly survives termination of this Agreement), the Termination Date shall automatically be extended to (i) the 20th Business Day following the resolution of such Action, if later than the date the Termination Date would otherwise occur pursuant to the terms hereof or (ii) such other time period established by the court presiding over such Action.

10.19    <u>Release</u>.

(a)    As of the Closing, Buyer and its Affiliates (each, a "<u>Releasing Person</u>"), hereby releases and forever discharges, except for Fraud, each of Sellers and their respective Affiliates (each, a "<u>Released Person</u>"), from all debts, demands, Actions, covenants, torts, damages and all defenses, offsets, judgments, demands and liabilities whatsoever, of every name and nature, both at law and in equity, known or unknown, accrued or unaccrued, that have been or could have been asserted against any Released Person, which any Releasing Person has or ever had, that arises out of or in any way relates to events, circumstances or actions occurring, existing or taken prior to or as of the Closing Date in respect of matters directly or indirectly relating to the Business, the Acquired Assets, the Assumed Liabilities or the Assumed Contracts. This <u>Section 10.19</u> does not limit the provisions of <u>Section 8.02</u>.

(b)    Buyer, on behalf of itself and the other Releasing Persons: (i) expressly waives and relinquishes all rights and benefits that the Releasing Persons may have under applicable law, including any state law or any common law principles limiting waivers of unknown claims; (ii) understands that the facts and circumstances under which Buyer gives this full and complete release and discharge of the Released Persons may hereafter prove

to be different than now known or believed to be true by Buyer; and (iii) accepts and assumes the risk thereof and agrees that the Releasing Persons' full and complete release and discharge of the Released Persons with respect to the matters described in this Section 10.19 shall remain effective in all respects and not be subject to termination, rescission or modification by reason of any such difference in facts and circumstances.

(c)    All claims or causes of action (whether in contract or in tort, at law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or related in any manner to this Agreement or the Ancillary Documents may be made only against (and are expressly limited to) the Persons that are expressly identified as parties hereto or thereto (the "Contracting Parties").

10.20    Electronic Delivery.    This Agreement and any signed agreement or instrument entered into in connection with this Agreement, and any amendments hereto or thereto, to the extent delivered by means of a facsimile machine or electronic mail (any such delivery, an "Electronic Delivery"), will be treated in all manner and respects as an original agreement or instrument and will be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto will re execute original forms thereof and deliver them to all other parties.  No party hereto or to any such agreement or instrument will raise the use of Electronic Delivery to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of Electronic Delivery as a defense to the formation of a Contract, and each such party forever waives any such defense, except to the extent such defense related to lack of authenticity.

10.21    Sale Without Chapter 11 Filing.    In the event the parties agree that the sale transaction contemplated hereunder can be consummated without the commencement of the Bankruptcy Cases on terms that are mutually acceptable to each of the parties hereto, then the parties will cooperate and negotiate in good faith to amend this agreement to effectuate such sale transaction with the terms set forth on Exhibit 10.21.

10.22    Buyer Deliveries.  Any document or item will be deemed "delivered", "provided" or "made available" within the meaning of this Agreement if such document or item (a) is included in the electronic data room, (b) actually delivered or provided to Buyer or any of its Representatives or (c) made available upon request, including at any of Sellers' offices.

*        *        *        *        *

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement on the day and year first above written.

SELLERS:

**KB US HOLDINGS, INC.**

By: _____
Name: Judith Spires
Title: CEO

**KB HOLDING, INC.**

By: _____
Name:  Judith Spires
Title: Authorized Signatory

**AG KINGS HOLDINGS INC.**

By: _____
Name:  Judith Spires
Title: Authorized Signatory

**AG HOLDINGS II INC.**

By: _____
Name:  Judith Spires
Title: Authorized Signatory

**KINGS SUPER MARKETS, INC.**

By: _____

Name:  Judith Spires

Title: Authorized Signatory


**BALDUCCI'S HOLDINGS, LLC**

By: _____

Name:  Judith Spires

Title: Authorized Signatory


**BALDUCCI'S CONNECTICUT, LLC**

By: _____

Name:  Judith Spires

Title: Authorized Signatory


**BALDUCCI'S MARYLAND, LLC**

By: _____

Name:  Judith Spires

Title: Authorized Signatory


**BALDUCCI'S NEW YORK, LLC**

By: _____

Name:  Judith Spires

Title: Authorized Signatory


[*Signature Page to Asset Purchase Agreement*]

**BALDUCCI'S VIRGINIA, LLC**

By: _____
    Name:  Judith Spires
    Title: Authorized Signatory

BUYER:

**TLI BEDROCK LLC**

By: _____

    Name: Andrew Siegel
    Title: Manager