**SQUIRE PATTON BOGGS (US) LLP**
Stephen D. Lerner
201 E. Fourth St., Suite 1900
Cincinnati, Ohio 45202
Telephone: 513-361-1200
Facsimile: 513-361-1201
Email: stephen.lerner@squirepb.com

Norman N. Kinel
Jihyun Park
1211 Avenue of the Americas, 26th Floor
New York, NY 10036
Telephone: 212-872-9800
Facsimile: 212-872-9815
Email: norman.kinel@squirepb.com
Email: jihyun.park@squirepb.com

*Counsel to GSSG Capital Corp.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re** | **Chapter 11** |
| **KB US Holdings, Inc.,** *et al.*, | **Case No. 20-22962 (SHL)** |
| **Debtors.**[1] | **(Jointly Administered)** |

## GSSG CAPITAL CORP.'S MOTION TO DISMISS DEBTORS' CHAPTER 11 CASES

GSSG Capital Corp. ("GSSG") hereby submits this motion seeking entry of an order

substantially in the form attached hereto as **Exhibit A** (the "Order"), (i) dismissing the chapter

11 cases of KB US Holdings, Inc. ("Holdings") and its debtor affiliates (collectively, the

"Debtors") pursuant to section 1112(b) of title 11 of the United States Code (the "Bankruptcy

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: KB US Holdings, Inc. (1000), KB Holding, Inc. (3082), AG Kings Holdings, Inc. (8681), AG Holdings II, Inc. (3828), Kings Super Markets, Inc. (6769), Balducci's Holdings LLC (1913), Balducci's Connecticut LLC (1945), Balducci's Maryland LLC (1926), Balducci's Virginia LLC (1949), and Balducci's New York LLC (1934). The location of the Debtors' corporate headquarters is 700 Lanidex Plaza, Parsippany, NJ 07054.

Code") and rule 1017 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),
(ii) finding that the APA (defined below) is void as a matter of law; and (iii) granting related
relief.  In support of this motion, GSSG respectfully states as follows:

## PRELIMINARY STATEMENT

1.      GSSG seeks immediate dismissal of the Debtors' cases for cause and for lack of
subject matter jurisdiction.  The Debtors purportedly filed these cases with authorization from their
respective governing bodies.  However, as presented in further detail below, the Debtors did not
and *could not* have obtained the requisite authorization.

2.      Pursuant to Delaware law and Holdings' governance documents, the Holdings
board of directors presently is fixed at eight members (such board of directors constituting eight
members, the "Board of Directors") and, thus, requires a quorum of five directors in order to act
on Holdings' behalf.  According to the Debtors' own admissions during the first day hearing and
in their filings, as of the Petition Date (defined below), Holdings' Board of Directors had only
three directors, each holding one vote as to the decision to file for bankruptcy, and five vacancies.[2]
Vacancies are irrelevant in determining a quorum, and the quorum for the Holdings' Board of
Directors remains five.  Thus, Holdings could not have achieved a quorum with the current three
members of the Board of Directors.

3.      Section 1112(b) of the Bankruptcy Code provides that a court *shall* dismiss a
bankruptcy case for cause.  A lack of authority to file has been held to constitute an independent
ground for "cause" for relief under section 1112(b).  Courts have further held that if a bankruptcy

---

[2] Prior to filing this motion to dismiss, on September 4, 2020, non-debtor KB Group Holdings, Inc., a wholly owned
subsidiary of GSSG and the holder of 98.5% of the stock of Holdings, signed a Written Consent electing a new board
of directors of Holdings consisting of five independent directors.  This newly elected board replaces the board in its
entirety.  The five independent directors are:  William H. Henrich, Andrew R. Wright, Bradley E. Scher, Michael T.
Sullivan and Seth E. Lemler.

petition is filed without proper authorization, the bankruptcy court lacks subject matter jurisdiction over the case and must dismiss such case. Accordingly, GSSG respectfully requests that the Court dismiss Holdings' case. Moreover, under Delaware law, subsidiaries owe duties to act in the interest of their parent and shareholders. GSSG does not know if the bankruptcy filings of Holdings' debtor-affiliates (collectively, without Holdings, the "Other Debtors") were technically properly authorized. However, given that Holdings' bankruptcy filing was not properly authorized and that Delaware law makes the interests of the Other Debtors subservient to the interests of Holdings, to the extent that any of the Other Debtors' bankruptcy filings were technically in compliance with their governance requirements, dismissal of the Other Debtors' cases is nevertheless warranted and appropriate.

