Vincent Indelicato
Timothy Q. Karcher
Michael T. Mervis
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, New York 10036
Telephone: (212) 969-3000
Facsimile: (212) 969-2900

Steve Y. Ma
**PROSKAUER ROSE LLP**
2029 Century Park East, Suite 2400
Los Angeles, CA 90067-3010
Telephone: (310) 557-2900
Facsimile: (310) 557-2193

Charles A. Dale (*pro hac vice*)
**PROSKAUER ROSE LLP**
One International Place
Boston, MA 02110
Telephone: (617) 519-9600
Facsimile: (617) 519-9899

Robert J. Dehney
**MORRIS NICHOLS ARSHT AND TUNNELL LLP**
1201 North Market Street, 16th Floor
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re** | Chapter 11 |
| **KB US Holdings, Inc.,** *et al.*, | Case No. 20-22962 (SHL) |
| Debtors.[1] | (Jointly Administered) |
| **GSSG Capital Corp.,** | |
| Movant, | |
| v. | |
| **KB US Holdings, Inc.,** *et al.* | |
| Objectors. | |

**DEBTORS' PRELIMINARY RESPONSE TO**
**GSSG CAPITAL CORP.'S MOTION TO DISMISS DEBTORS' CHAPTER 11 CASES**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: KB US Holdings, Inc. (1000), KB Holding, Inc. (3082), AG Kings Holdings Inc. (8681), AG Holdings II Inc. (3828), Kings Super Markets, Inc. (6769), Balducci's Holdings LLC (1913), Balducci's Connecticut LLC (1945), Balducci's Maryland LLC (1926), Balducci's Virginia LLC (1949), and Balducci's New York LLC (1934). The location of the Debtors' corporate headquarters is 700 Lanidex Plaza Parsippany, NJ 07054.

KB US Holdings, Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), hereby submit this preliminary response (the "**Preliminary Response**") to *GSSG Capital Corp.'s Motion to Dismiss Debtors' Chapter 11 Cases* [Docket No. 98] (the "**Dismissal Motion**"). In support of this Preliminary Response, the Debtors respectfully state as follows:

## Preliminary Statement

1. After an exhaustive marketing process that began eighteen (18) months ago, the Debtors commenced these chapter 11 cases on August 23, 2020 to obtain the highest and best offer for the Debtors' businesses, preserve thousands of jobs, and alleviate the sustained financial challenges that have impeded the Debtors' growth and profitability for the last two years. Since that time, the Debtors and their professionals have worked diligently to ensure a smooth transition for the business, and minimize disruption to the Debtors' three thousand employees and the important communities they serve. While the Debtors anticipate some hard conversations with their unions in the coming weeks to address the labor modifications necessary to support a going concern sale, the Debtors remain optimistic that they will achieve compromise. With the prospects of reorganization on the horizon, the Debtors have finally settled into bankruptcy and the path to emergence lies well within their sights.

2. Late in the afternoon, on the eve of the Labor Day weekend, GSSG Capital Corp. ("**GSSG**"), the sole stockholder of non-debtor KB Group Holdings Inc. ("**KB Group**"), filed the Dismissal Motion. As its premise, GSSG asserts that one of the Debtors, KB US Holdings, Inc. ("**Holdings**"), filed for chapter 11 with less than the required quorum of directors, thereby rendering the Holdings filing improperly authorized, and this Court without subject matter jurisdiction to recognize the bankruptcy. GSSG asserted this created a basis for the Court to dismiss the bankruptcy case, but, as explained more fully below, GSSG's assertions are incorrect.

2

3. The indisputable facts show that when the five (5) directors appointed by GSSG resigned from the Holdings' board (the "**Holdings Board**") in December 2019 after the Collateral Agent exercised the voting proxy of Holdings that it obtained from Holdings in 2016, the remaining three (3) directors of the Holdings Board, each of whom had been approved by GSSG and installed with super voting majority powers to authorize a sale transaction in March 2019, properly filled the two (2) vacancies required to establish a quorum of five directors (5) before they fixed the size of the Holdings Board at three (3), as the Holdings Bylaws (as defined below) and the Delaware General Corporation Law ("**DGCL**") expressly authorized them to do. *See* Unanimous Written Consents of the Holdings Board, dated March 12, 2020, attached hereto as **Exhibit A**. Thus, the size of the Holdings Board was fixed at three (3), not eight (8), when the Holdings Board duly adopted resolutions authorizing the Asset Purchase Agreement (the "**APA**") and the filing of the chapter 11 case (and has been so fixed since March 12, 2020). GSSG's contention that Holdings was unable to authorize the APA and the chapter 11 case, is wholly without merit.

