UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
In re:                                                         :   Chapter 11
                                                               :
KB US HOLDINGS, INC., *et al.*,                                :   Case No.: 20-22962 (SHL)
                                                               :
                              Debtors.                         :   (Jointly Administered)
                                                               :
------------------------------------------------------------ x

## DECLARATION OF DAVID T. YOUNG
## IN SUPPORT OF THE UFCW LOCALS' OBJECTION
## TO THE DEBTORS' MOTION UNDER SECTIONS 1113/1114

I, David T. Young, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury and state as follows:

1. I am the Vice President and Director of Region 1 of United Food and Commercial Workers International Union ("UFCW" or "the Union") and have served in this position since March 2017.

2. I submit this declaration in support of the Union's Objection [Docket No. 162] to the Debtors' Motion Under Sections 1113/1114 [Docket No. 70].

3. As Vice President and Director of Region 1, I have responsibility for UFCW Locals in the Northeast, including those Locals that have a collective bargaining agreement ("CBA") with Debtor Kings Super Markets ("Kings" or the "Company"): Locals 342, 360, 371, 464A and 1500 (the "UFCW Locals").

4. Kings' more than 1,900 UFCW-represented employees courteously fill customers' high-margin deli orders. They cut and package the fish, seafood, meats, and cheeses that draw upscale customers to the stores. They artfully arrange produce departments, the displays of organic and locally grown fruits and vegetables that distinguish Kings from its competitors. They wake up early and stay late to keep the stores clean and attractive, and to ensure that their customers' COVID-era shopping experiences are both safe and perceived as

safe. They efficiently work the check-out aisles to provide customers with "service with a smile," even as the smiles are obscured by masks. They do the work that makes customers feel safe when they shop, a critical issue in light of the impact that COVID-19 has on shopper behavior. In short, the passionate, day-in and day-out work of Kings' UFCW-represented employees enables Kings to attract and retain its loyal customers.

5. These employees and their Unions negotiated five CBAs with Kings. Each of the individual Local Unions—Locals 342, 360, 371, 464A, and 1500—are party to a CBA. These CBAs govern the terms and conditions of employment of Kings' union-represented workers. Among other things, the CBAs specify wage rates and work rules, and provide for Kings to contribute to multi-employer pension plans and welfare plans. Kings' UFCW-represented workers depend on the welfare plans to provide medical coverage for themselves and their families, and those represented by Locals 360, 464A and 1500 rely on the CBA-mandated pension to provide for their retirement.

6. Local 342 represents approximately 16 Kings meat and deli department employees at Kings' Garden City, New York store. Local 342 and Kings negotiated a new collective bargaining agreement (the "Local 342 CBA") during the Spring and early Summer of 2020, signed a new agreement on July 17, 2020, and the Local's members voted to ratify that agreement on July 21, 2020. By its terms, that agreement covers the period September 8, 2018 through September 8, 2023.

7. Local 360 represents approximately 1,255 employees in all departments except meat and deli in twenty-five Kings' stores in New Jersey. Local 360 and Kings are parties to a collective bargaining agreement that, by its terms, is effective from November 19, 2017 through November 21, 2020 (the "Local 360 CBA").

8. Local 371 represents approximately 52 employees in the grocery, meat, deli and produce departments at Kings' Stamford, Connecticut store. Local 371 and Kings are parties to a collective bargaining agreement that, by its terms, is effective from May 17, 2019 through May 29, 2022 (the "Local 371 CBA").

9. Local 464A represents approximately 500 employees who work in the meat, deli, and seafood departments of twenty-eight Kings stores. Local 464A and Kings are parties to a collective bargaining agreement that, by its terms, is in effect from June 19, 2016 through October 31, 2020 (the "Local 464A CBA"). The Local 464A CBA provides, among other things, that Kings participate in the Local 464A Pension Fund. That Fund requires five years of contributions before an employee's pension benefit vests. Approximately 188 employees have worked at Kings fewer than five years, and thus have no vested benefits.

10. Local 1500 represents approximately 44 employees in all departments except meat, seafood, and deli at the Kings Garden City, New York store. Local 1500 and Kings are parties to a collective bargaining agreement that, by its terms, is in effect from September 30, 2018 through September 24, 2022 (the "Local 1500 CBA"). The Local 1500 CBA provides, among other things, that Kings participate in the Local 1500 Pension Fund. That Fund requires five years of contributions before an employee's pension benefit vests. Approximately 15 employees have worked at Kings fewer than five years, and thus have no vested benefits.

11. As Vice President and Director of Region 1, I have actively participated with the UFCW Locals in negotiations with Kings over the Section 1113/1114 proposals to modify the Local 342 CBA, the Local 360 CBA, the Local 371 CBA, the Local 464A CBA and the Local 1500 CBA. A true and accurate copy of each CBA will be offered at the hearing as a joint exhibit.