4.    In addition, the APA (defined below), which represents a stalking horse bid for substantially all of the Debtors' assets and for which the Debtors are seeking approval as to bidding procedures (*see* Docket No. 20), was not properly authorized by the Holdings' Board of Directors. Nor was the approval of GSSG or non-debtor KB Group Holdings, Inc. ("KB Group"), in their capacities as shareholders, sought or obtained, as required under Delaware law and the Debtors' governance documents. The Debtors cannot use the bankruptcy process to bypass the rights afforded to GSSG and KB Group, under applicable law. Thus, GSSG respectfully requests that the Court dismiss these chapter 11 cases and find that the APA is void as a matter of law.

### JURISDICTION

5.    As further described below, these chapter 11 cases were filed without proper authorization, and thus must be dismissed for lack of subject matter jurisdiction. However, without waiving any objections regarding subject matter jurisdiction, GSSG acknowledges that this Court

generally would otherwise have jurisdiction over the subject matter of this motion pursuant to 28 U.S.C. § 157(b).  Venue is proper under 28 U.S.C. §§ 1408 and 1409.

6.      The statutory predicates for the relief requested herein are section 1112(b) of the Bankruptcy Code and Bankruptcy Rule 1017.

## BACKGROUND

### I.      The Debtors' Governing Bodies

7.      Holdings, a Debtor in these cases, is a Delaware corporation and the direct or indirect parent of the Other Debtors.  Holdings is a wholly-owned subsidiary of non-debtor KB Group, which in turn is a wholly-owned subsidiary of GSSG.[3]

8.      Pursuant to Holdings' certificate of incorporation filed with the Delaware Secretary of State on July 18, 2016 (as further amended, modified, supplemented, or restated from time to time, the "Certificate of Incorporation"), "[t]he number of directors that shall constitute the entire Board of Directors shall be as specified in the By-laws of the Corporation."[4]

9.      Upon information and belief, the bylaws of Holdings adopted on July 22, 2016, as amended, including without limitation, on or about March 13, 2019 (the "Bylaws"),[5] are Holdings' current bylaws.  Pursuant to Article III, Section 2 of the Bylaws, "the number of directors may be fixed, from time to time, by the affirmative vote of a majority of the members of the entire Board of Directors or by action of the stockholders of the Corporation."

---

[3] The Debtors' organization chart is attached hereto as **Exhibit B**.

[4] The Certificate of Incorporation as filed on July 18, 2016, the Restated Certificate as filed on August 1, 2016, and a Certificate of Amendment as filed on March 13, 2019, are attached hereto collectively as **Exhibit C**.

[5] The Bylaws of Holdings are attached hereto as **Exhibit D**.  In June, 2020, GSSG requested copies of all governance documents and access to the Debtors' data room.  The data room did not contain the Bylaws or the UWC (defined below), which amended the Bylaws on or around March 13, 2019.  GSSG and its counsel received the Bylaws from Debtors' counsel via email upon request. GSSG is unaware of any amendment of the Bylaws of Holdings after March 13, 2019.  If they have been amended, Holdings and its board of directors failed to provide notice to GSSG.

- 4 -

10.    On or around March 13, 2019, Holdings' Board of Directors, by unanimous written consent, adopted resolutions that, among other things, fixed the number of directors at eight.  A copy of the Unanimous Written Consent of the Board of Directors of KB US Holdings, Inc. effecting this change is attached hereto as **Exhibit E** (the "UWC").  Thereafter, the number of directors constituting Holdings' "entire Board of Directors" became eight.  The March 13, 2019, amendment to the Certificate of Incorporation further provides that the Board of Directors "shall be divided into two classes: Class I and Class II."

11.    Prior to adoption of the UWC, the Board of Directors was fixed at six directors and consisted of (i) five designees of GSSG (the "GSSG Designees") and (ii) Judith Spires, the chief executive officer of Holdings (the "CEO").  Pursuant to the UWC, the number of directors was fixed at eight, and two newly appointed independent directors, Marc Beilinson and Scott Vogel (the "Independent Directors"), were added to the Board of Directors.  As discussed in greater detail below, the CEO and the Independent Directors were designated as Class I Directors and the GSSG Designees were designated as Class II Directors (as such terms are defined in the Certificate of Incorporation).