4. GSSG also incorrectly suggests that the APA was not duly authorized for failure to obtain a vote of the stockholders of Holdings under Section 271 of the DGCL, which requires a stockholder vote for a Delaware corporation to "sell, lease or exchange all or substantially all of its property and assets." 8 *Del. C.* § 271. Importantly, no sale of assets has occurred. Rather, Holdings has simply entered into the APA, which provides that the consummation of any sale is subject to the entry of the sale order. Under Delaware law, where a sale of assets is authorized pursuant to the order of a court in a bankruptcy proceeding, stockholder approval under Section 271 of the DGCL is not required. Instead, stockholder approval is deemed to have been obtained pursuant to the sale order and Section 303 of the DGCL. Accordingly, Holdings' entry into the APA was duly authorized.

5.  In addition, any action that GSSG may take with respect to Holdings will have no impact on the remaining Debtors or their Boards. Holdings does not have any assets, except for its equity interest in KB Holding, Inc., which it pledged to the Debtors' secured lenders in 2016. This pledge enabled the Collateral Agent to exercise the voting proxy rights of Holdings and its subsidiaries, including KB Holding, Inc., during the continuance of an event of default under the senior loan documents. In November 2019, after numerous events of default had continued for many months, the Collateral Agent exercised its proxy rights and reconstituted the boards of KB Holding, Inc. and its subsidiaries, and since that time, Holdings has had no control over the Debtors' operations or assets.

6.  Finally, the Dismissal Motion came as a complete surprise to the Debtors. For the last two years, the Debtors and their professionals repeatedly have afforded GSSG every opportunity to participate in a solution that addresses the Debtors' long-term financial challenges. As recently as May 2020, upon GSSG's request to bid for the Debtors' assets, the Debtors and their professionals extended GSSG and its advisors data room access, and made the Debtors' management team and professionals available to answer any diligence questions. The Debtors also have provided GSSG with Board materials every month. Additionally, in the weeks leading up to the Debtors' chapter 11 filing, the Debtors informed GSSG that they "anticipated signing a transaction in early July," emphasized that "time is of the essence," and reiterated that should GSSG "wish to submit any proposals, alternatives, or other ideas that it may have about how to maximize value for all stakeholders, [the Debtors] will consider them." Even now that the Debtors have commenced these chapter 11 cases, they will continue to engage and work cooperatively with GSSG to identify the highest and best transaction available to these estates. As it stands today, after an eighteen (18) month sale process that canvassed over one hundred (100) parties, that transaction amounts to a $75 million bid, subject to higher and better offers, for a company with

4

$114 million of secured prepetition debt and $20 million of projected DIP financing. If GSSG believes it can do better, it can participate in the sale process with all of the safeguards and protections that chapter 11 affords.

7. Dismissal of these chapter 11 cases, however, would result in a far worse outcome for these estates. The Debtors have been unable to pay regularly scheduled debt service for the last two years, thereby allowing their secured lenders to exercise any and all of their default-related rights and remedies, including sweeping of substantially all of the Debtors' cash, upon the immediate termination of the automatic stay. The Debtors are also in need of a significant capital infusion to invest in their stores and technology that would be further delayed in the event these cases were dismissed. The Debtors already have begun negotiations with their unions and pension funds to achieve a long-term solution related to their collective bargaining agreements and multi-employer pension plans. While the Debtors still have much to accomplish, these cases remain on track for a successful resolution that serves all of the policies of the Bankruptcy Code. Indeed, the Debtors can find no benefit to a dismissal of these cases for any party. Simply put, the Court should not disregard eighteen (18) months of meaningful efforts to find a value-maximizing path for the Debtors when no other party has presented a viable reorganization alternative.[2]

8. For these and the reasons more fully set forth below, the Debtors vigorously object to the Dismissal Motion.

---

[2] Shortly after filing its Motion, GSSG notified the Debtors that it caused KB Group, Holdings' majority stockholder, to reconstitute the Holdings Board by written consent (the "**September 4 Consent**"). Purportedly, GSSG caused KB Group to elect a new board of directors that "replaces the board in its entirety." The action KB Group purported to take in the September 4 Consent violated Holdings' governing documents and Delaware law, and, therefore, had no effect on the Holdings Board. Moreover, the Debtors reserve all rights to demonstrate at a later date that this Court should not recognize the appointment should the new directors continue to seek such recognition.