12. On the evening of Thursday, August 27, 2020, the Debtors' transmitted to the UFCW Locals the Company's Section 1113/1114 proposals. [Docket No. 70-1]

The First Negotiation Session on August 31

13. On Monday, August 31, the parties held their first negotiation session. In attendance were various representatives of the UFCW and UFCW Locals including myself; Debtors' counsel, Scott Faust, and its CEO, Judith Spires, attended for Kings. No one from the Stalking Horse, TLI Bedrock LLC ("TLI"), attended. Debtors' counsel explained that TLI

would not assume the UFCW Local CBAs unless TLI secured the proposed modifications. Debtors' counsel stated that absent a sale to TLI or another entity, Kings would liquidate. Debtors' counsel said that the deadlines in the APA with TLI and the deadlines in the DIP financing compelled the filing of the Sections 1113/1114 motion and compelled the short deadline for either agreeing to modify the UFCW Local CBAs or face rejection of those CBAs.

14. At that August 31 meeting, the Union asked Kings a series of questions designed to elicit information about the § 1113 proposals, information which was critical for the Unions' ability to analyze and respond to the § 1113 proposals. Debtors' counsel, however, was unable to provide any details regarding: (a) Kings' financial projections that supposedly warranted the accelerated sale and 1113/1114 schedule; (b) the marketing efforts that supposedly led the Company to conclude its only option was to sell its assets to TLI; (c) TLI's intentions regarding the operations of the acquired stores, given that TLI had no demonstrated experience in the grocery business, which suggested it might sell any or all of the acquired stores; or (d) the level of projected savings from the proposals regarding new hires. The UFCW Locals insisted that the Company needed to answer these questions and asked that the appropriate persons attend the next session on behalf of the Debtors. Debtors' counsel agreed to see what he could do to make that happen.

A Request for Information on September 2 and Kings' September 5 Response

15. On September 2 counsel for the UFCW Locals emailed Debtors' counsel asking for, among other things, all documents "which reflect how each store is being valued whether by Kings, TLI and/or potential buyers." On September 5, counsel for the Debtors replied in an email, "there are no documents which reflect how each store is being valued." Debtors' counsel further stated that Kings was still "preparing responses to the questions that were raised" by the Union five days earlier on August 31. As Kings marked its September 5 email (which included the Union's September 2 email) as "Highly Confidential/ Subject to NDA," I will not attach a copy of the email exchange to this declaration.

Kings Responds on September 8 to the Union's Questions on August 31

16. On the evening of September 8, the Debtors sent an email that, among other things, attached a written response to the questions posed by the Union at the August 31 session. In response to the Union's question "How much will the Company save with its overtime, Sunday premium and scheduling proposals?" the Debtors provided an answer with respect to the proposed elimination of Sunday premium for employees hired after the effective date of the sale, but confessed "The Company does not have comparable estimates for the savings it will achieve from its overtime and scheduling proposals for employees hired after the effective date....". A copy of the Company's September 8 email and a redacted version of its response is attached as Exhibit A.

The Second Negotiation Session on September 9

17. On September 9, representatives of the UFCW Locals and the Debtors met for a second session. Despite the Union's request on August 31 that TLI attend the next session, TLI did not attend. The Locals stated that they had sought TLI's attendance because TLI has no apparent experience in the grocery industry and the Union had no assurances that TLI intended to actually operate the stores, as opposed to sell or liquidate the stores. The UFCW Locals further explained that it was inconsistent for the Debtors to justify their proposals on the grounds that "this is what is required by TLI" but not answer questions about TLI's intentions. As the UFCW Locals stated, the Debtors were "asking" for TLI but not "answering" for TLI. Kings stated that it needed to reduce costs to be competitive, but when asked what level of savings in labor costs it was seeking to achieve, Debtors' counsel conceded that Kings did not have a number. When asked the basis for the Debtors' assertion that for new hires the elimination of Sunday premium pay would result in $207,000 in annual savings, Debtors' counsel conceded that Kings did not have that information.

A Request for Information on September 10

18. On the morning of September 10, the UFCW Locals sent an email to Kings to memorialize and supplement the information requests made during the September 9 meeting. A redacted copy of that email is attached as Exhibit B. Despite assurances on September 10 that the Debtors would respond on a rolling basis that same day, the Debtors did not begin responding until September 12.

TLI and the Union Meet on September 11

19. On September 11, representatives of the UFCW Locals and TLI met to discuss the § 1113 proposals in the context of the proposed sale. Representatives of TLI stressed they intended to continue to operate the purchased stores and to do so in a more efficient manner with respect to pricing and marketing. The representatives of TLI explained that the two-year duration sought in the § 1113 proposals was to afford the parties a "honeymoon" during which the parties could get to know and understand each other.

20. TLI also indicated that it intended to make a significant amount of capital expenditures to improve the stores, but TLI stressed that it was unwilling to commit to make any level of capital expenditures. When questioned by the UFCW Locals as to the short timetable for the sales process in Chapter 11, TLI stated that it was not involved in setting the deadlines, but nonetheless thought that it would be best to conclude the sale as soon as possible.