12.    In addition to increasing the number of directors of the Holdings' Board of Directors, the UWC also established a special transaction committee of the Holdings' Board of Directors (the "Special Committee").  The Special Committee was comprised of the CEO and the Independent Directors and was authorized "to investigate, evaluate, respond to and if appropriate, negotiate and approve subject to the final approval of the full Board and the stockholders, as required by applicable law, a Potential Transaction."  The UWC defined a "Potential Transaction" as "potential business opportunities for [Holdings] including one or more strategic transactions."

- 5 -

13.     The UWC also amended Holdings' Certificate of Incorporation by fixing the voting

rights of the Class 1 and Class 2 directors.  The amended Certificate of Incorporation provided as

follows with respect the voting rights of Holdings' Directors:

> Except as expressly set forth herein with respect to Special Matters, each
> director shall be entitled to cast one vote on any vote of the Board of
> Directors at a meeting of the Board of Directors (or in a unanimous written
> consent in lieu thereof). On each Special Matter proposed to be approved,
> adopted or authorized and recommended to the stockholders by the Board
> of Directors, each Class I Director shall be entitled to cast six votes and each
> Class II Director shall be entitled to cast one vote (solely for purposes of
> any vote of the Board of Directors on such Special Matter) at a meeting of
> the Board of Directors (or in a unanimous written consent in lieu thereof).

14.     The amended Certificate of Incorporation defines "Special Matters" as the

following:

> (i) the adoption, entry into or consummation of (and any amendment,
> alteration or termination of) any merger, consolidation or sale, lease,
> transfer or exchange of all or substantially all of the assets of the
> Corporation in one transaction or a series of related transactions, or any
> agreement of merger, consolidation or sale, lease, transfer or exchange of
> all or substantially all of the assets of the Corporation in one transaction or
> a series of related transactions, in each case, to which the Corporation is a
> party or constituent entity and (ii) any action to effect such merger,
> consolidation or sale, lease, transfer or exchange of all or substantially all
> of the assets of the Corporation in one transaction or a series of related
> transactions, in each case, ***excluding the filing of any bankruptcy petition
> for the purpose of effecting any of the foregoing***.

(emphasis added).

15.     As a result of this voting scheme, the three Class 1 directors (the CEO and the

Independent Directors) had the ability to out vote the five Class 2 directors (the GSSG Designees)

**only as to Special Matters**.  However, the filing of a chapter 11 petition for Holdings to implement

a sale of substantially all of the assets of Holdings is not a "Special Matter."

16.     On November 1, 2019, the collateral agent for certain lenders of the Debtors who

held pledges of stock of Debtor subsidiaries of Holdings, ***but not of the stock of Holdings***,

- 6 -

exercised its proxy rights. The collateral agent (a) issued a "Notice Re: Exercise of Collateral Agent's Proxy Rights Following Event of Default and Removal and Appointment of Directors and Officers" (the "Proxy Notice"), and (b) caused the sole stockholder of each of Debtors KB Holding, Inc., AG Kings Holdings, Inc., AG Holdings II, Inc., and Kings Super Markets, Inc. (the "Consenting Debtors"), to execute an Omnibus Written Consent (the "Collateral Agent Omnibus Written Consent").[6] Pursuant to the Collateral Agent Omnibus Written Consent, (a) the directors of each of the Consenting Debtors were removed and the CEO and the Independent Directors were appointed to the board of directors of each of the Consenting Debtors, and (b) the number of directors of Debtor KB Holding, Inc., was changed and fixed to three directors.

17.    Notwithstanding these changes to the governance of the Consenting Debtors, nothing contained in the Collateral Agent Omnibus Written Consent affected the governance of Holdings, which remained an eight person Board of Directors with the special voting scheme established in the UWC for Special Matters.

18.    Upon information and belief, all of the GSSG Designees serving on the Holdings Board of Directors resigned on or around December 2019, leaving only three directors, the CEO and the Independent Directors to function—to the extent permitted by the Bylaws, the Certificate of Incorporation, and applicable law—as the Board of Directors, with the entire Board of Directors remaining an eight person board.

19.    Importantly, upon information and belief, at no time prior to the commencement of these chapter 11 cases were the GSSG Designees replaced as directors of Holdings.[7] Thus, at all

---

[6] A copy of the Proxy Notice and the Collateral Agent Omnibus Written Consent are attached hereto as **Exhibit F**.

[7] GSSG did not receive any notice, prior to the commencement of these chapter 11 cases, as to whether the three remaining directors on the Holdings Board of Directors appointed new directors to replace any of the GSSG Designees who resigned in December 2019 or whether the Board of Directors has taken any action since March 2019 to amend the Bylaws.

times after their resignation, the required eight member Board of Directors only had three directors, with five unfilled vacancies.