**Factual Background**

A.   **The Debtors' Organizational Structure**

9.   As explained in the *Declaration of M. Benjamin Jones Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York* [Docket No. 17] (the "**Jones Declaration**") and as illustrated by the following organizational chart, the Debtors comprise ten (10) affiliated entities.



10.   AG Kings Holdings Inc. serves as the borrower on the Debtors' $114 million outstanding secured loan (the "**KB Secured Loan**"). The remaining nine (9) Debtor entities guaranteed the full amount of that debt.

11. Holdings does not have any cash, and does not own any assets, except its equity interest in KB Holding, Inc., which, in turn, directly and indirectly, owns the operating subsidiaries of the Debtors and their respective businesses. As further credit support for the KB Secured Loan, with the consent of GSSG, all of the equity interests of the Debtors (other than the equity interests of Holdings) were irrevocably pledged to the Debtors' secured lenders when the Debtors obtained the loan in 2016 (the "**Holdings Stock Pledge**"). Significantly, upon an event of default, the Holdings Stock Pledge enabled the Collateral Agent to exercise the voting proxy rights of KB Holding, Inc. and all of the remaining subsidiaries (together with KB Holding, Inc., the "**Subsidiary Debtors**").

12. As described more fully below, after multiple events of default continued for well over a year, and with the Debtors' liquidity challenges unaddressed, the Collateral Agent exercised its voting proxy rights through the Holdings Stock Pledge and reconstituted the governing bodies of the Subsidiary Debtors in November 2019. Thus, since that time, Holdings has not had (and does not have) any control over the Debtors' operating assets or cash accounts, which reside entirely at the Subsidiary Debtors. This fact alone renders GSSG's recent attempt to appoint new directors to the Holdings Board on the basis that they can direct the Subsidiary Debtors completely ineffectual.

**B.   The Debtors' Corporate Governance Structure**

13. The Debtors suffered declining operating performance in late 2018, and ultimately breached financial covenants that triggered events of default under the KB Secured Loan, which resulted in the Debtors being unable to access further borrowings under their revolver. These defaults and their impact on the liquidity of the business in the coming months would require the Debtors, GSSG, and the secured lenders to engage in formal workout discussions, which prompted the Debtors to retain legal and financial advisors with restructuring experience.

14. As explained more fully in the Jones Declaration, given the historical liquidity challenges and multiple defaults under the KB Secured Loan, almost two years ago, in November 2018, the Debtors engaged Ankura Consulting Group, LLC, as financial advisor, and Proskauer Rose LLP, as their attorneys, to assist the Debtors in their pursuit of strategic alternatives to maximize value to the Debtors' stakeholders. Several months later, the Debtors also engaged Morris, Nichols, Arsht & Tunnell LLP to serve as Delaware corporate counsel on February 11, 2019.

15. At that time, the Boards of Holdings and the corporate Subsidiary Debtors were comprised of six (6) directors: five (5) directors appointed by GSSG (the "**GSSG Directors**") and Judy Spires, the Chief Executive Officer (the "**CEO**").

C. **GSSG Consents to Appointment of Independent Directors and Sale Process**

16. With no resolution to the company's liquidity challenges, the Debtors retained PJ Solomon, L.P. ("**PJS**") as their investment banker on February 7, 2019. To address their looming defaults, the Debtors, the secured lenders, and GSSG worked for the next several weeks on the terms of amendments to the governing documents of Holdings (collectively, the "**Amendment**") that, among other things, resulted in GSSG's consent (through KB Group) to (i) the appointment of two (2) independent directors, Marc Beilinson and Scott Vogel, to the Holdings Board, (ii) the creation of a Special Committee comprised of the two independent directors and the CEO to manage a process to market and sell the assets of the Debtors, and (iii) the appointment of those three (3) directors as Class I directors with super voting majority powers to authorize a sale transaction, such that the five (5) GSSG Directors could not outvote the independent directors and the CEO with respect to a sale. *See* Stockholder Consent, attached hereto as **Exhibit B**. While the Amendment did not effectuate any of these changes at the boards of the corporate Subsidiary Debtors, GSSG (through KB Group) agreed as part of the Amendment that no Class I director on

8

the Holdings Board could be removed without first providing the secured lenders with two (2) weeks' prior written notice. *See* Holdings Bylaws, Art. III, § 19.