21. With respect to the bargaining proposals, TLI stated that it had no role in calculating the cost of the proposal to eliminate Sunday premium pay for new hires and that its principal goal was to contain future cost increases. TLI conceded that it was hard to predict the cost savings of its new hire proposals since it was hard to predict the level of turnover that would occur in the next two years. With respect to its proposal regarding medical insurance, TLI assured the UFCW Locals that TLI had no current proposal to change healthcare plans but simply wanted the option to do so if it could find a cheaper alternative in the next two years. The UFCW Locals pointed out that as a practical matter, any potential cost savings through an

alternative health insurance plan would be minimal given that any change (if at all) would likely not occur until just shortly before the contracts' expirations in August 2022.

22. TLI explained that it had a financial model that addressed various assumptions regarding its future operations. In response to a request by the UFCW Locals, TLI agreed to make that financial model available. In response to the UFCW Locals' assertion that TLI seemed to have two primary goals—maintaining labor harmony, while mitigating future liabilities—TLI agreed.

Kings Responds on September 12 to the Union's Questions of September 10

23. On September 12, the Debtors' partially responded to the Union inquiries of September 10. Among other responses, Kings provided: (a) a one page "Store 4-Wall EBITDA Summary" of its 35 stores; (b) a one-page "Sunday Premium Savings Estimate (increasing its prior estimate); (c) a one-page "Overtime Savings Estimate" in annual savings, and (d) a one-page "Full-Time Employee Scheduling Savings Estimate" in annual savings. A copy of the Company's September 12 email and a redacted version of its response is attached as Exhibit C. The UFCW considers the annual savings to be minimal.

Kings Explains Its September 12 Response

24. On September 13, 2020, in response to a question by the Union, Kings confirmed that the three savings estimates provided on September 12 were created subsequent to September 8, the day that the Company gave the first estimate for Sunday premium pay and assured the UFCW Locals that Kings did "not have comparable estimates for the savings it will achieve from its overtime and scheduling proposals." A copy of the Company's September 13 email is attached as Exhibit D.

25. On September 14, 2020, again in response to a question by the Union, Kings explained that on September 5, the Debtors stated "there are no documents which reflect how each store is being valued" because it did not consider the "Store 4-Wall EBITDA Summary" to be a document that reflected "how each store is being valued whether by Kings,

TLI and/or potential buyers." A copy of the Company's September 14 email is attached as Exhibit E.

Kings Provides Addition Responses on September 17

26. As of the filing of the Union Objection on September 17, 2020, TLI had not provided the Union the financial model that addressed various assumptions regarding its future operations as TLI said it would on September 11. Nor had Kings provided, as requested on September 10, (a) "a copy of the financial presentations, power points, and other materials that the company used in any presentation or proposal to TLI," or (b) "each bid that Kings received for company assets since it started the marketing process and any documents reflecting whether the bidder would agree to contribute to the UFCW defined benefits pension funds."

27. On September 17, 2020, after the Union filed its Objection, Kings sent an email in response to a UFCW question that same day and to supplement its September 12 responses to the UFCW's September 10 request for information. A copy of the Company's September 17 email and a redacted copy of its response is attached as Exhibit F.

28. As of the filing of this declaration, TLI has not provided the Union the financial model that addressed various assumptions regarding its future operations as TLI said it would on September 11, 2020.

On September 18, the UFCW Offers a Counter-Proposal

29. Late in the afternoon of September 18, 2020 (admittedly on the eve of Rosh Hashanah, but as soon as the Union was able), the Union emailed Kings with a counter-proposal. A copy of the Union's September 18 email and counter-proposal is attached as Exhibit G.

30. Kings has premised all negotiations to date on an assumption—that the Stalking Horse, TLI, will be the only bidder or "almost certainly" has collective bargaining demands identical to any other possible bidder. Motion ¶ 47.

31. As the UFCW set forth in its Objection, given that the bid deadline is October 9, this assumption is unwarranted and premature. The UFCW has nonetheless offered a counter-proposal that is premised on Kings' assertions regarding TLI's intent. The counter-proposal is expressly conditioned on the closing of a sale to TLI and provides that "If TLI is not the successful bidder or a sale is not concluded, the current CBAs between Kings and the UFCW Locals remain in full effect."

32. The Union is prepared to negotiate with any potential purchaser, but the UFCW's counter-proposal to Kings on September 18 is without prejudice to the Union's ability to negotiate different terms (if any) with other interested purchasers.

33. Since September 18, 2020, Kings' counsel has asked Union counsel to clarify the counter-proposal, Union counsel has done so, and Kings' counsel has indicated the Company is working on a response.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the contents of the foregoing Declaration are true and correct to the best of my information and belief.

Dated: September 21, 2020

By: _____
DAVID T. YOUNG