20.     In order for the Board of Directors to take action lawfully, a quorum must be present at any meeting of the Board of Directors.  Specifically, the Bylaws provide in Article III, section 9, that "[a] majority of the members of the entire Board of Directors shall constitute a quorum for the transaction of business of any meeting of the Board of Directors, and . . . the act of a majority of the members of the entire Board of Directors shall be the act of the Board of Directors."

21.     Likewise, Article FIFTH of the Certificate of Incorporation ("Article V") provides in section D, that the "affirmative vote of directors possessing a majority of the total voting power of the members of the entire Board of Directors shall be the act of the Board of Directors with respect to any matter."  As provided in Article V, section B, "each director shall be entitled to cast one vote on any vote of the Board of Directors," except with respect to the Special Matters, for which "each Class I Director shall be entitled to cast six votes and each Class II Director shall be entitled to cast one vote."

22.     Holdings' Board of Directors today remains an eight member board according to the Bylaws.  At all times since the resignation of the GSSG Designees in December 2019, there have been only three members of the Board of Directors, with five vacancies remaining.  As such, at no time since December 2019, has there been a quorum of at least five directors.  And, as a result, any actions taken by Holdings' Board of Directors since December 2019, including the decisions to enter into the APA and to file a chapter 11 petition, were not properly authorized.  Such actions are therefore void as a matter of law.

## II.      The Voluntary Petitions and Related Filings

23.      On August 23, 2020 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions") in the United States Bankruptcy Court for the Southern District of New York (this "Court").  The Petitions were purportedly authorized by "the required members of the board of directors, board of managers, or the sole member, as the case may be (as applicable, the "Governing Body" and, collectively, the "Governing Bodies")" of each of the Debtors.  *See* Docket No. 1.

24.      According to the *Declaration of M. Benjamin Jones Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York* [Docket No. 17] (the "First Day Declaration"), Holdings' current Board of Directors is comprised of three individuals:  the CEO and the two Independent Directors.

25.      On August 24, 2020, the Debtors filed the *Debtors' Motion for Entry of (I) Order (A) Authorizing Performance Under the Stalking Horse Purchase Agreement, (B) Approving Bidding Procedures for the Sale of Assets, (C) Scheduling Hearings and Objection Deadline with Respect to the Sale, (D) Scheduling Bid Deadline and an Auction, (E) Approving the Form and Manner of Notice Thereof, (F) Approving Contract Assumption and Assignment Procedures, and (G) Granting Related Relief; and (II) Order Authorizing the Sale of Assets Free and Clear, (B) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* (the "Sale Motion").  Through the Sale Motion, the Debtors request, among other things, the authorization to perform under that certain Asset Purchase Agreement dated and executed as of July 13, 2020 (the "APA"), for the sale of substantially all of the Debtors' assets to TLI Bedrock, LLC (the "Stalking Horse Purchaser").

26.     In the months leading to the filing of these chapter 11 cases, GSSG, as the ultimate controlling shareholder of the Debtors, requested, but was not provided, material details regarding the Debtors' ongoing efforts to restructure or engage in a transaction, including any potential sale. Despite its rights under Delaware law, GSSG was not provided with the requested information and was denied any meaningful opportunity to engage with the Debtors and their advisors so as to collaborate on a mutually beneficial and value maximizing restructuring.   Aside from one document dated January 2020 (apparently provided by the CEO to a principal at GSSG in March 2020) to the best of its knowledge, GSSG was not provided with any information or materials regarding the restructuring process or a restructuring transaction.  While the Debtors will no doubt suggest that they were always willing to have a discussion with GSSG, the failure of the Debtors to provide their controlling shareholder with all relevant information necessary to enable GSSG to meaningfully participate in the Debtors' restructuring efforts was prejudicial and contrary to the Debtors' legal and contractual obligations to GSSG.

27.     In addition, much of the information provided by the Debtors to GSSG appears to be misleading by omission.  For example, the Debtors provided GSSG with the board meeting materials purportedly provided to the three Holdings board members for each board meeting.  The materials for each board meeting included the minutes of the prior board meeting.  Remarkably, other than ambiguous references in the agendas of the June 25, 2019 and July 24, 2019 Holdings board meetings to "Process Update," the minutes of **every** board meeting conducted after the establishment of the Special Committee in March 2019 are devoid of any reference to the Special Committee or any discussion of the Special Matters that the Special Committee supposedly was considering.  Nor is there any reference in the minutes to any discussion or even an agenda topic related to the sale/transaction process that was being run by the Debtors and their advisors that led

- 10 -

to the execution of the APA or the **consideration of a chapter 11 filing**.  It is not credible or possible that the Holdings' Board of Dreictors did not discuss these matters prior to signing the APA or filing for bankruptcy; yet, if one reads the minutes of the board meetings provided by the Debtors to GSSG, that is the conclusion one must reach.