       **D.**       **The Collateral Agent Exercises the Holdings Stock Pledge**

          17.     In furtherance of the agreement set forth in the Amendment, PJS, even before the appointment of the independent directors, began a process to market the Debtors' assets in March 2019. PJS continued its sale process for the duration of 2019, while GSSG and the secured lenders engaged in discussions on a parallel track. The Debtors continued to languish with poor operating performance and no capital commitment. In November 2019, after more than a year of negotiations with GSSG and certain GSSG Directors, the secured lenders exercised their voting proxy related to the Holdings Stock Pledge, and reconstituted the boards of the Subsidiary Debtors such that they are comprised of three (3) directors: the two (2) independent directors approved by GSSG through the Amendment and the CEO, who together formed the Special Committee at the Holdings Board. As previously stated, this had the effect of causing Holdings to have no further control over the Subsidiary Debtors. The sale process continued, and the GSSG directors resigned from the Holdings Board on or around December 2019, almost one year ago. The resignation left the Holdings Board with five (5) vacancies.

       **E.**       **The Remaining Directors Fill Vacancies Left After the GSSG Directors Resign from the Holdings Board**

          18.     In March 2020, the three (3) remaining directors of the Holdings Board took the responsible step to ensure that it had the requisite authority to act on Holdings' behalf after the resignation of the GSSG Directors. As more fully described below, in accordance with the Holdings Bylaws and the DGCL, in March 2020, the Holdings Board appointed two (2) directors and fixed the number of directors of the Holdings Board to three (3). Since the resignation of the GSSG Directors in December 2019, GSSG had not indicated any intention to fill the vacancies created by the resignations with new GSSG Directors.

19. After the resignation of the GSSG Directors, the CEO continued to provide GSSG with Monthly Board materials. In May 2020, the Debtors provided GSSG with the current amount of the outstanding secured debt, and explained the Debtors had been in default since 2018, and had not paid debt service for the last two years.

F.  **GSSG Indicates its Intention to Submit a Proposal to the Debtors**

20. On June 11, 2020, GSSG's counsel at Squire Patton Boggs ("**Squire**") contacted the Debtors' counsel and informed them it had been engaged by GSSG. It also stated that Azura had been engaged as GSSG's financial advisor. The following day, the Debtors' counsel and Ankura spoke with Squire and Azura, giving them an overview of the situation and the ongoing sale process. The Debtors gave several individuals from Squire, Azura, and GSSG access to the data room that PJS made available to all parties involved in the sale process. In the days that followed, the Debtors urged GSSG to engage with the secured lenders, and introduced Squire to the secured lenders' counsel via email. The Debtors also made Ankura and PJS available to participate on diligence calls with GSSG and Azura. Squire informed the Debtors' counsel that GSSG "was actively preparing a proposal with respect to a restructuring transaction for [the Debtors.]" *See* Squire Letter dated June 27, 2020, attached hereto as **Exhibit C**. On June 30, 2020, as it had emphasized to Squire on multiple occasions, the Debtors' counsel informed Squire that the Debtors "[were] actively considering two attractive proposals plus other parties who are actively working towards a proposal, and now anticipate[d] the signing of a transaction in the first half of July." *See* Proskauer Letter dated June 30, 2020, attached hereto as **Exhibit D**. The Debtors' counsel reiterated that "time is of the essence." *Id*.

      **G.**      **After The Debtors Inform GSSG that they Were Evaluating an Imminent Transaction, GSSG Declares that it No Longer Intends to Submit a Proposal, but Demands to See the Terms of Other Bids**

      21.      On July 3, 2020, Squire informed the Debtors that GSSG had "review[ed] the overall situation, including the diligence information provided by [the Debtors,]" and "determined that it will not make an offer to purchase the operating assets." *See* Squire Letter dated July 3, 2020 (the "**July 3 Squire Letter**"), attached hereto as **Exhibit E**. Nevertheless, GSSG demanded to see the terms of the other bids. The Debtors' counsel responded to the July 3 Squire Letter on July 8, 2020, and reiterated to Squire that if GSSG should "wish to submit any proposals, alternatives, or other ideas that it may have about how to maximize value for all stakeholders, [KB] and its advisors will consider them." *See* Proskauer Letter dated July 8, 2020, attached hereto as **Exhibit F**.