28.      Most tellingly, the Debtors completely ignored their contractual and legal obligations to seek and obtain the consent of GSSG and Holdings' non-debtor parent, KB Group, a wholly owned subsidiary of GSSG, to the Debtors' entry into the APA.[8]  GSSG only became aware of the APA and the Debtors' intent to file these chapter 11 cases *after* the Debtors filed for bankruptcy.  The Debtors provided no notice to GSSG of either their intent to file for bankruptcy or of the execution of the APA on July 13, 2020, **more than one month before the chapter 11 filings**.

### RELIEF REQUESTED

29.      GSSG seeks entry of an Order, substantially in the form attached hereto as **<u>Exhibit A</u>**, (i) dismissing these chapter 11 cases pursuant to section 1112(b) of the Bankruptcy Code and Bankruptcy Rule 1017; (ii) finding that the APA is null and void *ab initio* as a matter of law; and (iii) granting related relief.

---

[8] The Certificate of Incorporation, Article SIXTH, provides that the "Board of Directors may exercise all such authority and powers of this Corporation and do all such lawful acts and things as are not by statute or by this Certificate of Incorporation directed or required to be exercised or done by the stockholders."  Section 271(a) of DGCL requires shareholder consent for a sale of all or substantially all of a corporation's assets. 8 Del. C. § 271(a)

## ARGUMENT

I.      **Dismissal of Holdings' chapter 11 case is mandatory and appropriate.**

      A.      **The lack of authorization to file the bankruptcy petition constitutes "cause" for dismissal under section 1112(b) of the Bankruptcy Code.**

30.     Section 1112(b) of the Bankruptcy Code governs the dismissal of these chapter 11 cases. It provides, in relevant part, that, "on request of a party in interest, and after notice and a hearing, the court shall . . . dismiss a [chapter 11 case] . . . for cause." 11 U.S.C. § 1112(b)(1). Section 1112(b)(4) sets forth a non-exhaustive list of "causes" for dismissing a chapter 11 case. *See In re BH S&B Holdings, LLC*, 439 B.R. 342, 349 (Bankr. S.D.N.Y. 2010) ("the list of grounds for . . . dismissing a Chapter 11 case under § 1112(b) is illustrative, not exhaustive.") (quoting *C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*, 113 F.3d 1304, 1311 (2d Cir. 1997)).

31.     Bankruptcy courts, including this Court, have held that "the lack of authority to file a voluntary chapter 11 bankruptcy petition by the party filing it constitutes an independent ground for 'cause' for relief under § 1112(b) of the Bankruptcy Code." *In re 167 W. 133rd St. Hous. Dev. Fund Corp.*, No. 18-12043 (JLG), 2018 Bankr. LEXIS 2909, at *14 (Bankr. S.D.N.Y. Sept. 25, 2018) (citing *Price v. Gurney*, 324 U.S. 100, 106 (1945)); *see also In re NNN 123 N. Wacker, LLC*, 510 B.R. 854, 858 (Bankr. N.D. Ill. 2014); *In re ComScape Telecomms., Inc.*, 423 B.R. 816, 829 (Bankr. S.D. Ohio 2010); *In re A-Z Elecs., LLC*, 350 B.R. 886, 891 (Bankr. D. Idaho 2006).

32.     A finding of a lack of authority to file not only establishes "cause" under section 1112(b), but also leads to the conclusion that the bankruptcy court does not have subject matter jurisdiction over the proceedings. *See In re Mid-South Bus. Assocs.*, 555 B.R. 565, 570 (Bankr. N.D. Miss. 2016) ("[A] bankruptcy court lacks subject matter jurisdiction over a bankruptcy

- 12 -

petition filed without the required corporate authority.") (citing *Treen v. Orrill, Cordell, & Beary, LLC (In re Delta Starr Broad., LLC)*, 422 Fed. Appx. 362, 368 (5th Cir. 2011)).