      **H.**      **The Debtors Inform GSSG of their Chapter 11 Filing and Encourage it to Submit a Higher and Better Transaction**

      22.      Proskauer spoke with Squire on August 23, 2020, to inform GSSG that the Debtors had filed for chapter 11, disclose the terms of the stalking horse bid, and encourage GSSG to participate in the sale process if it believes it or anyone it knows could present the Debtors with a higher and better transaction. Squire attended the first-day hearing on GSSG's behalf, and did not object to any of the first-day relief, let alone raise any of the allegations in the Dismissal Motion.

## Argument

      23.      Putting aside GSSG's motives, the Dismissal Motion should be denied because, as detailed below, all action taken to enter into the APA and commence the chapter 11 cases was consistent with and authorized under applicable law and the Debtors' governing documents.

**II.     These Chapter 11 Cases Were Properly Filed**

24.     The Dismissal Motion should be denied because the Debtors' chapter 11 cases were duly authorized in accordance with applicable law, including the applicable provisions of the DGCL, and the Debtors' governing documents. GSSG's arguments to the contrary ignore the plain language of the Debtors' governing documents and elementary principles of corporate law.

**A.     Holdings' Chapter 11 Case Was Duly Authorized**

25.     Holdings' chapter 11 case was duly authorized in accordance with the DGCL and Holdings' governing documents—the Amended and Restated Certificate of Incorporation of KB US Holdings, Inc. filed with the Office of the Secretary of State of the State of Delaware on August 1, 2016, as amended by the Certificate of Amendment of Amended and Restated Certificate of Incorporation of KB US Holdings, Inc. filed with the Office of the Secretary of State of the State of Delaware on March 13, 2019 (together, the "**Holdings Charter**") and the By-Laws of KB US Holdings, Inc. adopted on July 22, 2016, as amended by the Amendment to By-Laws of KB US Holdings, Inc. adopted on March 13, 2019 (together, the "**Holdings Bylaws**").

26.     As stated above, in December 2019, GSSG's designees resigned *en masse* from the Holdings Board and GSSG and KB Group effectively abandoned the governance of Holdings. At no point prior to the filing of these chapter 11 cases did KB Group seek to elect replacement directors and, by March 2020, it was clear to the remaining members of the Holdings Board that GSSG did not intend to do so. However, contrary to GSSG's contentions, GSSG's inaction did not relegate the Holdings Board to governance purgatory. Instead, the Holdings Board, consistent with the DGCL and the Holdings Bylaws, took the necessary steps to have a fully functioning Board.

12

27. Pursuant to Section 223(a)(1) of the DGCL and Section 12 of Article III of the Holdings Bylaws, the Holdings Board is authorized to appoint directors to fill vacancies, even in the absence of a quorum.[3]

28. Pursuant to Section 141(b) of the DGCL and Section 2 of Article III of the Holdings Bylaws, the Holdings Board is authorized to fix the size of the Holdings Board by the affirmative vote of a majority of the members of the entire Holdings Board. Specifically, the Holdings Bylaws provide that "the number of directors may be fixed, from time to time, by the affirmative vote of a majority of the members of the entire Board of Directors or by action of the stockholders of the Corporation."[4]

29. On March 12, 2020, in its first official action since the December 2019 resignations, the Holdings Board duly appointed two (2) individuals to fill two (2) Class II vacancies. Following the appointment of the two (2) new Class II directors, on March 12, 2020, the resulting five (5) person Holdings Board duly adopted resolutions fixing the size of the Holdings Board at three (3) and the two (2) individuals previously appointed resigned. No amendment to the Holdings Bylaws was required, as GSSG incorrectly implies, for the Holdings Board to validly reduce the number of authorized directorships. In fact, the Holdings Board

---

[3] 8 Del. C. § 223(a)(1) ("Vacancies and newly created directorships resulting from any increase in the authorized number of directors elected by all of the stockholders having the right to vote as a single class may be filled by a majority of the directors then in office, although less than a quorum, or by a sole remaining director . . . ."). Section 12 of Article III of the Holdings Bylaws provides that "[a]ny vacancy in the Board of Directors, whether arising from death, resignation, removal (with or without cause), an increase in the number of directors or any other cause, may be filled by only by the vote of a majority of the directors then in office, though less than a quorum, or by the sole remaining director or by the stockholders at the next annual meeting thereof or at a special meeting thereof."