33.    Dismissal of a bankruptcy petition filed without proper corporate authority is **mandatory**. *See In re Mid-South Bus. Assocs.*, 555 B.R. at 570 ("a bankruptcy petition filed without proper corporate authority must be dismissed independent of any finding of 'cause' under § 1112(b), because if the Debtor did not have sufficient corporate authority for the filing of its petition, then this Court lacks subject matter jurisdiction over the case.") (citing *Price*, 324 U.S. at 106). Bankruptcy courts *shall* dismiss a chapter 11 petition where the individual instituting the proceeding lacks authority under state law or the corporate governance instruments. *See, e.g., In re S&R Grandview, LLC*, No. 13-03098-8-RDD, 2013 Bankr. LEXIS 4182, at *3 (Bankr. E.D.N.C. Oct. 4, 2013) (citing *Price*, 324 U.S. at 106); *Green Bridge Cap. S.A. v. Shapiro (In re FKF Madison Park Grp. Owner, LLC)*, Nos. 10-11867 (KG), 10-56158, 2011 Bankr. LEXIS 344, at *8 (Bankr. D. Del. Jan. 31, 2011) (affirming that, "A party cannot subject an entity to bankruptcy without authority.").

34.    This Court has consistently granted motions to dismiss where the movants established that a proper authorization for filing of the bankruptcy petition was lacking. In *In re 167 W. 133rd St.*, this Court granted a motion to dismiss a chapter 11 case because the movants established "cause" for dismissal by demonstrating that the individual who filed the petition lacked authority to file it. *See generally, In re 167 W. 133rd St.*, 2018 Bankr. LEXIS 2909. The Court, after reviewing the debtor's certificate of incorporation and bylaws, determined that board actions must be approved by a majority of the directors, constituting a quorum, and that corporate documents can only be executed by officers. The Court then found that the individual who filed the bankruptcy petition was neither a corporate officer nor a director, and thus lacked the authority

- 13 -

to act on behalf of the debtor. *See id.* at **16-21. Accordingly, the movants established "cause" under section 1112(b) to dismiss the case. *See id.* at *21.

35.    Likewise, in *Pasta Bar*, this Court granted a motion of dismiss filed by a 50% membership interest owner because "the filing of the chapter 11 petition . . . was not properly authorized." *In re Pasta Bar by Scotto II*, No. 15-12766 (MG), 2015 Bankr. LEXIS 3941, at *2 (Bankr. S.D.N.Y. Nov. 19, 2015). The movant argued that under the express terms of the debtor's operating agreement, filing of a chapter 11 petition was a "Major Decision" requiring a supermajority vote of 75% of membership interests, which was never obtained. *See id.* at **1-2. The Court agreed, holding that the debtor's operating agreement clearly provided that a supermajority vote was required before filing a bankruptcy petition and the parties did not achieve a supermajority vote. *See id.* at *8; *accord In re S&R Grandview,* 2013 Bankr. LEXIS 4182, at *10 (finding that sufficient cause existed to dismiss the chapter 11 petition because the manager did not have authority to file a bankruptcy petition on behalf of the debtor); *In re Mid-South Bus. Assocs., LLC*, 555 B.R. at 577 ("Without a valid vote of the Debtor's membership, which no one alleges actually occurred, none of the members . . . had the authority to sign or file the petition on behalf of the Debtor.").

36.    Accordingly, if the Court finds that Holdings did not have proper authorization to file the bankruptcy petitions under applicable law, it is respectfully submitted that the Court must dismiss Holdings' chapter 11 case.

### B.    The Holdings' Board of Directors did not have the quorum of five votes required to file the Petitions.

37.    "[T]he Bankruptcy Code does not establish express rules relating to authority to file a voluntary petition for relief." *In re Pasta Bar*, 2015 Bankr. LEXIS 3941, at **6-7 (citing *In re Quad-C Funding, LLC*, 496 B.R. 135, 141 (Bankr. S.D.N.Y. 2013) (citations omitted)). Rather,

- 14 -

"[d]etermining authority is a question of state law, and in the case of a limited liability company is governed by the operating agreement, which defines the rights of members." *In re FKF Madison Park*, 2011 Bankr. LEXIS 344, at \*8 (citing *In re Am. Globus Corp.*, 195 B. R. 263, 265 (Bankr. S.D.N.Y. 1996). If a petitioner does not have the authority to file a petition pursuant to applicable state law, then the debtor's case is subject to dismissal. *See In re Pasta Bar*, 2015 Bankr. LEXIS 3941, at \*7 (citing *In re E. End Dev., LLC*, 491 B.R. 633, 638 (Bankr. E.D.N.Y. 2013)).