[4] See also 8 Del. C. § 141(b) ("The number of directors shall be fixed by, or in the manner provided in, the bylaws, unless the certificate of incorporation fixes the number of directors, in which case a change in the number of directors shall be made only by amendment of the certificate."). Paragraph (A) of Article Fifth of Holdings Charter provides that "[t]he number of directors that shall constitute the entire Board of Directors shall be as specified in the By-Laws of the Corporation."

reduced its size and restored its ability to take formal board action using the provisions of DGCL, the Holdings Charter, and the Holdings Bylaws in place both at the time that the GSSG designees resigned from the Holdings Board and the time that the Holdings Board acted. The December resignations created the problem and the remaining directors used the corporate tools at hand to remedy it.

30. Thus, the size of the Holdings Board was fixed at three (3) when the Holdings Board duly adopted resolutions authorizing the APA and the filing of the chapter 11 case (and has been so fixed since March 12, 2020). GSSG's contention that, through its own inaction, Holdings was unable to authorize the APA and the chapter 11 case, is wholly without merit.

### B. The Remaining Chapter 11 Cases Were Properly Filed

31. GSSG makes "no claims" as to the validity of the authorizations made by the Debtors other than Holdings. Yet, GSSG nevertheless asks this Court to dismiss the chapter 11 cases of all Debtors because Holdings "could not properly direct the Other Debtors to authorize chapter 11 filings or entry into the APA."

32. Each Debtor is a distinct legal entity. There is no requirement under applicable law or any relevant governing document that the other Debtors ask Holdings to "properly direct" them to do anything.[5] Each Debtor, consistent with its governing documents and the law of the jurisdiction of its organization, authorized the chapter 11 filings and the entry into the APA.[6] GSSG is, in essence, asking this Court to ignore the principal of legal separateness of

---

[5] The authorities cited by GSSG pertain to fiduciary duty claims and do not stand for the proposition that actions taken by a subsidiary are void if the parent corporation did not "properly direct" such actions.

[6] GSSG, as sole stockholder of KB Group, and KB Group, as majority stockholder of Holdings, cannot supplant the Holdings Board, which is entitled to direct its chapter 11 case. Even if they could, GSSG and KB Group owe fiduciary duties and cannot simply disregard the effect that their actions have on the Debtors' stakeholders. *See* Transcript of Telephonic Hearing on Macquarie Septa (US) I, LLC's Motion for an Order Dismissing the Chapter 11 Cases of KPI Immediate Holdings, Inc., and its Direct and Indirect Subsidiaries, 42:2-7, *In re Pace Industries, LLC*, Case No. 20-10927-MFW (Bankr. D. Del. May 6, 2020) (Walrath, J.) (explaining that, in evaluating a motion

the other Debtors—the same principal that affords GSSG protection from liability for the Debtors' debts.

### III. The Stalking Horse APA Was Duly Authorized

33. GSSG argues that the APA was not duly authorized for failure to obtain a vote of the stockholders of Holdings under Section 271 of the DGCL, which requires a stockholder vote for a Delaware corporation to "sell, lease or exchange all or substantially all of its property and assets." 8 *Del. C.* § 271. However, no sale of assets has occurred. Holdings has simply entered into the APA, which provides that the consummation of any sale is subject to the entry of the sale order.[7] APA § 7.01(c). Under Delaware law, where a sale of assets is authorized pursuant to the order of a court in a bankruptcy proceeding, stockholder approval under Section 271 of the DGCL is not required. Instead, stockholder approval is deemed to have been obtained pursuant to the sale order and Section 303 of the DGCL.[8]

---

to dismiss, a court must "consider what is in the best interest of all, and does consider whether the party seeking to block [a bankruptcy filing] has a fiduciary duty that it appears it is not fulfilling by not specifically . . . considering the rights of others in its decision to file a motion to dismiss").

[7] This distinction between the signing of an agreement and the consummation of the transactions contemplated thereby is important for purposes of the DGCL. When consummation of a transaction requires stockholder and/or court approval, a corporation can properly enter into the agreement with a condition to closing that such stockholder and/or court approval be obtained. This approach is regularly followed in the context of mergers involving public Delaware corporations, where the corporation enters into a merger agreement and closing of the merger is condition on obtaining stockholder approval. 8 *Del. C.* § 251.