38.    Under Delaware law, a board of directors cannot authorize a transaction without a quorum, and any such transaction made without a quorum is void. *See, e.g.*, *Belle Isle Corp. v. MacBean*, 49 A.2d 5, 9 (Del. Ch. 1946); *see also Applied Energetics Inc. v. Farley*, No. 2018-0489-JTL, 2020 Del. Ch. LEXIS 255, at \*2 (Del. Ch. Aug. 3, 2020) (holding that the sole remaining director on a three-member board could not validly have taken action because the director could not satisfy the quorum requirement). Further, vacancies are irrelevant when determining a quorum. *See Applied Energetics*, 2020 Del. Ch. LEXIS 255, at \*\*36-37 (citing 2 *Fletcher Cyclopedia of the Law of Corporations* § 419, Westlaw (database updated Sept. 2019) ("It is thus a matter of blackletter law that 'vacancies in the board reducing the number to less than a quorum of the number fixed by statute or otherwise preclude action by the remaining directors other than to fill the vacancies.'")).

39.    Pursuant to Delaware General Corporation Law ("DGCL"), the "vote of the majority of the directors present at a meeting at which a quorum is present shall be the act of the board of directors unless the certificate of incorporation or the bylaws shall require a vote of a greater number." 8 Del. C. § 141(b). DGCL also provides that the "majority of the total number of directors shall constitute a quorum for the transaction of business unless the certificate of incorporation or the bylaws require a greater number." *Id.*

- 15 -

40.    Thus, under both Delaware law and the Debtors' Bylaws and Certificate of Incorporation, a quorum constituting the affirmative vote of a majority of directors is required for Holdings' Board of Directors to act on Holdings' behalf.  As more fully described above, pursuant to the terms of the Certificate of Incorporation and the Bylaws, Holdings' Board of Directors is composed of eight directors and a quorum of five votes is required to take any action, including authorizing the filing of a bankruptcy petition.  However, upon information and belief, and as represented by the Debtors in the First Day Declaration, at the time of the filing of these bankruptcy cases, only three directors remained on the Board of Directors.  Even if all remaining directors (*i.e.*, three) had voted to approve the bankruptcy filing, the Board of Directors—came short of achieving a quorum by two directors.  Thus, the three directors—consisting of the CEO and the two Independent Directors did not have proper authorization to file the bankruptcy petitions on Holdings' behalf and its bankruptcy case must therefore be dismissed.

## II.    The Court should also dismiss the remaining chapter 11 cases.

41.    In addition to dismissing the chapter 11 case of Holdings, GSSG respectfully requests that the Court dismiss the chapter 11 cases of the Other Debtors.

42.    Under Delaware law, the directors of a wholly-owned subsidiary are obligated to manage the affairs of the subsidiary in the best interests of the parent and its shareholders.  *See Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 173 (Del. Ch. 2006) ("Wholly-owned subsidiary corporations are expected to operate for the benefit of their parent corporations; that is why they are created."); *see also Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988) (citing *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971)); *Goodman v. Futrovsky*, 213 A.2d 899, 902 (Del. 1965).  Moreover, subsidiary directors must act with loyalty to the parent "even if the directors' actions make the subsidiary less valuable." *Lightsway Litig. Servs., LLC v. Yung (In re Tropicana Entm't, LLC)*, 520 B.R. 455, 471 (Bankr.

- 16 -

D. Del. 2014) (citing *Trenwick*, 906 A.2d at 201).  Parent companies direct the actions and activities of their subsidiaries.  Subsidiaries are subservient to their parents and the decisions and actions of the ultimate parent control and take precedence over the decision and actions of their direct and indirect subsidiaries.

43.     GSSG does not know if the applicable Governing Bodies of the Other Debtors complied with applicable law and their governance documents in purportedly authorizing their chapter 11 filings.  And GSSG makes no claims or concessions as to the validity of any such authorizations.  However, *even if* the voluntary petitions of the Other Debtors were technically properly authorized, such authorizations were made at the direction of Holdings, their ultimate parent Debtor.  However, Holdings' Board of Directors, at all relevant times, could not act on Holdings' behalf and therefore could not properly direct the Other Debtors to authorize chapter 11 filings or entry into the APA.  Accordingly, the chapter 11 cases of the Other Debtors must also be dismissed.