[8] See 8 *Del. C.* § 303(a) ("Any corporation of this State, an order for relief with respect to which has been entered pursuant to the Federal Bankruptcy Code, 11 U.S.C. § 101 et seq., or any successor statute, may put into effect and carry out any decrees and orders of the court or judge in such bankruptcy proceeding and may take any corporate action provided or directed by such decrees and orders, *without further action by its directors or stockholders*.") (emphasis added); 8 *Del. C.* § 303(b) ("Such corporation may, *in the manner provided in subsection (a) of this section*, but without limiting the generality or effect of the foregoing, alter, amend or repeal its bylaws; constitute or reconstitute and classify or reclassify its board of directors, and name, constitute or appoint directors and officers in place of or in addition to all or some of the directors or officers then in office; amend its certificate of incorporation, and make any change in its capital or capital stock, or any other amendment, change, or alteration, or provision, authorized by this chapter; be dissolved, *transfer all or part of its assets*, merge or consolidate as permitted by this chapter . . . .") (emphasis added).

15

34. More fundamentally, even if the transactions contemplated by the APA were consummated outside of the authority of the bankruptcy court, Section 271 of the DGCL would not require GSSG's approval. GSSG is not a stockholder of Holdings. GSSG is a stockholder of KB Group. KB Group is a stockholder of Holdings but does not own all of the outstanding stock of Holdings. Section 271(c) of the DGCL provides that, for purposes of Section 271, "the property and assets of the corporation include the property and assets of any subsidiary of the corporation" and defines "subsidiary" as "any entity *wholly-owned* and *controlled*, directly or indirectly, by the corporation." (emphasis added).

35. Thus, Holdings is not, directly or indirectly, a wholly-owned subsidiary of GSSG and KB Group. Accordingly, the APA does not relate to the sale of the "property and assets" of GSSG. Moreover, the other Debtors are not "wholly-owned and controlled" by Holdings. The chain of control from Holdings to the Subsidiary Debtors—which own and control all operating assets of the Debtors' businesses—was broken by the exercise of the proxy held by the Collateral Agent. All equity interests of the other Debtors are subject to that proxy.

36. The Delaware Court of Chancery's decision in *Esopus Creek Value LP v. Hauf*, 913 A.2d 593 (2006) does not support GSSG's argument that the APA is "null and void *ab initio* as a matter of law." *Esopus Creek* involved a company that had not entered into any agreement and had not filed a chapter 11 case. The company was solvent with virtually no debt, but purportedly unable to call a stockholders meeting because of delinquent SEC filings. Rather than seeking exemptive relief from the SEC, the company proposed to effect a sale of substantially all of its assets in bankruptcy court. Contrary to GSSG's suggestion, the *Esopus Creek* Court did not invalidate any agreement for lack of approval under Section 271 of the DGCL. Instead, the *Esopus Creek* Court approved a *stipulated* order under which the parties agreed that any sale agreement would be subject to a stockholder vote. 913 A.2d at 601. The Court approved the

16

stipulated order in light of the equities before it, which stand in stark contrast to the Debtors' situation.

37. The *Esopus Creek* Court found that the company's plan to effect the sale in bankruptcy court was "technically within the letter of the law" but reasoned that it would be inequitable (not invalid) for the company to foist a bankruptcy process on stockholders of a company that had virtually no debt. *Id*. at 604.

### IV.  This Court Has Subject Matter Jurisdiction Over these Chapter 11 Cases.

38. Because the Debtors properly authorized the chapter 11 cases, consistent with applicable law and the relevant governing documents, the Court has jurisdiction over the subject matter of the chapter 11 cases. 28 U.S.C. § 157(b).

### V.  The Appointment of the New Directors Is Invalid

#### A.  The September 4 Consent Is Ineffective

39. The actions KB Group purported to take in the September 4 Consent are ineffective under the DGCL and violate Holdings' governing documents. Here, KB Group purported to elect a new board of directors by executing a written consent in lieu of an annual meeting. The DGCL permits such action "only if all the directorships to which directors could be elected at an annual meeting held at the effective time of such action are vacant and are filled by such action." 8 *Del. C* § 211(b). As noted above, there are no vacancies on the Holdings Board, and the September 4 Consent did not expressly provide for the removal of any directors (presumably in an attempt to avoid the secured lender notice requirements discussed below). Accordingly, the September 4 Consent had no effect on the composition of the Holdings Board. *See Crown EMAK Partners, LLC v. Kurz*, 992 A.2d 377, 401 (Del. 2010) ("To operate in lieu of an annual meeting, a non-unanimous written consent thus must first remove all sitting directors and then fill the resulting vacancies."). Delaware law requires "precision, both in defining the

17

exact nature of the corporate action to be authorized, and in verifying that the requirements for taking such an action are met." *Espinoza v. Zuckerberg*, 124 A.3d 47, 57-58 (Del. Ch. 2015) (footnote omitted).