**III.     The APA is void for failure to notify and receive authorization from the shareholders.**

44.     The Debtors seek to use these unauthorized bankruptcy cases to bypass the requirements of DGCL and the applicable governance documents to seek shareholder approval of a sale of all or substantially all of their assets.  These rights were granted to GSSG and KB Group Holdings, Inc., in their capacities as shareholders of Holdings.

45.     Under DGCL, a corporation must receive authorization from a majority of shareholders to sell all or substantially all of its assets:

> Every corporation may at any meeting of its board of directors or governing body sell, lease or exchange all or substantially all of its property and assets, . . . , as its board of directors or governing body deems expedient and for the best interests of the corporation, **when and as authorized by a resolution adopted by the holders of a majority of the outstanding stock of the corporation entitled to vote thereon** or, if the corporation is a nonstock corporation, by a majority of the members having the right to vote

- 17 -

for the election of the members of the governing body and any other
members entitled to vote thereon under the certificate of incorporation or
the bylaws of such corporation, at a meeting duly called upon at least 20
days' notice . . . .

8 Del. C. § 271(a) (emphasis added).

46.    In *Esopus Creek Value L.P. v. Hauf*, a corporation sought to avoid the stockholder

vote, as required by applicable law and governance documents, to sell substantially all of its assets

and instead commenced a bankruptcy case in which it would seek bankruptcy court approval of

the sale without a stockholder vote.  *See Esopus Creek Value L.P. v. Hauf*, 913 A.2d 593, 596 (Del.

Ch. 2006) ("the board of directors adopted a plan to file a bankruptcy petition once the asset sale

agreement [was] signed, and thereafter seek approval of the sale from the bankruptcy court,

without a meeting and without a vote by the common stockholders").  The reason the corporation

in *Esopus Creek* sought to file bankruptcy to avoid the stockholder vote was based on its belief

that its delinquencies in its required securities filings prevented it from calling a stockholders

meeting to vote on the proposed sale.  However, the Delaware Court of Chancery did not allow

these unusual facts to override Delaware law and prohibited the corporation from "making any

agreement to sell all or substantially all of the assets that [was] not conditioned upon the approval

of the corporation's common stockholder."  *Id*. at 597.

47.    Here, the relevant facts are similar, yet substantially more concerning.  Unlike in

*Esopus Creek*, where the reason for seeking to avoid a stockholder vote was to find a work-around

to a securities regulations issue, here the Debtors actively concealed any details about the proposed

sale and purposefully disregarded their legal and contractual obligation to seek and obtain

shareholder approval of the APA.  On July 13, 2020, more than five weeks prior to the Petition

Date, the Debtors entered into the APA with the Stalking Horse Purchaser for the sale of

substantially all of the Debtors assets without notice to, or authorization by, GSSG or KB Group.

- 18 -

GSSG only became aware of the APA after the Debtors filed these bankruptcy cases, *i.e.*, five weeks after the execution date of the APA.

48.    GSSG did not prior to the Petition Date, and does not today, authorize or consent to the Debtors' entering into the APA.  The Debtors' execution of the APA without the notice, meeting, and vote required under section 271 of DGCL was a clear violation of the rights afforded to GSSG and KB Group under Delaware law and the Debtors' governance documents.  As *Esopus Creek* illustrates, the Debtors' subsequent filing of the bankruptcy petitions—even if such petitions were authorized, which they were not—does not allow the Debtors to avoid compliance with applicable law.  Consequently, this Court should find that the APA is null and void *ab initio* as a matter of law.

- 19 -

## CONCLUSION

WHEREFORE, for all the reasons set forth herein, GSSG respectfully requests that the

Court enter the order, substantially in the form attached hereto as **Exhibit A**, (i) dismissing these

chapter 11 cases, (ii) finding that the APA is null and void, *ab initio*, and (ii) granting such other

and further relief as the Court deems just and proper.

Dated: September 4, 2020

Respectfully submitted,

**SQUIRE PATTON BOGGS (US) LLP**

By: */s/ Stephen D. Lerner*
Stephen D. Lerner
201 E. Fourth St., Suite 1900
Cincinnati, Ohio 45202
Telephone: 513-361-1200
Facsimile:  513-361-1201
Email:  stephen.lerner@squirepb.com

Norman N. Kinel
Jihyun Park
1211 Avenue of the Americas, 26th Floor
New York, NY 10036
Telephone:  212-872-9800
Facsimile:  212-872-9815
Email:  norman.kinel@squirepb.com
Email:  jihyun.park@squirepb.com

*Counsel to GSSG Capital Corp.*

010-9108-1536/11/AMERICAS