40.    As noted above, the September 4 Consent purports to elect three new directors, but is silent as to the removal of the existing board. If the election resolutions contained in the September 4 Consent somehow were given effect despite the failure to contain an express removal resolution, that election would cause the removal of the Class I directors.

41.    Such a removal would violate the Holdings Bylaws since the secured lenders were not provided any advance notice of the action. Specifically, the Holdings Bylaws, which KB Group approved, provide that certain actions "shall not be effected without two weeks' prior written notice to the Lenders (as defined therein) under that certain Credit Agreement, dated as of August 10, 2016 (as amended) to which the Corporation is party" including "*removal of any Class I Director from the Board of Directors*." Holdings Bylaws, Art. III, § 19 (emphasis added).[9]

---

[9] To the extent that GSSG attempts to orchestrate some future action to remove and replace the existing Holdings Board in a manner that at least on its face *is* consistent with the DGCL and the governing documents, the Debtors reserve the right to seek relief, including injunctive relief from this Court on the basis that such action would threaten the success of the Debtors' reorganization and constitute "clear abuse." Generally, stockholders "have the right to be adequately represented in the conduct of the debtor's affairs, especially in such an important matter as the reorganization of the debtor[,] by having as directors persons of their choice." *Manville Corp. v. Equity Sec. Holders Comm. (In re Johns-Manville Corp.)*, 801 F.2d 60, 65 (2d Cir. 1986) (quoting *In re Bush Terminal Co.*, 78 F.2d 662, 664 (2d Cir. 1935)). However, "this right is not absolute, and will be denied if it is found that an election of new directors might result in an unsatisfactory management which might jeopardize the debtor's rehabilitation and the rights of creditors and shareholders, so as to constitute a 'clear abuse.'" *In re New York Trap Rock Corp.*, 138 B.R. 420, 423 (Bankr. S.D.N.Y. 1992) (citing *Johns Manville*, 801 F.2d at 64; *In re Potter Instrument Co.*, 593 F.2d 470, 475 (2d Cir. 1979)). For example, in *Pinnacle Airlines Corp. v. Meson Capital Partners, LP*, No. 12-11343 (Bankr. S.D.N.Y. Sept. 10, 2012), the Court issued a temporary restraining order preventing stockholders from replacing key directors, reasoning that the loss of the key directors "would materially impair the debtors' ability to reorganize and come at the worst possible time as the debtors need to embark on negotiations with their labor unions to reduce their costs and that confusion as to the future leadership of the debtor or, worse yet, confronting the unions with the specters that their deals with the estate will be undone will materially interfere with the negotiating efforts." *Hearing Tr.* 114:10-17 (Sept. 5, 2012).

## Conclusion

WHEREFORE, the Debtors respectfully request that this Court enter an order sustaining the objections set forth in this Preliminary Response, denying the relief sought in the Dismissal Motion, and granting the Debtors such further relief as may be just and proper.

Dated: September 8, 2020
      New York, New York

/s/ *Vincent Indelicato*
Vincent Indelicato
Timothy Q. Karcher
Michael T. Mervis
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, New York 10036
Telephone: (212) 969-3000
Facsimile: (212) 969-2900

Charles A. Dale (*pro hac vice*)
**PROSKAUER ROSE LLP**
One International Place
Boston, MA 02110
Telephone: (617) 519-9600
Facsimile: (617) 519-9899

-and-

Steve Y. Ma
**PROSKAUER ROSE LLP**
2029 Century Park East, Suite 2400
Los Angeles, CA 90067-3010
Telephone: (310) 557-2900
Facsimile: (310) 557-2193

*Proposed Attorneys for Debtors
and Debtors in Possession*

/s/ *Robert J. Dehney*
Robert J. Dehney
**MORRIS NICHOLS ARSHT AND TUNNELL LLP**
1201 North Market Street, 16th Floor
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989